# 11-2420 cv

In the

# United States Court of Appeals

## for the Second Circuit

Alfred G. Osterweil,

*Plaintiff - Appellant*,

v.

George R. Bartlett, III,
In his official capacity as Licensing Officer in the County of Schoharie,

*Defendant – Appellee*,

David A. Paterson, in his official capacity as
Governor of the State of New York; Andrew M. Cuomo, in his official capacity as
Attorney General of the State of New York,

*Defendants*.

**On Appeal from the United States District Court
for the Northern District of New York (Syracuse)**

## BRIEF FOR APPELLANT ALFRED G. OSTERWEIL

Paul D. Clement
D. Zachary Hudson
BANCROFT PLLC
1919 M Street, N.W., Suite 470
Washington, D.C. 20036
(202) 234-0090
pclement@bancroftpllc.com

Daniel L. Schmutter
GREENBAUM, ROWE, SMITH
  & DAVIS LLP
P.O. Box 5600
Woodbridge, NJ 07095
(732) 549-5600
dschmutter@greenbaumlaw.com

*Counsel for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Appellant hereby certifies that none of the parties to this case are corporate entities.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................i

TABLE OF AUTHORITIES ................................................ iii

JURISDICTIONAL STATEMENT ..........................................1

STATEMENT OF ISSUES PRESENTED...............................1

STATEMENT OF THE CASE..............................................2

STATEMENT OF FACTS ...................................................4

SUMMARY OF ARGUMENT .............................................9

STANDARD OF REVIEW .................................................16

ARGUMENT ....................................................................16

I.    New York's Ban On Home Handgun Possession By Part-Time State Residents Violates the Second Amendment.........................................16

    A.    New York's Ban On Home Handgun Possession By Part-Time State Residents Is, At A Minimum, Subject To Strict Scrutiny. ............................................................17

    B.    New York's Ban On Home Handgun Possession By Part-Time State Residents Substantially and Unconstitutionally Burdens Second Amendment Rights. .................................................30

II.    New York's Residency Requirement Arbitrarily Burdens The Fundamental Rights Of Part-Time State Residents In Violation Of The Equal Protection Clause. .......................................................42

CONCLUSION .................................................................45

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ...................................................35

*Bach v. Pataki*, 408 F.3d 75 (2d Cir. 2005) ...........................................37

*Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989)................................40

*Burdick v. Takushi*, 504 U.S. 428 (1992)................................................22

*Carey v. Brown*, 447 U.S. 455 (1980) ...................................................36

*Chan v. City of Troy*, 559 N.W.2d 374 (Mich. Ct. App. 1996) ...............................45

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)................ 15, 42, 43

*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984)...........................24

*Clark v. Jeter*, 486 U.S. 456 (1988).......................................................18

*Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177 (2007)...........................................23

*\*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................................... *passim*

*Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214 (1989) ...........................35

*Fla. Star v. B.J.F.*, 491 U.S. 524 (1989) ................................................36

*Foucha v. Lousiana*, 504 U.S. 71 (1992).................................................18

*Harper v. Va. Bd. of Elections*, 383 U.S. 663 (1966) ..............................42

*Heller v. District of Columbia*, No. 10-7036, 2011 WL 4551558
    (D.C. Cir. Oct. 4, 2011) ...................................................34

*In re Davies*, 506 N.Y.S.2d 626 (Oswego Cnty. Ct., N.Y. 1986) ...........................31

*Jeffreys v. City of N.Y.*, 426 F.3d 549 (2d Cir. 2005) ...............................16

*Johnson v. California*, 543 U.S. 499 (2005).........................................25

*Kramer v. Union Free School District*, 395 U.S. 621 (1969)......................... 42, 43

*Lawrence v. Texas*, 539 U.S. 558 (2003) ..................................................18

*Mahoney v. Lewis*, 199 A.D.2d 734 (N.Y. App. Div. 1993) ...................... 7, 31, 32

*Maslow v. Bd. of Elections in City of N.Y.*, 658 F.3d 291 (2d Cir. 2011) ..............16

*\*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) ................................ *passim*

*Nordlinger v. Hahn*, 505 U.S. 1 (1992) ...................................................44

*People v. Bounsari*, 915 N.Y.S.2d 921 (Rochester City Ct., 2011) .......................45

*People v. Perkins*, 62 A.D.3d 1160 (N.Y. App. Ct. 2009) ..................................31

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) ..............17

*Plyler v. Doe*, 457 U.S. 202 (1982)........................................................42

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) .................................... 25, 27

*Reno v. Flores*, 507 U.S. 292 (1993) ......................................................18

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973)...........................17

*Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82 (2d Cir. 2009) ..................................18

*State v. Chumphol*, 634 P.2d 451 (Nev. 1981) ...........................................45

*Thompson v. Western States Medical Center*, 535 U.S. 357 (2002) ......................22

*Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997) ...........................22

*Ullman v. United States*, 350 U.S. 422 (1956) ..........................................29

*United States v. Carolene Prods. Co.*, 304 U.S. 144 (1938) ..................................18

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010)...........................................40

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)......................... 26, 27, 28

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000)................... 35, 36

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) .............................................26

iv

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982) ................................................................29

*Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353 (2009) ............................................23

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985)..........................18

**Constitutional Provisions**

*U.S. Const. amend. II ........................................................................................16

**Statutes**

28 U.S.C. § 1291 ..................................................................................................1

28 U.S.C. § 1294 ..................................................................................................1

28 U.S.C. § 1331 ..................................................................................................1

42 U.S.C. § 1983 .......................................................................................... 1, 3, 8

N.Y. Penal Law § 261.01(5) ...............................................................................45

N.Y. Penal Law § 265.00(10) ...............................................................................5

N.Y. Penal Law § 265.01(1) ...........................................................................4, 31

N.Y. Penal Law § 265.02(4) ...........................................................................4, 31

N.Y. Penal Law § 265.20 .................................................................................4, 31

N.Y. Penal Law § 400.00 ...................................................................... 14, 31, 40

N.Y. Penal Law § 400.00(1) .................................................................................5

N.Y. Penal Law § 400.00(2)(a)........................................................................4, 5

N.Y. Penal Law § 400.00(3) .................................................................................5

N.Y. Penal Law § 400.00(3)(a)........................................................................3, 6

N.Y. Penal Law § 400.00(4) ...........................................................................5, 38

N.Y. Penal Law § 400.00(11) .............................................................................39

**Other Authorities**

Brief for the United States as Amicus Curiae, District of Columbia v. Heller,
    554 U.S. 570 (2008) (No. 07-290), 2008 WL 157201 ..................................22

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-
    Defense: An Analytical Framework and a Research Agenda*, 56
    UCLA L. Rev. 1443, 1449 (2009)................................................................26

Irving Brant, The Fourth President: A Life of James Madison (1970) ...................34

The Federalist No. 46 (James Madison) .................................................................34

*Citations upon which Appellant primarily relies are marked with asterisks.

## JURISDICTIONAL STATEMENT

This case was originally filed in the United States District Court for the Northern District of New York on July 21, 2009. A7.[1] The District Court had subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as it involves claims arising under 42 U.S.C. § 1983 and the Constitution. On May 20, 2011, the District Court entered a final judgment disposing of all claims. A180; *see* A151 (2011 WL 1983340). Plaintiff-Appellant filed a timely notice of appeal on June 13, 2011. A181. This Court has appellate jurisdiction pursuant to 28 U.S.C. §§ 1291 & 1294.

## STATEMENT OF ISSUES PRESENTED

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), the Supreme Court of the United States made clear that the Second Amendment to the United States Constitution guarantees the fundamental right of an individual to possess a handgun in his home for the purpose of self-defense. According to New York State, however, an individual can only have one such home. Thus, according to New York, if you own a home in New York and live there with your family, but that home is not your primary residence, you have no right to possess a handgun for self-defense.

---

[1] Citations to the District Court docket (No. 09-CV-00825) are designated "Doc." followed by the appropriate document number and page number, and citations to the Joint Appendix are designated "A__."

Plaintiff-Appellant Alfred G. Osterweil ("Mr. Osterweil") owns a home in New York, but only lives in that home part of the year. Because of that fact, he was denied a license to keep a handgun in his New York home. This case requires the Court to decide:

1.     Whether the District Court erred by holding that New York's statutory scheme denying handgun permits to all individuals whose "primary residence" is in another State does not violate the fundamental Second Amendment right to keep and bear arms in defense of hearth and home.

2.     Whether in light of the recognition in *Heller* and *McDonald* of the fundamental nature of Second Amendment rights, the Equal Protection Clause permits New York to distinguish between domiciliary residents and non-domiciliary residents when it comes to the right to keep and bear arms in the home.

## STATEMENT OF THE CASE

Mr. Osterweil is a part-time resident of Schoharie County, New York. Although Mr. Osterweil owns a home in Schoharie, pays property taxes on that home, and spends several months there each year, his "domicile" is in Louisiana. Mr. Osterweil applied for and was denied a license to keep a handgun in his New York home. The licensing officer, George R. Bartlett, III ("Bartlett"), based his denial of Mr. Osterweil's request on his part-time resident status: New York law only provides for the issuance of home handgun licenses to "residents," where

2

"residence" means "domicile," of which there can be only one. A7; *see* N.Y. Penal Law § 400.00(3)(a).

Mr. Osterweil filed this suit against Bartlett and other state officials pursuant to 42 U.S.C. § 1983, alleging that New York's domicile requirement, which denies part-time residents the ability to obtain a permit to possess a handgun in their homes, abridges his fundamental Second Amendment right to keep and bear arms. A7. The complaint further alleged that New York's treatment of part-time residents, as compared to those domiciled in New York, violates the Equal Protection Clause of the Fourteenth Amendment. A7.

The Honorable Mae A. D'Agostino, United States District Court Judge for the Northern District of New York, granted summary judgment in favor of defendants. A180. Notwithstanding *Heller*'s clear recognition of a Second Amendment right to possess a firearm in the home and *McDonald*'s recognition of the Second Amendment's status as a fundamental right fully applicable against state action, the court applied intermediate scrutiny and held that the New York domicile requirement serves the "significant interest" of "allow[ing] the government to monitor its licensees more closely and better ensure public safety," and that "there is a substantial relationship between New York's residency requirement and the government's" interest. A169–A171. The District Court also

concluded that "New York's different treatment of nonresidents does not violate the Equal Protection Clause."  A172.

Mr. Osterweil now appeals the District Court's judgment.

## STATEMENT OF FACTS

Mr. Osterweil is a retired attorney who previously served in the U.S. Army. A108.  For a number of years, Mr. Osterweil lived with his family full time on a 21-acre plot of land in Schoharie County at 310 Rossman Fly Road, Summit, New York.  A14.  While in Schoharie, Mr. Osterweil served as a commissioner on the Summit Fire District Board of Commissioners and as an unpaid member of the Board of Directors of the Western Catskills Revitalization Corporation.  After he retired, he decided to split his time between New York and Louisiana.  He now spends the majority of his time in Louisiana and is domiciled there.  Mr. Osterweil keeps a .22-caliber revolver in his Louisiana home for purposes of self-defense. A107, A110.

On May 21, 2008, Mr. Osterweil applied to Schoharie County officials for a New York State pistol license pursuant to Penal Law § 400.00(2)(a), without which he may not lawfully possess a handgun in his home under New York law. A7; A25 ¶ 2.[2]  To obtain a license, an applicant must meet several requirements.

---

[2] New York law imposes a general ban on handgun possession.  N.Y. Penal Law §§ 265.01(1), 265.02(4), 265.20.  In order to legally possess a handgun, one must

4

The licensing process begins with the submission of an application to the local licensing officer.[3]  § 400.00(3).  The applicant must be over 21 years of age, of good moral character, not have a history of crime or mental illness, and there must not exist any other "good cause" for denying the license.  § 400.00(1).  The application triggers a local investigation probing the applicant's mental health and criminal history, moral character, and, in some circumstances, whether there is a "need" for the requested license.  § 400.00(4).  The investigating authority also takes the applicant's fingerprints and uses that information to check for criminal history through the New York State Division of Criminal Justice Services ("DCJS"), the National Crime Information Center ("NCIC"), and the Federal Bureau of Investigation.  *See ibid*; A57.  The New York licensing law also states that an application for "a license to carry or possess a pistol or revolver" "shall be made . . . to the licensing officer in the city or county . . . where the applicant

---

qualify for an enumerated statutory exemption from that prohibition.  Having a § 400.00(2)(a) license provides such an exemption.  It should be noted, however, that the constitutional validity of presumptively banning the exercise of a fundamental right (here, the possession of a handgun for self-defense within the home) and then creating "an exception" to the ban by way of a licensing scheme is a question that is not before the court in this case.

[3] The identity of the licensing officer varies from place to place under New York law.  In many places, the licensing officer is the state "judge or justice of a court of record having his office in the county of issuance." § 265.00(10).  In some instances, the police commissioner or sheriff plays the role. *Ibid*.

resides, is principally employed or has his principal place of business as merchant or storekeeper." § 400.00(3)(a).

Mr. Osterweil's home-handgun license application set this statutory machinery in motion. The Schoharie County Sheriff initiated the required investigation. A25 ¶ 3. He verified the information set forth in Mr. Osterweil's application, contacted his references, conducted a background check using state information resources and the NCIC, and obtained and submitted Mr. Osterweil's fingerprints to the DCJS and the FBI. A25 ¶ 3.

On June 24, 2008, the Sheriff sent a letter to Mr. Osterweil informing him that he needed to come to the Sheriff's office "to correct and/or complete some information" on his application. A25–A26 ¶ 4. In a letter sent on June 25, 2008, Mr. Osterweil informed the Sheriff that since he had applied for the permit he had purchased a home in Louisiana that he intended to use as his primary residence, and that he would now use his Schoharie residence for only part of the year. A26 ¶ 5. The letter inquired whether under such circumstances Mr. Osterweil was still eligible for a permit. A26 ¶ 5.

On August 13, 2008, the DCJS advised the Sheriff that it was unable to determine whether Mr. Osterweil had a criminal record because of "the poor quality of the fingerprint impressions received." A26 ¶ 8. And on July 31, 2008, the FBI similarly determined that "the quality of the characteristics" of Mr.

Osterweil's fingerprints was "too low to be used." A26 ¶ 9. A second set of fingerprints submitted by Mr. Osterweil were similarly insufficient to permit analysis. A26–A27 ¶ 11.

On February 18, 2009, the Sheriff informed Mr. Osterweil that he was forwarding his application to Bartlett. A27 ¶ 13. In a February 20, 2009 letter, Bartlett informed Mr. Osterweil of what he viewed as the two major obstacles to his application: (1) the absence of fingerprints that could be used by the DCJS and FBI, and (2) his residency. A27 ¶ 14. Mr. Osterweil responded with a letter on March 3, 2009, explaining to Bartlett various techniques that could be employed to address individuals with "worn fingerprints" and pointing out that the Sheriff failed to use such techniques. A27 ¶ 16.

After several exchanges between Mr. Osterweil and Bartlett, Bartlett issued a decision on May 29, 2009, denying Mr. Osterweil's request for a pistol permit. A134 (Exh. 21). Bartlett determined that Mr. Osterweil's application was incomplete because the Sheriff was never able to finish the statutorily required investigation due to the fingerprint issue. But that was not the reason for Bartlett's denial of Mr. Osterweil's application. Bartlett rejected Mr. Osterweil's request after concluding that pistol permits may not be issued to "non-residents," and that Mr. Osterweil was a "non-resident" under New York law. A143–A144 & n.2 (citing *Mahoney v. Lewis*, 199 A.D.2d 734, 735 (N.Y. App. Div. 1993) ("we

7

expressly have held that 'where a statute prescribes "residence" as a qualification for a privilege or the enjoyment of a benefit, the word is equivalent to "domicile". . . .'"). Bartlett further determined that New York's residency requirement was consistent with *Heller*. A145–A150.

Bartlett never concluded that Mr. Osterweil lacked the necessary character or qualifications to obtain a home handgun license. The license denial was predicated entirely on the conclusion that Mr. Osterweil is domiciled in Louisiana and therefore is not a New York resident, notwithstanding that Mr. Osterweil owns a home in New York and lives there part of the year with his wife, that he has family in Summit, and that Mr. Osterweil and his wife have participated and continue to participate in social, political, and community affairs in Schoharie County, including remaining as dues-paying members of the Summit Snow Riders, a local social group, and the Summit Conservation Club. A123.

Mr. Osterweil filed suit pursuant to 42 U.S.C. § 1983 against Bartlett, David A. Patterson, then Governor of the State of New York, and Andrew M. Cuomo, then Attorney General of the State of New York. A7. As relevant here, Mr. Osterweil's complaint alleged that the defendants denied him his fundamental Second Amendment right to keep and bear arms by denying his license request and that this denial ran afoul of the Equal Protection Clause. A10–A11.

After the defendants other than Bartlett were dismissed from the suit, Doc. 15, both Mr. Osterweil and Bartlett moved for summary judgment.[4]  A14, A22. The District Court ruled against Mr. Osterweil.  A151.  First, the District Court addressed the level of scrutiny applicable to Mr. Osterweil's constitutional claims. The District Court concluded that "fundamental constitutional rights are not invariably subject to strict scrutiny," and that strict scrutiny was inappropriate here. A164.  After reviewing a series of post-*Heller* cases, the District Court held "that intermediate scrutiny is the appropriate level of scrutiny for this case."  A168.  The court went on to conclude that the government had a "significant interest" in "monitor[ing] its licensees . . . [to] better ensure public safety," and that "there is a substantial relationship between New York's residency requirement and" achieving that interest.  A164–A171.  The District Court also concluded that "New York's different treatment of nonresidents does not violate the Equal Protection Clause."  A172.

## SUMMARY OF ARGUMENT

**I.** The decision below is fundamentally inconsistent with the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and

---

[4] Mr. Osterweil's Second Amendment claims were initially dismissed.  He filed a motion for reconsideration after the Supreme Court issued its decision in *McDonald v. Chicago*, 130 S. Ct. 3020 (2010), and Mr. Osterweil's Second Amendment claims were reinstated.  Doc. 22, 26.

*McDonald v. Chicago*, 130 S. Ct. 3020 (2010). *Heller* made clear that the Second Amendment protects individual rights as a general matter and the right to keep and bear a handgun for self-protection in the home in particular. *McDonald* recognized that the right protected by the Second Amendment is not just an individual one, but a fundamental right protected against intrusion from state and local governments via its incorporation through the Fourteenth Amendment. Those decisions make clear that the result here is indefensible—not one word in either decision suggests that the Second Amendment is a part-time right such that a lawful, but not full-year, resident may be denied an ability to possess a handgun in the home—and that the District Court applied a legal standard that provides insufficient protection for the right.

Restrictions on the right to keep and bear arms are subject to strict scrutiny. That conclusion follows directly from both *McDonald*'s holding that the right to keep and bear arms is a fundamental right and from *Heller*'s rejection of rational basis scrutiny and an "interest-balancing" approach, which was simply intermediate scrutiny by another name.

The District Court's reasons for applying only intermediate scrutiny to New York's ban on home handgun possession by part-time residents are unavailing. The District Court suggested that not every law that impedes a fundamental right is subject to strict scrutiny and cited First Amendment cases applying intermediate

10

scrutiny to prove the point. But Justice Breyer also cited First Amendment intermediate scrutiny cases to support his "interest-balancing" approach, and the majority rejected that standard as insufficiently protective of the right. What is more, New York's ban on part-time residents' possession in the home is no mere time, place, and manner restriction. It is a complete prohibition on the core right recognized in *Heller*.

Contrary to the District Court's conclusion, *Heller*'s "list of presumptively lawful regulatory measures" is in no way inconsistent with the application of strict scrutiny. A169. Presumptions can be rebutted, and there are certainly laws that would survive even the strictest of scrutiny or that would not be entitled to Second Amendment protection because the conduct at issue falls outside the scope of that protection. In all events, *Heller*'s underlying logic—that the right to keep and bear arms is fundamental and that restrictions on the right require strict scrutiny—is wholly consistent with its dictum that certain types of restrictions, such as bans on possession by felons and the mentally ill, are "presumptively lawful," *Heller*, 554 U.S. at 627 & n.26. In the end, given the general rule that restrictions on fundamental constitutional rights are subject to strict scrutiny and *McDonald*'s unequivocal holding that Second Amendment rights are fundamental, the contention that restrictions on Second Amendment rights should be permitted

11

under a less-demanding standard reduces to the contention that the right to keep and bear arms is a lesser right. It is not, and *McDonald* settles the matter.

New York's law amounts to a total prohibition of the exercise of the core right protected by the Second Amendment, and is thus unconstitutional. As interpreted and applied by the District Court, New York's handgun licensing scheme effectively eviscerates the right of part-time residents to defend their New York homes using handguns. Citing New York case law, the court concluded that "[n]onresidents without in-state employment are completely excluded from the [State's] license-application procedure," and thus conclusively prohibited from keeping a handgun in their home. A159. That complete ban cannot be squared with *Heller*, which made clear that the core purpose of the Second Amendment right is to allow "law-abiding, responsible citizens to use arms in defense of hearth and home" where the need for self-defense "is most acute." 554 U.S. at 628, 635.

Defense of home is not less vital or constitutionally protected when the hearth is only fired up during a part of the year. If anything, the constitutional right is more vital for part-time residents because part-time residences tend to be more rural and the absence of full-time occupants can make them attractive targets for criminal activity. Moreover, "handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 629. The New York law makes it impossible for

12

part-time residents like Mr. Osterweil to use handguns "for the core lawful purpose of self-defense and is hence unconstitutional." *Ibid.*

*Heller*'s dispositive treatment of bans on handguns in the home demands reversal of the District Court's decision. But the New York ban on home handgun possession by part-time residents also fails strict scrutiny. The New York law prevents part-time residents who are not domiciliaries from possessing handguns in their homes based on a purported interest in monitoring licensees. But there is no time limit linked to the domicile requirement, as domicile is largely determined by the subjective basis of a person's intent. Indeed, one could be domiciled in New York and spend little-to-no time there. So, a New York domiciliary can have a license to have a handgun in their home spending nearly no time there, and a non-domiciliary who spends nearly all of his time in New York cannot. That the law elides such a broad swath of conduct relevant to its stated monitoring interest completely undermines the assertion that the interest is compelling and clearly demonstrates that the law lacks the necessary narrow tailoring to withstand scrutiny. Furthermore, there is no evidence that the residency requirement in and of itself does anything to further the State's asserted interests.

What is more, categorically excluding *all* non-domiciliaries is certainly not the least restrictive means of achieving the State's monitoring and public safety goals. The part-time resident possession ban is not limited to those individuals

13

who pose a heightened threat to others, or to circumstances that for some other reason might create a particularly acute danger. Moreover, there are myriad other ways that the State could achieve its goals short of an illegitimate and unnecessary categorical ban.

Indeed, New York's ban on part-time resident home handgun possession fails even intermediate scrutiny, properly applied. The District Court found a "substantial relationship between New York's residency requirement and the government's significant interest" primarily because the "State is in a considerably better position to monitor residents' eligibility for firearm licenses as compared to nonresidents." A170. But it is not at all clear that this is true, as Mr. Osterweil's case demonstrates. Beyond his residency and issues with his fingerprints—an issue not unique to "nonresidents"—Mr. Osterweil would have easily qualified for a license under § 400.00. Nothing about his part-time resident status made it more cumbersome to ascertain his eligibility. And the court engaged in no meaningful consideration of the fit between the State's claimed interest and the contours of its regulatory scheme. It is also critical to recognize that New York's policy works a complete ban on a part-time resident's possession in the home. New York does not defer to licensing decisions of the domiciliary state or provide any alternative through which the State's purported interests could be addressed. *Heller* makes

14

crystal clear that a complete ban is not a constitutional option when it comes to handguns in the home.

**II.** New York's ban on non-resident handgun possession suffers from a second fatal flaw: it violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. When "state laws impinge on personal rights protected by the Constitution" "strict scrutiny" applies, and such laws "will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

As already discussed, the State lacks a compelling interest to justify imposing a complete ban on part-time residents' constitutional right to possess handguns in their home, and has no adequate justification for treating full-time residents and part-time residents differently. Mr. Osterweil has the same interest in protecting his family when staying at his home in Schoharie as do his New York-domiciled neighbors down the street. What is more, the facts of Mr. Osterweil's case show that the conclusion the District Court relied on—that it is harder to obtain information about nonresidents—is incorrect. Other than usable fingerprints, Bartlett had all the information he needed to decide whether Mr. Osterweil was deserving of a handgun license. The only thing standing between Mr. Osterweil and the license he desired was his part-time residency.

## STANDARD OF REVIEW

This case presents "purely legal questions concerning the scope of the" Second Amendment and the Equal Protection Clause of the Fourteenth Amendment, and is thus subject to de novo review. *Maslow v. Bd. of Elections in City of N.Y.*, 658 F.3d 291, 295–96 (2d Cir. 2011). Because the District Court granted Bartlett's motion for summary judgment, any factual issues are construed in the light most favorable to Mr. Osterweil, the non-moving party. *Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005).

## ARGUMENT

### I. New York's Ban On Home Handgun Possession By Part-Time State Residents Violates the Second Amendment.

The Second Amendment provides that "A well regulated militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court recognized that the Second Amendment protects the individual right to keep and bear arms in the home and for self-defense. And in *McDonald v. Chicago*, 130 S. Ct. 3020, 3021, 3050 (2010), the Court concluded that "the Second Amendment right recognized in *Heller*" was a fundamental right that was fully applicable to the States. Those two precedents taken together should have made it crystal clear that New York's complete ban on a Mr. Osterweil's ability to possess a handgun for defense of his New York

16

property was unconstitutional. But those clear precedents did not stop the District Court from treating Second Amendment rights as second-class rights, wrongly applying intermediate scrutiny to a law that substantially burdens fundamental rights, and upholding a law that categorically and impermissibly bans home handgun possession by part-time residents.

### A.  New York's Ban On Home Handgun Possession By Part-Time State Residents Is, At A Minimum, Subject To Strict Scrutiny.

After *District of Columbia v. Heller* and *McDonald v. Chicago*, it should be clear that restrictions on the right to keep and bear arms are subject to strict scrutiny. Although a number of courts have resisted that conclusion and applied intermediate scrutiny or reserved strict scrutiny for invasions of the "core" of the right, the implications of *Heller* and *McDonald* are clear. That conclusion flows directly from *McDonald*'s holding that the right to keep and bear arms is incorporated through the Fourteenth Amendment because of its fundamental nature and from *Heller*'s rejection of rational basis scrutiny and an "interest-balancing" approach, which was simply intermediate scrutiny by another name.

When a law interferes with "fundamental constitutional rights," it is subject to "strict judicial scrutiny." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 15 (1973); *see Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983) ("strict scrutiny [is] applied when government action impinges upon a fundamental right protected by the Constitution"). Supreme Court precedent is

replete with such statements.  *See, e.g.*, *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 n.14 (1985) ("governments are entitled to attack problems piecemeal, save where their policies implicate rights so fundamental that strict scrutiny must be applied"); *Lawrence v. Texas*, 539 U.S. 558, 586 (2003) (Scalia, J., dissenting) ("the standard of review that [is] appropriate" for "a fundamental right" is "strict scrutiny") (internal quotation marks omitted); *Reno v. Flores*, 507 U.S. 292, 302 (1993) (due process "forbids the government to infringe certain 'fundamental' liberty interests . . . unless the infringement is narrowly tailored to serve a compelling state interest"); *Foucha v. Lousiana*, 504 U.S. 71, 115 (1992) (Thomas, J., dissenting) ("Certain substantive rights we have recognized as 'fundamental'; legislation trenching upon these is subjected to 'strict scrutiny' . . . ."); *Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("classifications affecting fundamental rights . . . are given the most exacting scrutiny"); *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938) ("There may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution . . . .").  And this Court has recognized that it "must evaluate policies with strict scrutiny if they . . . implicate a fundamental right."  *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 99 n.6 (2d Cir. 2009).[5]

---

[5] Of course, the levels-of-scrutiny framework does not govern if an enumerated

*McDonald* removed all doubt about the fundamental nature of the right to keep and bear arms, declaring that "the right to bear arms was fundamental to the newly formed system of government." 130 S. Ct. at 3037; *see id.* at 3042 ("[T]he Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty."); *id.* at 3041 ("Evidence from the period immediately following the ratification of the Fourteenth Amendment only confirms that the right to keep and bear arms was considered fundamental."); *id.* at 3037 ("The right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of Rights."); *id.* at 3040 (39th Congress' "efforts to safeguard the right to keep and bear arms demonstrate that the right was still recognized to be fundamental"); *id.* at 3041 ("In debating the Fourteenth Amendment, the 39th Congress referred to the right to keep and bear arms as a fundamental right deserving of protection.").

Indeed, whether the right to keep and bear arms is fundamental was the basic question presented in *McDonald*. The Court stated that in deciding "whether the Second Amendment right to keep and bear arms is incorporated in the concept of due process, . . . we must decide whether the right to keep and bear arms is

---

right directly suggests its own standard, such as the Fourth Amendment's prohibition on "unreasonable searches," or is by its terms absolute where it applies, such as the Sixth Amendment's guarantee that the accused "shall enjoy," *inter alia*, the right to confront witnesses.

19

fundamental to our scheme of ordered liberty." *Id.* at 3036 (emphasis omitted). And the same basic question featured prominently in *Heller*. The first sentence of the Court's analysis of this question in *McDonald* states that "*Heller* points unmistakably to [an affirmative] answer." *Id.*[6] *Heller* explained that, "[b]y the time of the founding, the right to have arms had become fundamental for English subjects." 554 U.S. at 593. It was this fundamental "pre-existing right" that the Second Amendment "codified." *Id.* at 592 (emphasis omitted). Accordingly, the right to keep and bear arms—like any other fundamental right—should be subject to strict scrutiny.

*Heller* did not explicitly state that "strict scrutiny" is required of laws that restrict the rights protected by the Second Amendment. That is because the *Heller* court eschewed levels of scrutiny in favor of an approach that focused more directly on history, which provided a clear answer as to the constitutionality of the ordinance before the Court in *Heller*. As *Heller* explained, "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban." 554 U.S. at 629; *see also id.* at 634. Nonetheless, *Heller* points

---

[6] Importantly, Justice Thomas joined this part of the opinion of the Court and agreed that the Second Amendment right is fundamental. *See id.* at 3059 (Thomas, J., concurring in part and concurring in the judgment) ("[T]he plurality opinion concludes that the right to keep and bear arms applies to the States through the Fourteenth Amendment's Due Process Clause because it is 'fundamental' to the American 'scheme of ordered liberty' . . . . I agree with that description of the right.").

20

clearly to strict scrutiny as the level of scrutiny that would be required within a levels-of-scrutiny framework or when history does not provide a definitive answer, and *McDonald*'s incorporation holding eliminated any potential doubt on that score. *Heller* may leave room for debate about when to apply strict scrutiny and when a *sui generis* historical approach should be applied, but *Heller* and *McDonald* leave no room for debate about what level of scrutiny applies when levels of scrutiny are applicable.

That strict scrutiny applies to laws that substantially burden Second Amendment rights is confirmed by the approaches that the Supreme Court rejected in *Heller* and *McDonald*. *Heller* explicitly and definitively rejected not only rational basis review, *id.* at 628 n.27, but also the "interest-balancing" approach endorsed by Justice Breyer—which is intermediate scrutiny by another name. *See id.* at 634; *McDonald*, 130 S. Ct. at 3050 (plurality op.) ("while [Justice Breyer's] opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion"). Justice Breyer called his approach "interest-balancing" because of his view that the government's interest in regulating firearms—some version of protecting public safety—would always be important or compelling. Thus, in his view, whether the level of scrutiny applied was strict (requiring a compelling government interest) or intermediate (requiring only an important interest), the government interest would always qualify, and the analysis would

21

really turn on a search for the appropriate degree of fit, which Justice Breyer described as interest-balancing. *See Heller*, 554 U.S. at 689–90 (Breyer, J., dissenting).

Semantics aside, Justice Breyer's approach in substance was simply intermediate scrutiny. Justice Breyer relied (*see id.* at 690) on cases such as *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997), and *Thompson v. Western States Medical Center*, 535 U.S. 357 (2002), which explicitly apply intermediate scrutiny. Even more revealingly, Justice Breyer invoked *Burdick v. Takushi*, 504 U.S. 428 (1992), the case on which the United States principally relied in advocating that the Court adopt intermediate scrutiny. *See* Brief for the United States as Amicus Curiae at 8, 24, 28, District of Columbia v. Heller, 554 U.S. 570 (2008) (No. 07-290), 2008 WL 157201. Justice Breyer's interest-balancing amounted to intermediate scrutiny, and the Court rejected it (and reaffirmed that rejection in *McDonald*).

*Heller* and *McDonald* make clear that the kind of reasonableness review that applies in the intermediate scrutiny context is so malleable that it provides "no constitutional guarantee at all." *Heller*, 554 U.S. at 634. A standard rejected by both *Heller* and *McDonald* as categorically underprotective of Second Amendment rights clearly cannot govern analysis of regulations that substantially burden such

rights, and it was entirely inappropriate for the District Court to apply intermediate scrutiny to Mr. Osterweil's Second Amendment challenge.

The District Court's reasons for applying intermediate scrutiny to New York's ban on home handgun possession by part-time residents are unavailing. The District Court first observed that "fundamental constitutional rights are not invariably subject to strict scrutiny." A164. In support of this proposition, the District Court cited First Amendment cases and noted that in some instances "content-neutral restrictions on the time, place and manner of speech are subject to a form of intermediate scrutiny." A164. But the court's invocation of the First Amendment actually underscores the case for strict scrutiny. It can hardly be denied that the default mode of analysis for a direct government restriction of free speech is strict scrutiny. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009); *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188 (2007). To be sure, the Court has over the years developed a more relaxed standard for certain kinds of restrictions that, based on judicial experience, can be subject to a different test. But none of that assists Bartlett. One context where strict scrutiny does not apply (at least currently) is so-called commercial speech. And for just that reason, Justice Breyer invoked a commercial speech case—*Thompson*—for his balancing-approach version of intermediate scrutiny. The Court rejected that standard as

23

insufficiently protective. Justice Breyer also invoked *Turner*, another First Amendment intermediate scrutiny case. Once again, the Court rejected it.

The time, place, and manner cases invoked by the District Court are even more obviously inapposite. Those cases by definition involve limitations—not complete bans like that at issue here—and time, place, and manner restrictions must "leave open ample alternative channels for communication" to be constitutional. If they do not leave open such alternatives, the consequence is not that strict scrutiny applies; such restrictions are per se unconstitutional. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). The District Court followed the bad example of a handful of other courts, and applied a standard endorsed by Justice Breyer, but rejected by the majority of the Court. Given the complete ban on Mr. Osterweil's ability to possess a handgun to protect his New York home, the appropriate First Amendment analog is the default mode of analysis for government efforts to ban a category of speech—strict scrutiny applies.

Next, taking a cue from Justice Breyer's *Heller* dissent, *see* 554 U.S. at 687–88, the District Court concluded that *Heller*'s "list of presumptively lawful regulatory measures is at least implicitly inconsistent with strict scrutiny." A159. Not so. *Heller*'s underlying logic—that the right to keep and bear arms is fundamental and that restrictions on the right require strict scrutiny—is wholly

24

consistent with its dictum that certain types of restrictions, such as bans on possession by felons and the mentally ill and "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," are "presumptively lawful," *id.* at 626–27 & n.26.

First, a State obviously has a compelling interest in prohibiting firearm possession by violent felons and the insane. The interest in keeping private firearms out of certain truly sensitive places may be compelling as well. Thus, it was of no great moment that the *Heller* Court suggested that in future cases the government might easily prove that laws prohibiting firearm possession by convicted felons, or possession in sensitive places like courthouses or prisons, satisfy strict scrutiny. Because "[t]he fact that strict scrutiny applies says nothing about the ultimate validity of any particular law" predicting that such restrictions will be upheld is in no way inconsistent with requiring strict scrutiny. *Johnson v. California*, 543 U.S. 499, 515 (2005) (internal quotation marks omitted); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 n.6 (1992) (stating that in the First Amendment context "presumptive invalidity does not mean invariable invalidity"). Courts should not overread *Heller*'s "presumptively lawful" dictum to mean any more than that.

Second, it is possible that the *Heller* Court may have been stating merely that, based on its preliminary understanding of the relevant history, such

restrictions appear to fall outside the bounds of the right as understood at the time of the Framing, with future cases available to test that proposition and refine the precise contours of the right. *See* 554 U.S. at 635 ("The First Amendment contains the freedom-of speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed views. The Second Amendment is no different . . . . [T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us.").[7] Indeed, in his concurring opinion in *McDonald*, Justice Scalia specifically explained that "[t]he traditional restrictions [on the right to keep and bear arms] go to show the scope of the right, not its lack of fundamental character." *McDonald*, 130 S. Ct. at 3056 (Scalia, J., concurring).

The need for strict scrutiny of restrictions on the rights protected by the Second Amendment is hardly undermined by the recognition that there may be

---

[7] *See also United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) ("That *some* categorical limits are proper is part of the original meaning . . . ."); *United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010) ("[T]he identified restrictions [could be] presumptively lawful because they regulate conduct outside the scope of the Second Amendment . . . [or] because they pass muster under any standard of scrutiny."); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1449 (2009) ("Sometimes, a constitutional right isn't violated by a restriction because the restriction is outside the terms of the right as set forth by the constitution.").

categories of conduct relating to keeping and bearing arms that fall outside the scope of the Second Amendment. After all, the fact that there are categories of unprotected speech is hardly a justification for applying less than strict scrutiny to laws that restrict protected speech. *See, e.g.*, *R.A.V.*, 505 U.S. at 382–83 ("From 1791 to the present . . . our society . . . has permitted restrictions upon the content of speech in a few limited areas . . . . We have recognized that 'the freedom of speech' referred to by the First Amendment does not include a freedom to disregard these traditional limitations."). Just as "a limited categorical approach has remained an important part of our First Amendment jurisprudence," *id.* at 383, *Heller*'s suggestion that certain categories of historically supported restrictions are lawful is entirely consistent with recognizing that restrictions on rights that are protected by the Second Amendment must be subjected to strict scrutiny.

The District Court also heavily relied on a case from the Third Circuit, *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), which declined to apply strict scrutiny. A165–A167. But *Marzzarella* is inapposite. *Marzzarella* addressed a law prohibiting possession of a gun with an obliterated serial number and struck it down under intermediate scrutiny. 614 F.3d at 97. In doing so, the court recognized that the statute at issue "does not severely limit the possession of firearms," and that the "District of Columbia's handgun ban is an example of a law at the far end of the spectrum of infringement on protected Second Amendment

rights . . . . It did not just regulate possession of handguns; it prohibited it, even for the stated fundamental interest protected by the right—the defense of hearth and home." *Ibid.* Indeed, the Third Circuit *did* apply strict scrutiny to the serial number obliteration law after applying intermediate scrutiny, presumably because it was not sure that even a law that "does not severely limit the possession of firearms" should be subjected to anything less. *Id.* at 97, 99. The wisdom of the Third Circuit's distinction and approach notwithstanding, it is safe to say that the *Marzzarella* court would not have applied intermediate scrutiny to New York's ban on handgun possession in the homes of part-time residents, and that the District Court was wrong to rely on *Marzzarella* (and cases relying on *Marzzarella*) in so doing.

In the end, given the general rule that restrictions on fundamental constitutional rights are subject to strict scrutiny, the contention that restrictions on Second Amendment rights should be permitted under a less-demanding standard reduces to the contention that the right to keep and bear arms is a lesser right. It is not. Any such contention would have been deeply misguided before *McDonald*, and in light of *McDonald* no such contention is even remotely tenable.

First, the Court has reiterated that it is improper to prefer certain enumerated constitutional rights while relegating others to a lower plane: No constitutional right is "less 'fundamental' than" another, and there is "no principled basis on

28

which to create a hierarchy of constitutional values . . . ." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 484 (1982); *accord Ullman v. United States*, 350 U.S. 422, 428–29 (1956) ("To view a particular provision of the Bill of Rights with disfavor inevitably results in a constricted application of it. This is to disrespect the Constitution.").

Second, the Court has applied this rule against "disrespect[ing] the Constitution" in the specific context of the right to keep and bear arms and has emphatically rejected repeated attempts to deprive that right of the same dignity afforded other fundamental rights. *Ullman*, 350 U.S. at 428–29. *Heller* admonished that "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." 554 U.S. at 634. And *Heller* explained that the "Second Amendment is no different" from the First Amendment in that it was the product of interest-balancing by the people themselves. *Id.* at 635. In *McDonald*, confronted with the argument that the Second Amendment right, even though an individual, enumerated right as held by *Heller*, should be deemed less than fundamental, the Court rejected that argument in the plainest terms: "what [respondents] must mean is that the Second Amendment should be singled out for special—and specifically unfavorable—treatment. We reject that suggestion." 130 S. Ct. at 3043. (plurality op.); *see also*

*id.* at 3044 (rejecting plea to "treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees").

It is accordingly too late in the day to argue that the right to keep and bear arms is less fundamental than the other individual rights enumerated in the Constitution. There is consequently no basis to review restrictions on that right under anything less demanding than the strict scrutiny that governs challenges to restrictions on other fundamental rights. *Heller*'s historical approach was no less demanding than ordinary strict scrutiny, and certain types of restrictions may be conducive to that approach. But to the extent that a levels-of-scrutiny analysis is to apply, the scrutiny must be strict.

### B. New York's Ban On Home Handgun Possession By Part-Time State Residents Substantially and Unconstitutionally Burdens Second Amendment Rights.

New York's law amounts to a total prohibition of the exercise of the core right protected by the Second Amendment, and is thus unconstitutional. As interpreted and applied by the District Court, New York's handgun licensing scheme effectively eviscerates the right of part-time residents to defend their New York homes using handguns. Citing New York case law, the court concluded that "[n]onresidents without in-state employment are completely excluded from the [State's] license-application procedure," and thus conclusively prohibited from

30

keeping a handgun in their home. A159; *see* N.Y. Penal Law §§ 265.01(1), 265.02(4), 265.20, 400.00.[8] As the District Court recognized, "New York courts have limited resident applications to persons who are New York domiciliaries," A159 n.2; *see Mahoney v. Lewis*, 199 A.D.2d 734, 735 (N.Y. App. Div. 1993) ("we have expressly held that 'where a statute prescribes 'residence' as a qualification for a privilege or the enjoyment of a benefit, the word is equivalent to 'domicile' . . . . '"), where "domicile" is defined as a person's "true and permanent home, to which he has at all times the intention of, sooner or later, returning"— where a person "owns a home, maintains voter and motor vehicle registration, and . . . holds a job." *In re Davies*, 506 N.Y.S.2d 626, 628–29 (Oswego Cnty. Ct., N.Y. 1986) (internal quotation marks omitted).[9] Those definitions may work for

---

[8] The New York Supreme Court, Appellate Division, Third District, has upheld the State's general licensing scheme against a *Heller*-based challenge, holding that "article 265 does not effect [a] complete ban on handguns and is, therefore, not [a] 'severe restriction' improperly infringing upon . . . Second Amendment rights." *People v. Perkins*, 62 A.D.3d 1160, 1161 (N.Y. App. Ct. 2009). Whatever the merits of that conclusion, it certainly cannot apply to article 265's application to affect a complete ban on possession of handguns in the homes of part-time residents.

[9] It is not at all clear that *Mahoney*'s evaluation of § 400's residency requirement remains good law in *Heller*'s wake. The *Mahoney* court stated that "we expressly have held that 'where a statute prescribes "residence" as a qualification for a privilege or the enjoyment of a benefit, the word is equivalent to "domicile" . . . . '" and that "possession and use of a pistol are not vested rights but privileges." 199 A.D.2d at 735. The *Mahoney* court's rights/privilege distinction, on which its residence/domicile distinction at least in part relied, was critically

31

some other licensing schemes, but it is not good enough when it comes to a fundamental right. If an individual lawfully owns a home and pays taxes on that home, a state cannot deny the homeowner the constitutional right to protect him on the ground that his legal domicile lies elsewhere.

This complete ban on home handgun possession by part-time New York residents who are not "domiciliaries" cannot be squared with *Heller*. *Heller* held that the District of Columbia's ban on handgun possession in the home violated the Second Amendment. *Heller*, 554 U.S. at 635. In so doing, the Court stated that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation," and that the core purpose of the right is to allow "law-abiding, responsible citizens to use arms in defense of hearth and home" where the need for self-defense "is most acute." *Id.* at 592, 628, 635. "[H]andguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 629.

The New York law makes it impossible for part-time residents like Mr. Osterweil to use handguns "for the core lawful purpose of self-defense and is

undermined by *Heller*. What is more, *Mahoney*'s domicile requirement may have been wrongly applied to Mr. Osterweil in the first place. *Mahoney* stated that New York's residency requirement necessitated "more than mere ownership of land." *Id.* Mr. Osterweil is not a mere New York land owner; for part of the year, he actually resides in New York and remains involved in the Summit, New York community.

hence unconstitutional." *Heller*, 554 U.S. at 630. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home." *Heller*, 554 U.S. at 636; *see McDonald*, 130 S. Ct. at 3044 ("[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home."); *id.* at 3048 (The right to keep and bear arms is "valued because the possession of firearms [i]s thought to be essential for self-defense."). There is no reason to think that the part-time nature of Mr. Osterweil's occupancy of his New York home should impact the calculus. The Second Amendment is not a second-class right, nor is it a part-time one. An individual living part-time in a home has no less need for self-protection and may in fact have an even greater need. Second homes are often more rural, and the fact that such homes are not constantly inhabited can make them attractive targets for criminal activity.

The scope of Mr. Osterweil's Second Amendment right to defend his hearth and home cannot be eviscerated by an arbitrary temporal distinction. *Heller* did not base its holding on how many months out of the year a person lives in his home, where he is registered to vote, or where he has his driver's license. As explained in *Heller*, and reaffirmed in *McDonald*, the right to keep and bear arms arises from the fundamental right of self-defense, which is most acute in the home.

The fundamental right of self-defense is no less acute because one has more than one home, or spends less than twelve months per year in one's home. To be sure, those likely to cause a confrontation or illegally enter a home will be neither impressed nor deterred by the part-time nature of a person's occupancy.[10]

Lest there be any doubt, the New York law at issue here is quite unlike the "longstanding prohibitions on the possession of firearms" that the Court suggested might be acceptable, such as bans on the possession of firearms by felons, the mentally ill, and minors, as well as "laws forbidding the carrying of firearms in sensitive places," "or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27. Nor is it an effort to defer

---

[10] The Founding-era sources on which *Heller* relied do not suggest that the part-time nature of Mr. Osterweil's occupancy is of any constitutional relevance. "Justice James Wilson interpreted the Pennsylvania Constitution's arms-bearing right, for example, as a recognition of the natural right to defense 'of one's person or house'—what he called the law of 'self preservation.'" *Heller*, 554 U.S. at 585 (quoting 2 Collected Works of James Wilson 1142, & n.x (K. Hall & M. Hall eds. 2007); *see id.* at 594 (quoting 1 Blackstone 136, 139 (1765)).

And surely the Founders themselves would not have drawn such a distinction. In Federalist paper No. 46, James Madison wrote of what "citizens with arms in their hands" can accomplish. The Federalist No. 46 (James Madison). Madison, a Virginian, would have been shocked to find that his right to possess a weapon was somehow less sacrosanct during his temporary stays in the Capitol for public service than when in his permanent home outside Montpelier, Virginia. *See* Irving Brant, The Fourth President: A Life of James Madison (1970); *cf. Heller v. District of Columbia*, No. 10-7036, 2011 WL 4551558, at *23 (D.C. Cir. Oct. 4, 2011) (Kavanaugh, J., dissenting) ("*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition . . . .").

to the licensing decision of another state, whether positive or negative. A part-time resident fully licensed in his state of domicile still cannot lawfully possess a handgun in his New York home. New York's law amounts to a total prohibition of the exercise of the core right protected by the Second Amendment. And the fact that this ban is the product of a regulatory scheme and not a specific legislative prohibition is of no moment; "a statute which, under the pretense of regulating, amounts to a destruction of the right . . . [is] clearly unconstitutional." *Id.* at 629.

*Heller*'s dispositive treatment of bans on handguns in the home demands reversal of the District Court's decision. But the New York ban on home handgun possession by part-time residents also fails strict scrutiny. The District Court more or less conceded as much, admitting that "prohibiting gun possession by nearly all nonresidents might not be the most precisely focused means to achieve th[e State's] end[s]." A171. Such a conceded lack of focus is fatal under strict scrutiny.

Under strict scrutiny, a law infringing a constitutional right must be narrowly tailored to serve a compelling government interest. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). To be narrowly tailored, a law must actually advance the compelling interest it is designed to serve, and be the least restrictive means of achieving that advancement. *See Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 226 (1989); *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). Burdening a significant amount of conduct not implicating the

35

asserted interest is evidence that the law at issue is inadequately tailored. When applying strict scrutiny, the challenged law is presumed invalid, and the government bears the burden of rebutting that presumption. *Playboy Entm't Grp.*, 529 U.S. at 817.

The interest that the State advanced below in support of the home handgun ban, and that the District Court concluded was "important" and "substantial," was the interest in "allow[ing] the government to monitor its licensees more closely and better ensure public safety." A169. Neither of those interests is sufficient. The interest of the government in monitoring its licensees cannot itself be a compelling interest in any republic worthy of the name. A licensing process with adequate monitoring might be a means to some other compelling end, but it cannot be an end in itself. Public safety, on the other hand, may be compelling, but it is far too general to suffice for constitutional analysis. And combining the two interests does not solve the problem.

When a law or regulation fails to cover a substantial swath of conduct implicating the asserted compelling interest, such underinclusiveness not only demonstrates the absence of narrow tailoring, but also serves as evidence that the interest is not significant enough to justify the regulation. *See Carey v. Brown*, 447 U.S. 455, 465 (1980); *see also Fla. Star v. B.J.F.*, 491 U.S. 524, 541–42 (1989) (Scalia, J., concurring) ("[A] law cannot be regarded as protecting an interest of the

highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.") (citation and internal quotation marks omitted). Here, the New York law prevents part-time residents who are not domiciliaries from possessing handguns in their homes. But there is no time limit linked to the domicile requirement. One could be domiciled in New York and spend little-to-no time there. So, a New York domiciliary can have a license to have a handgun in their home spending nearly no time there, and a non-domiciliary who spends substantially more time in New York cannot. This completely undermines the assertion that the State's interest in monitoring its licensees is compelling.[11]

---

[11] This Court addressed New York's licensing requirement in *Bach v. Pataki*, 408 F.3d 75, 88 (2d Cir. 2005). In *Bach*, a Virginia resident sought a permit to carry a pistol while visiting his parents. *Id.* at 76. When Bach learned he was not eligible for such a license, he filed suit against the State officials responsible for administering the licensing scheme. *Id.* at 77. *Bach* is, at best, of marginal relevance here. First of all, *Bach* held that the Second Amendment right to keep and bear arms "imposes a limitation on only federal, not state, legislative efforts," and disposed of Bach's Second Amendment claim on that ground. *Id.* at 85–86. Thus *Bach*'s views on the scope and nature of Second Amendment rights are outdated. Second, the facts at issue in Bach are quite different from this case. Mr. Osterweil owns a home in New York and spends part of the year living in that home. The same cannot be said of Bach, who the Court deemed a "mere visitor[]." *Id.* at 92. Finally, though *Bach* concluded that "New York's interest in monitoring gun licensees"—"an interest in continually obtaining relevant behavioral information"—"is substantial and [] New York's restriction of licenses to residents and persons working primarily within the State is sufficiently related to th[at] interest," *id.* at 88, 91, that conclusion was clearly infected by the Court's misapprehension of Second Amendment rights. And, in any event, the Court described the State's interest as "substantial," not "compelling," and thus *Bach*—

Even assuming, however, that the State does have a compelling interest in ensuring public safety through monitoring its licensees, the New York part-time resident handgun possession ban is not narrowly tailored to serve that interest. First, as just discussed, there is a profound mismatch between the asserted interest and the actual requirement. Second, there is no evidence that the residency requirement in and of itself does anything to further the State's public safety interest. The application process that an individual must go through to obtain a handgun possession permit in New York is robust. The required investigation involves checking references, consulting FBI databases, and taking fingerprints. *See* N.Y. Penal Law § 400.00(4). The application package is reviewed by a licensing officer, often a judge. *Ibid.* It is hard to imagine what added benefit excluding part-time residents from obtaining licenses could add. Moreover, the logical answer to any legitimate concerns with the ability to monitor those domiciled elsewhere would be deference to the licensing decision of the state of domicile. But this New York will not do. New York cannot simultaneously insist that it must do its own independent licensing process for property owners domiciled elsewhere and that those domiciled elsewhere need not apply.

---

even if it were still good law—would dictate that the State's monitoring interest fails strict scrutiny.

38

What is more, categorically excluding *all* non-domiciliaries is certainly not the least restrictive means of achieving the State's monitoring and public safety goals. The part-time resident possession ban is not limited to those individuals who pose a heightened threat to others, or to circumstances that for some other reason might create a particularly acute danger to the public. Moreover, there are myriad ways that the State could achieve its goals—such as periodically consulting the national and comprehensive NCIC database that it already consults during licensing, requiring annual application updates from part-time residents, or cooperating with the law enforcement organs of other states—short of its illegitimate and unnecessary categorical ban. Indeed, the New York licensing law contemplates that there are available and useful mechanisms for monitoring out-of-state behavior: Penal Law § 400.00(11) provides that a handgun license can be suspended upon conviction for a felony or serious offense "anywhere."

Furthermore, despite the District Court's contrary conclusion, New York's ban on part-time resident in-home handgun possession fails even intermediate scrutiny. The District Court found a "substantial relationship between New York's residency requirement and the government's significant interest" primarily because the "State is in a considerably better position to monitor residents' eligibility for firearm licenses as compared to nonresidents." A170. But it is not at all clear that this is true, as Mr. Osterweil's case demonstrates. Beyond his residency and issues

39

with his fingerprints—an issue not unique to "nonresidents"—Mr. Osterweil would have easily qualified for a license under § 400.00. Nothing about his part-time resident status made it more cumbersome to ascertain his eligibility.

It appears that the District Court only found otherwise based on its decision to ignore *Heller*'s warnings and insert its own policy concerns into the analysis. *See* A170 (listing studies detailing the "well-documented" "harm caused by gun violence"). In doing so, the District Court effectively rendered its ultimate ruling a foregone conclusion. Having already decided that firearms are dangerous, the court had little difficulty in summarily declaring that the State's interest in monitoring was "'significant, 'substantial,' or 'important,'" and that there was "a substantial relationship between New York's residency requirement and the government's significant interest." A170. The court all but eliminated the government's burden to demonstrate that a restriction on a fundamental right is constitutional—a burden of proof that should have applied even under the "intermediate scrutiny" analysis that the District Court purported to apply. *See, e.g.*, *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) ("[U]nless the conduct at issue is not protected by the Second Amendment at all, the Government bears the burden of justifying the constitutional validity of the law."). But even more to the point, the District Court's analysis is reminiscent of the interest-balancing approach

40

advocated by Justice Breyer and rejected by the Court. When it comes to balancing general public safety concerns with the right to possess a handgun for self-protection in the home, the Constitution itself has done all the interest-balancing that is necessary. *See Heller*, 554 U.S. at 635.

In fact, the District Court appears to have applied a level of scrutiny even less protective of Second Amendment rights than Justice Breyer's rejected approach in *Heller*. Justice Breyer presumed that the government would always have a compelling or important interest in regulating Second Amendment rights, meaning courts should focus on the reasonableness of the fit between the regulation and the government's interest. *See Heller*, 554 U.S. at 687–91 (Breyer, J., dissenting). But the District Court did Justice Breyer one better. Once the court concluded that the government had an important interest in monitoring licensees, it deemed that interest sufficient to sustain an outright ban on possession by part-time residents. The court engaged in no meaningful consideration of the fit between the State's interest and its regulatory scheme.

Only the District Court's decision to apply a test less demanding than the unequivocally rejected "interest-balancing" test could explain the result below. A per se ban on home gun ownership for part-time residents would violate any meaningful conception of the Second Amendment or intermediate scrutiny. Courts would not tolerate for one second a regime that granted free speech or the privilege

41

against self-incrimination only to a State's full-time residents. The Second Amendment is no different. Under any appropriate standard of review, this Court should reverse the District Court's judgment.

## II. New York's Residency Requirement Arbitrarily Burdens The Fundamental Rights Of Part-Time State Residents In Violation Of The Equal Protection Clause.

New York's ban on non-resident handgun possession suffers from a second fatal flaw: it violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Equal Protection Clause commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. *Plyler v. Doe*, 457 U.S. 202, 216 (1982).

When "state laws impinge on personal rights protected by the Constitution" "strict scrutiny" applies, and such laws "will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *see Harper v. Va. Bd. of Elections*, 383 U.S. 663, 670 (1966) ("[W]here fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized."). For example, in *Kramer v. Union Free School District*, 395 U.S. 621, 626–29 (1969), the Court struck down a law limiting the right to vote in school district elections to property owners and parents of school children, finding

that the classification failed under strict scrutiny. The Court explained that where fundamental rights are concerned, the issue is not whether the legislative judgment and resulting classification had some basis, but whether the distinctions "do in fact sufficiently further a compelling state interest to justify denying the franchise to appellant and members of his class." *Id.* at 633.

The District Court recognized that "[w]here a statute burdens a fundamental right . . . it is subject to heightened scrutiny under the Fourteenth Amendment's Equal Protection Clause." A172 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)). After stating the appropriate standard, however, the court proceeded to give Mr. Osterweil's equal protection claim short shrift. The Court simply stated: "it is clear that New York state residents and nonresidents are not similarly situated in terms of the state's ability to obtain information about and monitor the potential licensee's eligibility or continued eligibility for a firearm's license. As such, New York's different treatment of nonresidents does not violate the Equal Protection Clause." A172. But that amounts to no more than saying that the State has a rational basis for its classification; it is not an explanation of why strict scrutiny is satisfied.

As already discussed, the State lacks a compelling interest in denying part-time residents the right to possess handguns in their home, and thus there is no justification for treating full-time residents and part-time residents differently. Mr.

43

Osterweil has the same interest in protecting his family when staying at his home in Schoharie as do his domiciliary neighbors down the street. Again, if anything, his lack of year-round occupation may enhance the need for self-protection. Moreover, any state policy for non-domiciliaries that was remotely consistent with the Equal Protection Clause would include deference to the state of domicile as an important component. New York does nothing of the sort. It makes no difference whether a part-time resident is fully licensed in the state of domicile. No matter how many days they spend in their New York home, which is treated like all others for taxing purposes, they have no ability to lawfully possess a handgun for self-defense in that home.

What is more, the facts of Mr. Osterweil's case show that the conclusion the District Court relied on—that it is harder to obtain information about nonresidents—is incorrect. Other than usable fingerprints, Bartlett had all the information he needed to decide whether Mr. Osterweil was deserving of a handgun license. The only thing standing between Mr. Osterweil and the license he desired was his part-time residency.

The Equal Protection Clause "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Mr. Osterweil has the same fundamental right to

possess a gun in defense of his New York residence as his New York neighbors.

Holding otherwise is clearly a violation of the Equal Protection Clause.[12]

## CONCLUSION

For the foregoing reasons, the Court should reverse the judgment below.

---

[12] In *People v. Bounsari*, 915 N.Y.S.2d 921 (Rochester City Ct., 2011), a New York court held that N.Y. Penal Law § 261.01(5)—which makes it a crime for a non-citizen to "possess[] any dangerous or deadly weapon"—was unconstitutional. In *Bounsari*, the State "stipulated that the law's constitutionality must be evaluated under a strict scrutiny analysis," but then "did not proffer any state interest, let alone a compelling state interest, to justify New York's discriminatory law." 915 N.Y.S.2d at 923. After considering possible justifications for the law, the court concluded that "[t]here is no conceivable reason that aliens should be distinguished from citizens to achieve the law's otherwise legitimate public safety objectives." *Id. See Chan v. City of Troy*, 559 N.W.2d 374 (Mich. Ct. App. 1996) (Michigan law allowing only U.S. citizens to obtain pistol permits unconstitutional); *State v. Chumphol*, 634 P.2d 451 (Nev. 1981) (Nevada law prohibiting aliens from possessing concealable arms unconstitutional). It would be strange indeed if lawful resident aliens, who happen to be residents of New York, are entitled to greater rights under the Second Amendment than U.S. citizens who are also residents of New York, but for only part of the year.

Respectfully submitted,

/s/ Daniel L. Schmutter

| | |
|---|---|
| Paul D. Clement | Daniel L. Schmutter |
| D. Zachary Hudson | GREENBAUM, ROWE, SMITH |
| BANCROFT PLLC | & DAVIS LLP |
| 1919 M St., N.W., Suite 470 | P.O. Box 5600 |
| Washington, D.C. 20036 | Woodbridge, NJ 07095 |
| Telephone: (202) 234-0900 | (732) 549-5600 |
| pclement@bancroftpllc.com | dschmutter@greenbaumlaw.com |

*Counsel for Plaintiff-Appellant*

January 26, 2012

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(B), the undersigned certifies that the brief complies with the applicable type-volume limitations. The brief contains 11,200 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This certificate relies upon Microsoft Word 2010's word count feature; the program used in drafting this brief. The brief complies with the typeface requirements for Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Words' word processing program in 14-point Times New Roman font.

Dated: January 26, 2012            Respectfully submitted,

                                  /s/ Daniel L. Schmutter
                                  Daniel L. Schmutter
                                  GREENBAUM, ROWE, SMITH
                                    & DAVIS LLP
                                  P.O. Box 5600
                                  Woodbridge, NJ 07095
                                  (732) 549-5600
                                  dschmutter@greenbaumlaw.com