# 11-2420 cv

In the

# United States Court of Appeals
## for the Second Circuit

Alfred G. Osterweil,

*Plaintiff - Appellant*,

v.

George R. Bartlett, III,
In his official capacity as Licensing Officer in the County of Schoharie,

*Defendant – Appellee*,

David A. Paterson, in his official capacity as
Governor of the State of New York; Andrew M. Cuomo, in his official capacity as
Attorney General of the State of New York,

*Defendants*.

**On Appeal from the United States District Court
for the Northern District of New York (Syracuse)**

## JOINT APPENDIX

Frank Brady
OFFICE OF THE
ATTORNEYGENERAL
The Capitol
Albany, NY 12224
(518) 474-7330

*Counsel for Defendant-
  Appellee*

Paul D. Clement
D. Zachary Hudson
BANCROFT PLLC
1919 M St., N.W., Suite 470
Washington, D.C. 20036
(202) 234-0090
pclement@bancroftpllc.com

Daniel L. Schmutter
GREENBAUM, ROWE,
  SMITH & DAVIS LLP
P.O. Box 5600
Woodbridge, NJ 07095
(732) 549-5600
dschmutter@greenbaumlaw.com

*Counsel for Plaintiff-Appellant*

# Table of Contents

**Page**

District Court Docket Entries ............................................................................................. A1

Complaint, with Civil Cover Sheet attachment,
    dated July 21, 2009 [Docs. 1, 1-2] ............................................................................ A7

Answer to Complaint,
    dated February 4, 2011 [Doc. 27] .............................................................................. A12

Plaintiff's Notice of Motion for Summary Judgment,
    dated August 2, 2010 [Doc. 30] ................................................................................. A14

Affidavit of Alfred G. Osterweil,
    dated March 4, 2009 [Doc. 33-1] ............................................................................... A17

Supplemental Affidavit of Alfred G. Osterweil,
    dated March 4, 2009 [Doc. 33-1] ............................................................................... A19

Affidavit of Alfred G. Osterweil,
    dated March 19, 2009 [Doc. 33-1] ............................................................................. A20

Notice of Cross Motion for Summary Judgment,
    dated March 11, 2011 [Doc. 33] ................................................................................. A22

Defendant's Statement of Material Facts,
    dated March 11, 2011 [Doc. 33-2] ............................................................................. A25

Defendant's Response to Plaintiff's Statement of Material Facts,
    dated March 11, 2011 [Doc. 33-3] ............................................................................. A33

Declaration & Exhibits of George R. Bartlett, III,
    dated October 25, 2010 [Doc. 33-1] .......................................................................... A34

Memorandum-Decision and Order of the Honorable Mae A. D'Agostino,
    dated May 20, 2011 [Doc. 36] .................................................................................... A151

Judgment in a Civil Case,
    dated May 20, 2011 [Doc. 37] .................................................................................... A180

Notice of Appeal,
    dated June 13, 2011 [Doc. 39] ................................................................................... A181

## U.S. District Court
## Northern District of New York - Main Office (Syracuse) [LIVE - Version 5.0.3] (Albany)
## CIVIL DOCKET FOR CASE #: 1:09-cv-00825-MAD-DRH

Osterweil v. Bartlett et al
Assigned to: U.S. District Judge Mae A. D'Agostino
Referred to: Magistrate Judge David R. Homer
Case in other court: 2nd Circuit, 11-02420
Cause: 42:1983 Civil Rights Act

Date Filed: 07/21/2009
Date Terminated: 05/20/2011
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Alfred G. Osterweil**
        represented by  **Alfred G. Osterweil**
197 Lawson Lane
Many, LA 71449
318-256-1484
PRO SE

V.

**Defendant**

**George R. Bartlett, III**
*In his official capacity as Licensing Officer*
*in the County of Schoharie*
        represented by  **James B. McGowan**
New York State Department of Law -
Albany Office
The Capitol
Albany, NY 12224
518-473-6522
Fax: 518-473-1572
Email: James.McGowan@oag.state.ny.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Roger W. Kinsey**
Office of Attorney General - Albany
State of New York
The Capitol
Albany, NY 12224
518-473-6288
Fax: 518-473-1572
Email: roger.kinsey@oag.state.ny.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**David A. Paterson**
*In his official capacity as Governor of the*
*State of New York*
*TERMINATED: 02/24/2010*
        represented by  **Roger W. Kinsey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Andrew M. Cuomo**
*In his official capacity as Attorney General*
*of the State of New York*
*TERMINATED: 02/24/2010*

represented by **Roger W. Kinsey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/21/2009 | 1 | COMPLAINT against George R. Bartlett III, David A. Paterson, and Andrew M. Cuomo (Filing fee paid: $350; receipt number ALB5199) filed by Alfred G. Osterweil, Pro Se. (Attachments: # 1 Civil Cover Sheet)(sg) (Entered: 07/21/2009) |
| 07/21/2009 | | Summons Issued on 7/21/2009 as to George R. Bartlett III, David A. Paterson, and Andrew M. Cuomo. (sg) (Entered: 07/21/2009) |
| 07/21/2009 | 2 | G.O. 25 FILING ORDER ISSUED: Initial Conference set for 11/25/2009 at 9:00 AM in Albany before Magistrate Judge David R. Homer. Civil Case Management Plan due by 11/16/2009. (sg) (Entered: 07/21/2009) |
| 07/21/2009 | 3 | PRO SE HANDBOOK and NOTICE issued and explained at time complaint was filed. (sg ) (Entered: 07/21/2009) |
| 07/24/2009 | 4 | SUMMONS Returned Executed by Alfred G. Osterweil. David A. Paterson served on 7/21/2009, answer due 8/10/2009. (ban) (Entered: 07/24/2009) |
| 07/24/2009 | 5 | SUMMONS Returned Executed by Alfred G. Osterweil. George R. Bartlett III served on 7/23/2009, answer due 8/12/2009. (ban) (Entered: 07/24/2009) |
| 08/05/2009 | 6 | Letter Motion from Roger W. Kinsey for George R. Bartlett III, David A. Paterson, Andrew M. Cuomo requesting extension of time in which to respond to the complaint submitted to Judge Homer. (Kinsey, Roger) (Entered: 08/05/2009) |
| 08/07/2009 | 7 | ORDER granting 6 Letter Request, George R. Bartlett III answer due 9/12/2009; David A. Paterson answer due 9/12/2009; Andrew M. Cuomo answer due 9/12/2009. Signed by Magistrate Judge David R. Homer on 8/7/09. (tab) (Entered: 08/07/2009) |
| 09/03/2009 | 8 | MOTION to Dismiss Motion Hearing set for 10/15/2009 09:00 AM in Albany before Judge Gary L. Sharpe Response to Motion due by 9/28/2009 Reply to Response to Motion due by 10/5/2009. filed by George R. Bartlett III, David A. Paterson, Andrew M. Cuomo. (Attachments: # 1 Memorandum of Law Defendants' Memo, # 2 Appendix Appendix of unreported cases) (Kinsey, Roger) Modified on 9/3/2009 (jel, ). (Entered: 09/03/2009) |
| 09/03/2009 | | CLERK'S CORRECTION OF DOCKET ENTRY - Corrected docket entry 8 Motion to Dismiss to reflect the location for the motion return for Albany and not Binghamton. (jel, ) (Entered: 09/03/2009) |
| 09/03/2009 | 9 | AFFIDAVIT of Service for Notice of Motion to Dismiss *and Supporting Memo* served on Plaintiff on 9/3/2009, filed by George R. Bartlett III, David A. Paterson, Andrew M. Cuomo. (Kinsey, Roger) (Entered: 09/03/2009) |
| 09/17/2009 | 11 | MEMORANDUM OF LAW in opposition to 8 Motion to Dismiss, filed by Alfred G. Osterweil. (tab) (Entered: 09/18/2009) |
| 09/18/2009 | 10 | REPLY to Response to Motion re 8 MOTION to Dismiss filed by George R. Bartlett III, David A. Paterson, Andrew M. Cuomo. (Kinsey, Roger) (Entered: 09/18/2009) |

| 09/21/2009 | 12 | AFFIDAVIT of Service by Mail of plaintiff's 11 Memorandum and Appendix served on 9/16/09 upon Roger W. Kinsey, Office of Attorney General, filed by Alfred G. Osterweil. (sg ) (Entered: 09/22/2009) |
|---|---|---|
| 10/13/2009 | | TEXT ONLY NOTICE of Hearing on Motion 8 MOTION to Dismiss : Motion Hearing set for 10/15/2009 at 09:00 AM in Albany before Judge Gary L. Sharpe will be on SUBMIT only. No personal appearances are needed. (jel, ) (Entered: 10/13/2009) |
| 10/14/2009 | | Mailed copy of the October 13, 2009 text only notice to all non cm/ecf parties. (jel, ) (Entered: 10/14/2009) |
| 10/15/2009 | 13 | Letter Motion from Roger W. Kinsey for George R. Bartlett III, David A. Paterson, Andrew M. Cuomo requesting adjourn the Rule 16 conference submitted to Judge Homer. (Kinsey, Roger) (Entered: 10/15/2009) |
| 10/16/2009 | | TEXT NOTICE re 13 . The Rule 16 Conference set for November 25, 2009 with Magistrate Judge Homer is ADJOURNED WITHOUT DATE pending decision on the dispositive motion before Judge Sharpe. [copy of Text Notice sent by regular mail to plaintiff pro se.] (lah, ) (Entered: 10/16/2009) |
| 10/27/2009 | 14 | NOTICE of Change of Address by Alfred G. Osterweil Effective Date 10/30/09 Old Address: 310 Rossman Fly Road, Summit, NY 12175 New Address: 197 Lawson Lane, Many Louisiana 71449 (tab) (Entered: 10/28/2009) |
| 02/24/2010 | 15 | MEMORANDUM-DECISION AND ORDER: ORDERED that defendants' 8 motion to dismiss is GRANTED as to Osterweil's first, second, and third causes of action, and those causes of action are DISMISSED; ORDERED that defendants' 8 motion to dismiss is DENIED as to Osterweil's fourth, fifth, and sixth causes of action; ORDERED that defendants David A. Paterson and Andrew M.Cuomo are DISMISSED from the action. Signed by Judge Gary L. Sharpe on 2/24/2010. (mgh) (Entered: 02/24/2010) |
| 02/24/2010 | | Memorandum-Decision and Order Dkt. No. 15 served on plaintiff via regular mail. (mgh) (Entered: 02/24/2010) |
| 03/10/2010 | | TEXT NOTICE. A Telephone Rule 16 Scheduling Conference will be held with Magistrate Judge David R. Homer on MARCH 22, 2010 at 9:30 AM. The court will initiate the conference call. The parties shall e-file a Civil Case Management Plan on or before 3/18/2010. [A copy of the text notice sent by regular mail to plaintiff pro se.] (lah, ) (Entered: 03/10/2010) |
| 03/15/2010 | 16 | CIVIL CASE MANAGEMENT PLAN by George R. Bartlett, III. (Kinsey, Roger) (Entered: 03/15/2010) |
| 03/22/2010 | | Minute Entry for proceedings held before Magistrate Judge David R. Homer. A Rule 16 Conference was held by telephone on 3/22/2010 with Alfred Osterweil, plaintiff pro se, and AAG Roger Kinsey, counsel for defendant. Neither party foresees the need for any discovery beyond the Rule 26 disclosures already made by defendant. Both parties expect that the case will be decided on motions by the Supreme Court. There is no possibility of settlement as this case presents a purely legal issue. The case will opt-out of ADR. A scheduling order will be entered. A telephone status conference will be held on 7/19/2010 at 11:00 AM to assess the status of the case. [copy of Text Minute Entry sent by regular mail to plaintiff pro se] (lah, ) (Entered: 03/24/2010) |
| 03/24/2010 | | TEXT NOTICE. A Telephone Status Conference will be held with Magistrate Judge |

| | | |
|---|---|---|
| | | David R. Homer on JULY 19, 2010 at 11:30 AM [EST]. The Court will initiate the conference call. [copy of Text Notice sent by regular mail to plaintiff pro se] (lah, ) (Entered: 03/24/2010) |
| 03/24/2010 | 17 | UNIFORM PRETRIAL SCHEDULING ORDER: Anticipated length of trial: two days. Preferred Trial Location: Albany. Joinder of Parties due by 5/1/2010. Amended Pleadings due by 5/1/2010. Discovery due by 8/1/2010. Motions to be filed by 10/1/2010.This action has been Opted Out of the district's ADR program. Signed by Magistrate Judge David R. Homer on 3/24/2010. (mgh) (Entered: 03/24/2010) |
| 03/24/2010 | 18 | Uniform Pretrial Scheduling Order Dkt No. 17 served on plaintiff via regular mail. (mgh) (Entered: 03/24/2010) |
| 07/02/2010 | 19 | Letter Motion for Alfred G. Osterweil requesting that the Court reconsider its Decision and Order issued on February 24, 2010 in light of the recent Supreme Court opinion in McDonald v. Chicago submitted to Judge Sharpe. (mgh) (Entered: 07/07/2010) |
| 07/19/2010 | | Minute Entry for proceedings held before Magistrate Judge David R. Homer. A TelephoneStatus Conference was held on 7/19/2010 with defendant's counsel, AAG Roger Kinsey. Plaintiff was not available for the conference. Two telephone calls to the telephone number of plaintiff listed on the docket went unanswered. Messages were left. AAG Kinsey advised that the parties do not require any discovery and the matter will be presented as a purely legal issue in a dispositive motion. [copy of minute entry sent by regular mail to Alfred Osterweil] (lah, ) (Entered: 07/21/2010) |
| 07/27/2010 | 20 | Letter from Alfred G. Osterweil advising the Court of his current address information. Secondary Address as follows: 310 Rossman Fly Road, Summit, NY 12175(mgh) (Entered: 07/28/2010) |
| 08/06/2010 | 21 | ORDER, the court has reviewed the plaintiff's 19 Letter Motion requesting that the Court reconsider its Decision and Order issued on February 24, 2010 in light of the recent Supreme Court opinion in McDonald v. Chicago and directs the plaintiff to submit a formal motion in full compliance with the local rules. Signed by Judge Gary L. Sharpe on 8/6/2010. (jel, ) (Entered: 08/06/2010) |
| 08/06/2010 | | Mailed copy of the 21 letter/order to all non cm/ecf parties. (jel, ) (Entered: 08/06/2010) |
| 08/18/2010 | 22 | MOTION to Vacate 15 Order on Motion to Dismiss, filed by Alfred G. Osterweil. (Attachments: # 1 Memorandum of Law, # 2 Affidavit of Alfred G. Osterweil, # 3 Cover Letter) (mgh) (Entered: 08/20/2010) |
| 08/26/2010 | | TEXT ONLY NOTICE of Hearing on Motion 22 MOTION to Vacate 15 Order on Motion to Dismiss, : Response to Motion due by 9/20/2010. Motion Hearing set for 10/7/2010 at 09:00 AM in Albany before Judge Gary L. Sharpe on SUBMIT only. No personal appearances are needed. (jel, ) (Entered: 08/26/2010) |
| 08/26/2010 | | Mailed copy of the August 26, 2010 text only notice to all non cm/ecf parties. (jel, ) (Entered: 08/26/2010) |
| 09/07/2010 | 23 | LETTER BRIEF *on Second Amendment Claims* by George R. Bartlett, III. (Kinsey, Roger) (Entered: 09/07/2010) |
| 09/23/2010 | 24 | Letter Motion from Roger W. Kinsey for George R. Bartlett, III requesting adjournment of motion date submitted to Judge Homer *and joined by Plaintiff Osterweil*. (Kinsey, Roger) (Entered: 09/23/2010) |

| 09/24/2010 | 25 | ORDER granting 24 Letter Request adjourning dispositive motion deadline. Signed by Magistrate Judge David R. Homer on 9/23/2010. {Order served on plaintiff via regular mail} (mgh) (Entered: 09/24/2010) |
|---|---|---|
| 02/04/2011 | 26 | MEMORANDUM-DECISION and ORDER, that Osterweil's 22 Motion for Reconsideration is GRANTED. That this court's February 24, 2010 Memorandum-Decision and Order is REVERSED insofar as it dimissed Osterweil's first, second, and third causes of action. That Osterweil's first, second and third causes of action are REINSTATED. Signed by Judge Gary L. Sharpe on 2/4/2011. (jel, ) (Entered: 02/04/2011) |
| 02/04/2011 |  | Mailed copy of the 26 Memorandum-Decision and Order to all non cm/ecf parties. (jel, ) (Entered: 02/04/2011) |
| 02/04/2011 | 27 | ANSWER to 1 Complaint by George R. Bartlett, III. (Attachments: # 1 Declaration of service of Answer by traditional means)(McGowan, James) (Entered: 02/04/2011) |
| 02/08/2011 | 28 | Letter Motion from AAG McGowan for George R. Bartlett, III requesting an extension of the dispositive motion deadline to April 5, 2011, on consent from plaintiff pro se submitted to Judge Homer. (McGowan, James) (Entered: 02/08/2011) |
| 02/09/2011 | 29 | ORDER granting 28 Letter Request. Dispositive Motions to be filed by 4/5/2011. Signed by Magistrate Judge David R. Homer on 2/9/2011. {Order served on plaintiff via regular mail} (mgh) (Entered: 02/09/2011) |
| 02/17/2011 | 30 | MOTION for Summary Judgment filed by Alfred G. Osterweil. (mgh) (Entered: 02/17/2011) |
| 02/25/2011 | 31 | Letter Motion from AAG McGowan for George R. Bartlett, III requesting an extension of time to April 5, 2011, to respond to plaintiff's motion for summary judgment set forth at Docket # 30 submitted to Judge Homer. (McGowan, James) (Entered: 02/25/2011) |
| 03/01/2011 | 32 | ORDER granting 31 Letter Request re 30 MOTION for Summary Judgment. Request is GRANTED. The defendants' response papers are to be filed on or before 4/5/2011. The plaintiff's reply papers are to be filed on or before 4/19/2011. The motion hearing has been scheduled for 5/5/2011 at 9:00 a.m. on SUBMIT only. No personal appearances are needed. Signed by Judge Gary L. Sharpe on 3/1/2011. (dpk) (Entered: 03/01/2011) |
| 03/11/2011 | 33 | Cross MOTION for Summary Judgment Motion Hearing set for 5/10/2011 09:00 AM in Albany before Judge Gary L. Sharpe Response to Motion due by 4/25/2011 Reply to Response to Motion due by 4/29/2011. filed by George R. Bartlett, III. (Attachments: # 1 Declaration Bartlett Declaration, # 2 Statement of Material Facts Defendants Statement, # 3 Statement of Material Facts Defendant's response to Plaintiff's Statement, # 4 Memorandum of Law Defendant's Memo of Law) (Kinsey, Roger) (Entered: 03/11/2011) |
| 03/24/2011 | 34 | RESPONSE in Opposition re 33 Cross MOTION for Summary Judgment filed by Alfred G. Osterweil. (Attachments: # 1 Cover Letter)(mgh) (Entered: 03/24/2011) |
| 04/20/2011 | 35 | ORDER REASSIGNING CASE. Case reassigned to U.S. District Judge Mae A. D'Agostino for all further proceedings. Judge Gary L. Sharpe no longer assigned to case. Signed by Chief Judge Norman A. Mordue on 4/20/11. (ban) (Entered: 04/20/2011) |
| 04/20/2011 |  | Mailed a copy of 35 Order Reassigning case to All Non-ECF parties. (ban) (Entered: |

| | | 04/20/2011) |
|---|---|---|
| 04/25/2011 | | TEXT NOTICE of Hearing on Motion 30 MOTION for Summary Judgment, 33 Cross MOTION for Summary Judgment: The Motion Hearing is reset for 5/17/2011 10:00 AM in Albany (ON SUBMIT) before U.S. District Judge Mae A. D'Agostino. Response to Motion due by 4/25/2011, Reply to Response to Motion due by 4/29/2011. The Motions will be decided on the submission of the papers, only. NO personal appearances are necessary. No further submissions will be accepted without the prior approval of the Court.(ban) (Entered: 04/25/2011) |
| 04/25/2011 | | Mailed a copy of the 4/25/11 Text Notice re-setting the motion hearing, to all Non-ECF parties. (ban) (Entered: 04/25/2011) |
| 05/20/2011 | 36 | MEMORANDUM-DECISION AND ORDER. ORDERED that plaintiff's 30 Motion for Summary Judgment is DENIED in its entirety; ORDERED that defendant's 33 Cross-Motion for Summary Judgment is GRANTED in its entirety. Signed by U.S. District Judge Mae A. D'Agostino on 5/20/11. (ban) (Entered: 05/20/2011) |
| 05/20/2011 | 37 | JUDGMENT in favor of George R. Bartlett, III against Alfred G. Osterweil. IT IS ORDERED AND ADJUDGED that plaintiff's motion for summary judgment is DENIED in its entirety; ORDERED taht defendant's cross motion for summary judgment is GRANTED in its entirety, all in accordance with the Memorandum-Decision and Order of the Honorable Mae A. D'Agostino, signed 5/20/11. (ban) (Entered: 05/20/2011) |
| 05/20/2011 | | Mailed a copy of [36, 37] to Pro se Plaintiff Alfred Osterweil, via certified mail/Return receipt. (ban) (Entered: 05/20/2011) |
| 05/27/2011 | 38 | Acknowledgment of Receipt of Certified Mail 36 Order on Motion for Summary Judgment 37 Judgment, received by Alfred Osterwel on 5/23/2011 (mgh) (Entered: 05/31/2011) |
| 06/13/2011 | 39 | NOTICE OF APPEAL as to 36 Order on Motion for Summary Judgment 37 Judgment, by Alfred G. Osterweil. Filing fee $ 455, receipt number ALB006682. (mgh) (Entered: 06/13/2011) |
| 06/13/2011 | 40 | ELECTRONIC NOTICE AND CERTIFICATION sent to US Court of Appeals re 39 Notice of Appeal (mgh) (Entered: 06/13/2011) |
| 06/13/2011 | 41 | CERTIFICATE OF SERVICE by Alfred G. Osterweil re 39 Notice of Appeal (mgh) (Entered: 06/15/2011) |
| 08/09/2011 | | USCA Case Number is 11-2420 for 39 Appeal filed by Alfred G. Osterweil. (cbm ) (Entered: 08/09/2011) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/24/2012 14:16:39 | | | |
| PACER Login: | gr0015 | Client Code: | 23251-001dls |
| Description: | Docket Report | Search Criteria: | 1:09-cv-00825-MAD-DRH |
| Billable Pages: | 6 | Cost: | 0.48 |

1:09-CV-825(GLS/DRH)

**№JS 44** (Rev. 11/04)

# CIVIL COVER SHEET

**U.S. DISTRICT COURT
N.D. OF N.Y.
FILED**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a)   PLAINTIFFS**

ALFRED G. OSTRANDER

**(b)** County of Residence of First Listed Plaintiff  SCHOHARIE
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

PRO SE  518 287-1646

**DEFENDANTS**  GEORGE R. BARTLETT III,
DAVID A. PATERSON AND
LAWRENCE K. BAERMAN, CLERK

JUL 21 2009

County of Residence of First Listed Defendant  SCHOHARIE
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1   U.S. Government Plaintiff
- ☒ 3   Federal Question (U.S. Government Not a Party)
- ☐ 2   U.S. Government Defendant
- ☐ 4   Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from another district (specify)
- ☐ 6   Multidistrict Litigation
- ☐ 7   Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 USC § 1983
Brief description of cause:
REFUSAL TO GRANT GUN PERMIT

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

**VIII. RELATED CASE(S) IF ANY**
(See instructions):

JUDGE

DOCKET NUMBER

DATE  7/21/09

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**U.S. DISTRICT COURT
N.D. OF N.Y.
FILED**

JUL 2 1 2009

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

LAWRENCE K. BAERMAN, CLERK
ALBANY

**ALFRED G. OSTERWEIL**
            **Plaintiff**

      vs.

**GEORGE R. BARTLETT III,**
      In his official capacity as
      Licensing Officer
      In the County of Schoharie

**DAVID A. PATERSON**
      In his official capacity as
      Governor
      of the State of New York,

**ANDREW M. CUOMO**
      In his official capacity as
      Attorney General
      of the State of New York
            **Defendants**

                              and

CIVIL
RIGHTS          1:09-cv-825
COMPLAINT       (CLS/DRH)

**PURSUANT TO**
42 U.S.C. 1983

---

      Plaintiff in the above-captioned action alleges as follows:

## JURISDICTION

1.      This is a civil action seeking relief and/or damages to defend and protect the rights guaranteed by the Constitution of the United States. This action is brought pursuant to 42 U.S.C sec. 1983. The Court has jurisdiction over this action pursuant to 28 U.S.C. Secs. 1331, 1343(3) and (4) and 2201.

## PARTIES

2.      Plaintiff:  Alfred G. Osterweil
      Address:  310 Rossman Fly Road
                  Summit, New York   12175

3.      Defendant:  George R. Bartlett III
      Official Position:  Licensing Officer
      Address:  Schoharie County Courthouse
                  Schoharie, New York   12157

      Defendant:  David A. Paterson
      Official Position:  Governor of the State of New York
      Address:  Executive Chamber
                  State House
                  Albany, New York   12224

Defendant: Andrew M. Cuomo
Position: Attorney General of the State of New York
Address: State of New York Attorney General Office
The Capitol
Albany, New York   12224-0341

## FACTS

1. This court has jurisdiction over this matter as it raises a federal Constitutional issue.

2. Venue is properly before this court because all the parties are within counties which are part of the United States District Court, Northern District of New York.

3. George R. Bartlett III is the licensing official for Schoharie County with offices at the Schoharie County Courthouse, Schoharie, New York   12157.

4. David A. Paterson is the Governor of the State of New York, with offices at Executive Chamber, State House, Albany, New York   12224.

5. Andrew M. Cuomo is the Attorney General of the State of New York, with offices at State of New York Attorney General Office, The Capitol, Albany, New York   12224-0341.

6. Plaintiff filed an application for a pistol permit on May 21, 2008, at which time he paid a fee of $105.00 and was fingerprinted by the Schoharie County Sheriff's Department. Thereafter, Plaintiff advised the Sheriff that he intended to set up another residence in a state other than New York. Plaintiff was cautioned that this might present a problem.

7. Shortly thereafter, the U.S. Supreme Court decided the landmark *Heller* case. At that point, on July 10, 2008, plaintiff wrote a letter to the defendant licensing officer offering to appear before him, or, in the alternative, to provide an affidavit or other proof necessary to establish plaintiff's right to possess a handgun in his home in New York even though he might be domiciled in a sister state.

8. Issues arose as to the difficulty in obtaining acceptable fingerprints on two occasions, but the licensing officer did not contact plaintiff until February 20, 2009, long after the statutory six-month period for the licensing officer to make a determination or state in writing why no decision has been made. The statute expressly excludes the failure of the FBI to report back with its findings based on the fingerprints as a basis for failing to comply with the six-month limitation. Indeed, until the final letter of denial received by plaintiff, the licensing officer never gave a reason in writing for withholding a permit.

9. There were numerous pieces of correspondence between the plaintiff and the licensing officer as well as several affidavits supplied by plaintiff on a score of issues, including his entire background and his continued residence in his New York home notwithstanding his change of domicile.

10.  On May 29, 2009, the licensing officer determined that "Since applicant admittedly is not a resident of the State of New York, his application for a pistol permit is denied."

11.  Plaintiff files this action to enforce his right to possess a handgun in his home located in Summit, New York.

12.  Plaintiff alleges that the licensing officer imperfectly performed his sworn duties and violated plaintiff's rights under the United States Constitution and existing New York statutes.

13.  Plaintiff alleges that the Attorney General, as the chief law enforcement officer of the State of New York, and the Governor, as the chief executive officer of the State of New York, failed to take appropriate action to protect plaintiff's rights under the United States Constitution and existing New York statutes.

14.  Plaintiff further alleges that the Attorney General and the Governor are necessary parties to the within action as this action implicates New York's gun control statutes.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

Defendants, jointly, severally and in the alternative, denied plaintiff his right to bear arms within his home in Summit, New York, in violation of the Second Amendment to the to the United States Constitution, as made applicable to the states through "selective incorporation" by the Fourteenth Amendment to the United States Constitution.

### SECOND CAUSE OF ACTION

Defendants, jointly, severally, and in the alternative, denied plaintiff his right to bear arms within his home in Summit, New York, in violation of the Second Amendment to the United States Constitution which was incorporated into the fabric of New York law by virtue of the adoption of the New York Civil Rights law which tracks the language of the Second Amendment to the United States Constitution.

### THIRD CAUSE OF ACTION

Defendants, jointly, severally and in the alternative, denied plaintiff his right to bear arms within his home in Summit, New York, by using and applying a definition of residence akin to domicile, and determining that such residence is a prerequisite to a license, contrary to the *Heller* Court's use of the term "home" as the situs within which a citizen has the right to bear arms.

### FOURTH CAUSE OF ACTION

To the extent that the New York gun laws, as interpreted and enforced by the defendants, jointly, severally and in the alternative, precludes plaintiff and others similarly situated from bearing arms in their homes if they are owners of two homes, said laws are violative of plaintiff's rights and are

unconstitutional as being a denial of Equal Protection, there being no rational basis to justify plaintiff's being so precluded.

## FIFTH CAUSE OF ACTION

Defendants, jointly, severally and in the alternative, denied plaintiff his right to bear arms within his home in Summit, New York, when they failed to comply with their own statutory requirements that a decision be reached by the licensing officer within six months or, in the alternative, a reason be provided, in writing to the applicant, setting forth the reason for the failure to approve or deny the application.  Such failure represents a denial of equal protection under both the United States Constitution and the New York Constitution and Civil Rights Laws.

## SIXTH CAUSE OF ACTION

Defendants, jointly, severally, and in the alternative, denied plaintiff his right to bear arms within his home in Summit, New York, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by determining that plaintiff was not a resident of the State of New York within the meaning of New York Statues, and thus ineligible to obtain a license, notwithstanding the clear and convincing proof that he was a resident, albeit not domiciled in the State of New York.

Plaintiff demands a trial by the Court.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiff requests that the Court grant the following relief:

That the defendants be ordered to provide plaintiff with the type of permit originally applied for, for costs of suit and such other damages and relief as the Court deems reasonable and appropriate.

I declare under penalty of perjury that the foregoing is true and correct.

**DATED:** 7/21/09

**Alfred G. Osterweil, Plaintiff**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK     .

---

ALFRED G. OSTERWEIL

                                  *Plaintiff,*

             -against-

GEORGE R. BARTLETT III,

                                   *Defendant.*

**ANSWER
09-CV-825
(GLS)(DRH)**

---

Defendant Bartlett, by his attorney, ERIC T. SCHNEIDERMAN, Attorney General of the State of New York, James B. McGowan, Assistant Attorney General of Counsel, answers the complaint as follows:

1:     Leaves the legal conclusions set forth in both paragraphs 1 of the complaint to the determination of the Court and otherwise denies plaintiff is entitled to any relief herein.

2.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in both paragraphs 2 of the complaint and paragraph 11 of the complaint. .

3.     Denies paragraph 3 on page 1 of the complaint.

4.     Admits the allegations contained in paragraph 3 of page 2 of the complaint.

5.     Denies the allegations contained in paragraphs 4, 5, 8, 12, 13, and 14 of the complaint and each of the paragraphs stylized therein as causes of action.

6.     Respectfully refers the court to the materials cited in paragraphs 7, 9, and 10 of the complaint as the best evidence of the contents thereof and denies plaintiff's allegations insofar as they differ therefrom.

7.     Deny any allegation of the complaint not specifically responded to above.

### Defenses

8.     The complaint fails to state a claim upon which relief can be granted.

9.     At all relevant times Judge Bartlett acted under the reasonable belief that his conduct was in accordance with clearly established law.  Reasonable licensing officials in his position would believe that they could conduct themselves as Judge Bartlett did without any violation of plaintiff's federally protected rights.  Judge Bartlett, therefore, protected under the doctrine of qualified immunity.

10.     The complaint is barred, in whole or in part, under the Eleventh Amendment.

11.     Plaintiff has failed to exhaust administrative remedies.

12.     Insofar as plaintiff admittedly brings no state law claims, this Court is not empowered to issue a license under State law and must, in the interests of sovereign immunity and comity, abstain from granting any license herein regardless of its determination of any federal question.

WHEREFORE, Defendant Bartlett demands that this Court deny the relief requested, dismiss the complaint, and grant defendant such other relief as to the Court shall seem is just and equitable.

Dated: Albany, New York
      February 4, 2011

                ERIC T. SCHNEIDERMAN
                Attorney General of the State of New York
                Attorney for Defendant Bartlett
                    The Capitol
                    Albany, New York  12224-0341
                By: s/ James B. McGowan
                    James B. McGowan
                    Assistant Attorney General, of Counsel
                    Bar Roll No.   507606
                    Telephone:     (518) 473-6522
                    Fax: (518) 473-1572 (not for service of papers)
                    Email: James.McGowan@ag.ny.gov

TO:    Alfred G. Osterweil, 197 Lawson Lane, Many, LA 71449

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
....................................................................................

ALFRED G. OSTERWEIL.

|                        |                                |                                     |
|------------------------|--------------------------------|-------------------------------------|
|                        | *Plaintiff*                    | 09-CV-825                           |
| *versus*               |                                | GLS/DRH                             |
| GEORGE R. BARTLETT, III |                               |                                     |

U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

FEB 1 7 2011

LAWRENCE K. BAERMAN, CLERK
ALBANY

*defendant*

....................................................................................

To: Roger W. Kinsey, Esq., Attorney for Defendant

Please take notice that the undersigned does hereby move for Summary Judgment, before the Honorable Gary L. Sharpe, and

Please take Further Notice that we shall rely upon the Affidavit annexed hereto, and the enclosed Memorandum in Support of Plaintiff's Motion for Summary Judgment, and

Please take further notice that we hereby request the Court to hear this matter on a date to be fixed by the Clerk in accordance with Local Rule 7.1.

Alfred G. Osterweil,   Plaintiff *pro se*

310 Rossman Fly Road
P. O. Box 173
Summit, New Hyork  12175
Phone: (518) 287-1646

## AFFIDAVIT

Alfred G. Osterweil, being duly sworn, upon his oath does hereby depose and say that:

1. I am the Plaintiff in the matter of Osterweil v. Bartlett.
2. On May 21, 2008, I filed an application to possess and keep a gun in my home located in Schoharie County, at 310 Rossman Fly Road, Summit, New York.
3. Because I intended to change my domicile, I so advised the Sheriff who, in Schoharie County, was assigned the duty of fingerprinting me and performing an investigation of me on behalf of the licensing official, the Defendant herein.
4. I paid the sum of $105.00 as the charge for fingerprinting, paid for and provided a passport type photo, and was fingerprinted on two occasions.
5. Neither attempt at fingerprinting resulted in prints which were sufficiently satisfactory for the agency reviewing them.
6. Months of correspondence between the licensing officer and the undersigned ensued with the licensing officer advising me that he would determine my eligibility to possess a gun on the issue of my domicile being Louisiana, although I still maintained and spent time in the same home in Summit that I lived in when I first applied..
7. The issue of additional fingerprinting was to be addressed later if he ruled favorably on my application. There was no determination made with finality as to whether I would be required to pay an additional $105, so that issue remains.
8. On May 29, 2009, the licensing officer issued a written "decision" in which he stated that "Since applicant admittedly is not a resident of the State of New York, his application for a pistol permit is denied."
9. My Summit home is used exclusively by me and my family as a vacation home, and it has never been rented out to any person.
10. I incorporate by reference herein, all the statements made by me in prior affidavits/certifications and which are part of the record in this case.

I swear that the statements made by me in this affidavit are true to the best

of my knowledge, information and belief.

Alfred G. Osterweil

Sworn to and subscribed before me, a Notary Public of New York

this 2nd day of August 2010.

CAROL A. EAKIN
Notary Public, State of New York
No. 01EA6017271
Qualified in Schoharie County
Commission Expires December 7 2010

## STATEMENT OF MATERIAL FACTS NOT IN ISSUE

1. Plaintiff filed an application for a handgun permit on May 21, 2008, at which time he was domiiciled at his home locatedat 310 Rossman Fly Road, Summit, New York. {see Complt., Affidavit to this Motion, Par 2, 9.

2. During the process, Plaintiff advised the Sheriff that he intended to change his domicile but retain ownership of the same premises as a summer home. See Complt.; Affidavit to this Motion, Par 3.

3. In fact, Plaintiff is domiciled elsewhere and and maintains his Summit property as a vacation home. Affidavit to this Motion. Par. 6, 9.

4. Plaintiff's application was denied by the licensing officer on May 29, 2008, by written decision,stating : "Since applicant admittedly is not a resident of the State of New York, his application for a pistol permit is denied," Affidavit to this Motion, Par 8.



# AFFIDAVIT

I, Alfred G. Osterweil, of 310 Rossman Fly Road, Summit, New York do hereby swear to the following statements as true to the best of my knowledge and belief and I acknowledge that I may be punished for contempt and convicted of other offenses if any of said statements are false:

1. I was born in Newark New Jersey,
2. I received a Bachelor of Arts degree from Rutgers University.
3. I received a Juris Doctor degree from Rutgers University School of Law
4. I was inducted into the Army of the United States and trained at Fort Dix, New Jersey
5. As part of that training I was qualified with trhe M1 Garand and won medals as a marksman and sharpshooter with it
6. I was also qualified with the 30 caliber air cooled machine gun, the 30 caliber water cooled machine gun, the Browning Automatic Rifle and the standard army 45 caliber sidearm.
7. I thereafter was shipped to Germany where I served in an elite group of 136 men scattered throughout Germany
8. That unit, The 66th Counter Intelligence Group required a security clearance several levels above top secret.
9. As a result I was fingerprinted and underwent a background check by the FBI which included interviews with my instructors from law school back to elementary school, a check with friends and associates, a review of all books in my home and even an interview with my dentist and family physician.
10. While in Germany I was in civilian clothes rather than uniform, I did not sleep nor eat in a military facility nor did I report to a military supervisor. I was authorized and did carry a 45 caliber sidearm.
11. Upon discharge, I commenced the practice of law which I followed until my retirement in 1998 in Edgewater New Jersey'.
12. I was admitted to practice and did appear in all courts in New Jersey, the District Court for the District of New Jersey and the 3rd Circuit Court of Appeals In Philadelphia. On motion, I argued before the New York Supreme Court at 10 Center Street, Manhattan. I never appeared before the courts in the District of Columbia nor the U.S.Supreme Court although I am admitted to practice in each of them.
13. For the last thirty or so years of practice I represented police organizations almost solely, Included in the one hundred or so organizations I represented were the police employed by the Port Authority of New York and New Jersey. As such I was privy to various anti-terror plans established at Kennedy International Airport, La Guardia Airport and Newark International Airport
14. I received an honorable discharge from the US Army and I was never the subject of discipline as an attorney.
15. I was never convicted of any crime, be it felony or misdemeanor nor have I ever been arrested
16. I have never been treated for any type of mental illness
17. I am not addicted nor have I ever been addicted to any drug or substance including alcohol
18. I am married with an adult daughter and two grandsons.

19. I have two homes in Summit, New York and two homes in Many, Louisiana, I consider all of them my home and I rent out none of them

20. I have purchased guns in the past and have always been cleared to do so without any delay by the ATF. My most recent purchase which was within the past 30 days was a 22 caliber rifle

_____  3/4/09

Alfred G. Osterweil

This is to certify that the Affiant, Alfred G. Osterweil, did appear before me and swear to the truthfulness of the statements made therein.

_____  3/4/09

Cynthia A. Rollenhagen
Attorney-at-Law
State of New Jersey

# Supplemental Affidavit

I, Alfred G. Osterweil,of 310 Rossman Fly Road,Summit, New York,do hereby swear to the following statements as true to the best of my knowledge and belief and I acknowledge that I may be punished for contempt and convicted of other offenses if any of said statements are false:

1. I recently had the opportunity to review the dealer's copy of the federal Firearms Transaction Record associated with a transaction in which I purchased a Heritage Arms, 22 caliber Rough Rider model revolver, serial number F54528.
2. This is the official form all licensed gun dealers must complete for any such transaction, and it was created to comply with the Brady Handgun Violence Protection Act of 1993(Brady Act),
3. I was required to provide certain personal information and answer all questions which appeared on this Form 4473 which is issued pursuant to 18 USC Sec 921 *et.seq.*
4. The dealer must then communicate with the FBI for a so-called NICS background check.
5. The FBI was contacted and a background check was performed. The document reveals that the NICS transaction number is 1BCZ-WG5, the name and Brady identification number are Christi and 4371, respectively.
6. I paid for and received the revolver. Thus, it is incontrovertible that I received a favorable background check from the FBI on February 13, 2009, the date of the transaction.

----------------------------------------------------------  3/4/09

Alfred G. Osterweil

This to certify that the Affiant, Alfred G. Osterweil,
did appear before me and swear to the truthfulness of the statements made therein.

----------------------------------------------------------  3/4/09

Cynthia A. Rollenhagen
Attorney-at-Law
State of New Jersey

# AFFIDAVIT

I, Alfred G. Osterweil, of 310 Rossman Fly Road, Summit, New York do hereby swear to the following statements as true to the best of my knowledge and belief and I acknowledge that I may be punished for contempt and convicted of other offenses if any of said statements are false.

1. This third affidavit is provided to Judge Bartlett consistent with his letter dated March 13, 2009.
2. I incorporate by reference herein, any statement of fact I made in any correspondence to Judge Bartlett, and swear to those statements as being true.
3. Title to my home located at 310 Rossman Fly Road was closed on April 1, 2003.
4. From that time to today, my wife and I have played and continue to play a role in town affairs and we continue to participate in all social, political and community affairs.
5. We continue to be members in and pay dues to the Summit Snowriders, a social group dedicated to the outdoors and snowmobiling.
6. We continue to be members in and pay dues to the Summit Conservation Club, a group dedicated to the preservation of the environment.
7. I was a commissioner on the Summit Fire District Board of Commissioners but chose not to run for reelection after receiving a legal opinion that I had to be a registered voter to hold this office.
8. I was an unpaid member of the Board of Directors of Western Catskills Revitalization Corporation, a not for profit entity that distributes grants and services to needy applicants in Delaware and Schoharie Counties principally. I was compelled to leave because of a by-law which had certain attendance requirements I could not achieve.
9. My wife was a member of the Study Committee to create a new town master plan, and she participated for approximately three years up to its completion. While I was not named to that committee, I would attend many of its meetings to add such comments and give as much input as I could based on my experiences with other master plan committees.
10. My wife was also appointed to the Summit Town Planning board, and she attended regularly until she received a legal opinion that she had to be a registered voter to continue to serve.
11. Even after we had purchased a home in another state, we continued to be involved in local matters, attending town board and other town meetings.
12. With respect to the Summit Fire Department, I have a close relationship with the former and present Chiefs, and I continue to monitor current fire department matters even when I am not in town, by phone and e-mail.
13. On or about June, 2007, we purchased a home located at 159 Eagle Mountain Road, Summit, New York. Even after we had decided to purchase a home in another state, we had a garage/barn built on the Eagle Mountain property at a cost in excess of 30,000 dollars. That work was completed on or about June, 2008.
14. We continue to rent a mail box in Summit, New York,
15. We do not rent out either property nor have we put either of them up for sale.
16. We have many friends in Summit and we continuer to be in contact with them, This includes all

the references I supplied to the Sheriff on my application.

17. I am on a first name basis with the Town Supervisor, the members of the Town Board and the members of the Planning Board.

18. My wife continues to be a member of a church in Jefferson, Schoharie County, thus tithing and otherwise contributing to the church and the Schoharie County community.

19. I am on a first name basis with her Pastor and have contributed funds to many local charitable causes administered by the Pastor.

20. I remain a taxpayer of not inconsiderable sums, and I will continue to oversee my local and county governments to ensure a reasonable basis for any increases.

21. I purchased a home in another state for health reasons, an attempt to avoid the severe winters we have and other reasons personal to us.

22. I have attached to this affidavit a copy of the letter I faxed to Judge Bartlett with respect to the FBI site dealing with fingerprinting

23. During this past winter, while we were in warmer climes, my daughter had occasion to live in our home at 310 Rossman Fly Road.

24. My brother-in-law and my sister-in-law reside in their home on Lang Road, Summit, New York.

25. My mother-in-law resides in Summit, New York, and due to her age and infirmities, requires assistence provided regularly by Summit home care personnel.

26. With respect to the issue of "monitoring" I can be monitored quite adequately as compared to a gun owner in a county of a million or more people as is the case in other counties even assuming monitoring is a valid consideration in view of the Supreme Court ruling in the Heller case...

3/19/09

_____
Alfred G. Osterweil

This to certify that the Affiant, Alfred G. Osterweil,
did appear before me and swear to the truthfulness of the statements made therein.

3/19/09

_____
Cynthia A. Rollenhagen
An Attorney-at-Law
State of New Jersey

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ALFRED G. OSTERWEIL,

NOTICE OF CROSS
MOTION FOR SUMMARY
JUDGMENT

_Plaintiff,_                    09-CV-825
                                 GLS/DRH

-against-

GEORGE R. BARTLETT, III., in his official capacity as
Licensing Officer in the County of Schoharie,
                                        _Defendant._

**PLEASE TAKE NOTICE THAT** upon the annexed Declaration of Defendant George

R. Bartlett, III, dated October 25, 2010, the exhibits attached thereto; defendant's Statement

Pursuant to Local Rule 7.1 (a)(3); Memorandum of Law and upon the pleadings and all prior

papers by and between the parties of this action, the undersigned shall move for an order

pursuant to Rule 56 of the Federal Rules of Civil Procedure granting defendant summary

judgment in this action together with such other and further relief as to the Court may seem just

and proper on May 10, 2011, at 9:00 a.m., **upon submit,** before the Hon. Gary L. Sharpe, United

States District Judge, United States District Court, Northern District of New York, James T.

Foley U.S. Courthouse, 445 Broadway, Room 441, Albany, NY 12207.

PLEASE TAKE FURTHER NOTICE, that pursuant to Rule 56(e) of the Federal Rules of

Civil Procedure when a motion for summary judgment is made and properly supported, you may

not simply rely upon your complaint, but you must respond, by affidavits or as otherwise

provided in that rule, setting forth specific facts showing that there is a genuine issue of material

fact for trial.  Any factual assertions in our affidavits will be accepted by the District Judge as

being true unless you submit affidavits or other documentary evidence contradicting our

assertions.  If you do not so respond, summary judgment, if appropriate, may be entered against

you. If Summary Judgment is granted against you, your case will be dismissed and there will be no trial.

NOTE ALSO that Local Rule 7.1 (a)(3) of the Northern District of New York requires that you must include a separate short and concise statement of any material facts as to which you contend there exists a genuine issue. In the absence of such a statement, all material facts set forth in our Rule 7.1 (a)(3) statement will be deemed admitted.

DATED: Albany, New York
      March 11, 2011

              ERIC T. SCHNEIDERMAN
              Attorney General of the State of New York
              Attorney for Defendant Bartlett
              The Capitol
              Albany, NY  12224

              *s/Roger W. Kinsey*
              ROGER W. KINSEY,
              Assistant Attorney General, of Counsel
              Bar Roll No. 508171
              Telephone:  (518) 473-6288
              Email: Roger.Kinsey@ag.ny.gov
              Dol #09-099033-O

TO:   Alfred G. Osterweil
      310 Rossman Fly Road
      Summit, New York 12175

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

## NOTIFICATION OF THE CONSEQUENCES OF FAILING TO
## RESPOND TO A SUMMARY JUDGMENT MOTION

A motion for summary judgment seeks dismissal of some or all of the claims you have asserted in your complaint. You are hereby advised that if a motion for summary judgment is filed by the defendant(s) in the above-referenced action, any factual assertions in the defendant's affidavits will be taken as true by the District Court unless you contradict these assertions in affidavit form.[1]

You may not simply rely on your complaint to oppose this motion. You must file a written response in opposition to this motion with the Court, and send a copy of same to opposing counsel.

Pursuant to Local Rule 7. l of the Northern District of New York you are required to submit the following papers in opposition to this motion: (I) a **memorandum of law** (containing relevant factual and legal argument); (ii) **one or more affidavits** in opposition to the motion and (iii) a **short and concise statement of material facts** as to which you claim there are genuine issues in dispute. **These papers must be filed and served in accordance with the time set by Local Rule 7.1.**

If you do not submit a short and concise statement of material facts as to which you claim there are genuine issues in dispute, all material facts set forth in the statement filed and served by the defendant(s) shall be deemed admitted.

**If you do not respond in opposition to the motion, summary judgment, if appropriate, will be entered against you. If partial summary judgment is granted against you, the portions of your case as to which summary judgment was granted will dismissed; there will be no trial as to these portions of your complaint. If summary judgment is granted as to your entire complaint, your case will be dismissed and there will not be any trial concerning any of the aspects asserted in your complaint.**

---

[1] Rule 56(e) of the Federal Rules of Civil Procedure governs the form of affidavits. It states "Islupporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided by this rule, an adverse party may not rest on the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DEFENDANTS' STATEMENT
PURSUANT TO LOCAL RULE
7.1 (a)(3)

ALFRED G. OSTERWEIL,

*Plaintiff,*

09-CV-825

GLS/DRH

-against-

GEORGE R. BARTLETT, III., in his official capacity as
Licensing Officer in the County of Schoharie,
*Defendant.*

Defendant Bartlett by his attorney, Eric T. Schneiderman, Attorney General of the State of New York, for his statement of facts pursuant to Local Rule 7.1 (a)(3) states:

1.  Defendant Bartlett is the duly elected Schoharie County Judge.  In that capacity as Schoharie County Judge, he is the licensing officer in Schoharie County for pistol (firearm) permits (Penal Law §400).  Bartlett Declaration ¶ 1.

2.  On or about May 21, 2008, Alfred Osterweil submitted an application with the Schoharie County Sheriff's Department for a New York State Pistol permit.  In this application, he listed his residence as being in Schoharie County, New York.  Bartlett Declaration ¶ 2, Exhibit 1A.

3.  Pursuant to Penal Law §400.00[4], the Schoharie County Sheriff ("Sheriff") conducts investigations regarding pistol permit applications.  Part of the investigation involves verifying information set forth in the application, receiving references from the applicant's references, obtaining criminal background checks, obtaining the applicant's fingerprints and then submitting the fingerprints to the New York State Division of Criminal Justice Services and the FBI for records check.   Bartlett Declaration ¶ 3.

4.  By letter dated June 24, 2008 the Sheriff advised Mr. Osterweil that he needed to come into the Sheriff's office "to correct and/or complete some information on your permit."

Bartlett Declaration ¶ 4, Exhibit1.

5.  In response, Mr. Osterweil sent a letter dated June 25, 2008 to the Sheriff stating that since he applied for a permit, he had purchased a home in another state which he intended to utilize as his primary residence and to now use his Schoharie County property as a vacation home.  Accordingly, he asked "Under those circumstances, am I still eligible for a permit . . . Obviously, if my move to another state rules out a pistol permit, there is no sense in correcting the application."   Bartlett Declaration ¶ 5, Exhibit 2.

6.  By memo dated July 8, 2008,  the Sheriff forwarded Mr. Osterweil's "incomplete" application to the Court together with Mr. Osterweil's letter of  June 25, 2008.   Bartlett Declaration ¶ 6,Exhibit 3.

7.  On July 16, 2008, the Court also received a letter from Mr. Osterweil.  Bartlett Declaration ¶ 7, Exhibit 4.  According to court secretary, the Sheriff then requested that the application be given back to him and this was done.  Apparently, the Court also sent Mr. Osterweil's letter received July 16, 2008 to the Sheriff without responding.

8.  On or about August 13, 2008, the New York State Division of Criminal Justice Services ("DCJS") advised the Schoharie County Sheriff that "Due to the poor quality of the fingerprint impressions received, DCJS is unable to determine whether this individual has any other criminal record in New York State."  Bartlett Declaration ¶ 8, Exhibit 5.

9.  On or about July 31, 2008, Mr. Osterweil's fingerprints were rejected by the FBI as "the quality of the characteristics in too low to be used."  Bartlett Declaration ¶ 9, Exhibit 6.

10.  By letter dated August 18, 2001, the Schoharie County Sheriff requested Mr. Osterweil to come into his office to be re-fingerprinted.  Bartlett Declaration ¶ 10, Exhibit 7.

11.  On or about September 8, 2008, Mr. Osterweil's fingerprints were apparently again

rejected by the FBI because the "quality of the characteristics is too low to be used."

Bartlett Declaration ¶ 11, Exhibit 8.

12. After Mr. Osterweil's fingerprints were again rejected a series of e-mails ensued between the Sheriff and Mr. Osterweil. Bartlett Declaration ¶ 12, Exhibit 9.

13. By letter dated February 18, 2009, the Sheriff advised Mr. Osterweil that he was sending Mr. Osterweil application to Defendant Bartlett. Bartlett Declaration ¶ 13, Exhibit 10.

14. By letter to Mr. Osterweil dated February 20, 2009, Defendant Bartlett set forth what he felt were the issues regarding Mr. Osterweil's application *(i.e., the lack of quality fingerprints that could be used by the FBI and New York State Division of Criminal Justice Services and his residency [domicile]).* Accordingly, the Court scheduled an appearance on March 24, 2009 for Mr. Osterweil and/or his attorney. Bartlett Declaration ¶ 14, Exhibit 11.

15. Specifically, the letter scheduling the matter explained that this Court appearance was to allow Mr. Osterweil or his attorney the opportunity to "present any arguments in support of your application. In particular, I would be interested in your supplying any legal precedent supporting your position with regard to residency and in support of a fingerprint check waiver. Moreover, I would like the Sheriff to be present to explain the fingerprint situation and answer any questions you or your attorney may have." Bartlett Declaration ¶ 15, *Id.*

16. By letter to the Court dated March 3, 2009, Mr. Osterweil, sent information on special steps that could be taken with respect to persons with worn fingerprints. Mr. Osterweil indicated that none of these "special steps" were utilized by the Schoharie County Sheriff in his case. Bartlett Declaration ¶ 16, Exhibit 12.

3

17.    By letter dated March 4, 2009, Mr. Osterweil advised the Court that he would not be
available to attend Court on March 24, 2009 as scheduled, and would not be available
until the summer.  In this letter, Mr. Osterweil sets forth several issues he had with New
York law and the process used in processing pistol permits.  Mr. Osterweil's submission
contained several enclosures and an affidavit.  Bartlett Declaration ¶ 17, Exhibit 13.

18.    By another letter dated March 4, 2009 to the Court, Mr. Osterweil forwarded a
supplemental affidavit.  Bartlett Declaration ¶ 18, Exhibit 14.

19.    By letter dated March 13, 2009, the Court responded to Mr. Osterweil's correspondence.
Pursuant to Mr. Osterweil's request, the Court cancelled the appearance scheduled for
March 24, 2009 and asked Mr. Osterweil if he wished to reschedule the March 24, 2009
appearances or if he wished to waive an appearance. Bartlett Declaration ¶ 19, Exhibit
15.

20.    By letter dated March 19, 2009, Mr. Osterweil responded, explaining in some detail his
position regarding the lack of fingerprints and a residency requirement.  He also stated
that he would not be available to appear in the Court prior to April 15, 2009.  Bartlett
Declaration ¶ 20, Exhibit 16.

21.    As Mr. Osterweil's letter of March 19, 2009 did not indicate if he wished to personally
appear in Court or waive a personal appearance, by letter dated April 10, 2009,
Defendant Bartlett wrote Mr. Osterweil a letter to inquire whether he wished to
reschedule the March 24, 2009 Court date or waive a personal appearance and consider
his application fully submitted on papers.  Bartlett Declaration ¶ 21, Exhibit 17.

22.    By letter dated April 13, 2009, Mr. Osterweil responded that " . . . I do not wish to leave
any stone unturned in the prosecution of this matter, I will appear before you if you

request me to do so . . ."   "I expect to be in Summit [Schoharie County] commencing on

or about June 15, 2009, and will be available to appear at your convenience thereafter. "

Bartlett Declaration ¶ 22, Exhibit 18. *(emphasis supplied)*

23.   By letter dated May 1, 2009, Defendant Bartlett acknowledged receipt of Mr. Osterweil's

letter of April 13, 2009 and responded that: "It appears from this correspondence that you

do not wish to submit any further information or personally appear in support of your

application. Accordingly, unless I hear from you to the contrary on or before May 15,

2009, I will consider your application fully submitted and will proceed to determine it."

Bartlett Declaration ¶ 23, Exhibit 19.

24.   By letter dated May 6, 2009, Mr. Osterweil wrote to the Court indicating he did not wish

a personal appearance and referred the Court to a recent decision by the Ninth Circuit

Court of Appeals in support of his argument concerning the constitutionality of New

York's pistol permitting law. Bartlett Declaration ¶ 24, Exhibit 20.

25.   On May 29, 2010, the Court issued a written decision denying Mr. Osterweil's pistol

permit application. Bartlett Declaration ¶ 25, Exhibit 21.

26.   In this decision, the Court rejected Mr. Osterweil's argument that, since more than six (6)

months elapsed since he submitted his application, the Court was required to grant his

application. Bartlett Declaration ¶ 26, *Id.*

27.   The Court found there was good cause for the time taken in rendering a decision. Bartlett

Declaration ¶ 27, *Id.*

28.   Initially, the Court noted that Mr. Osterweil's application was as yet not complete as, due

to the poor quality of his fingerprints, the Sheriff had been unable to complete the

investigation required by New York Law (Penal Law §400). The Court noted, as a

courtesy to Mr. Osterweil, the Court held the issue of fingerprints in abeyance in order to address the threshold issue of whether New York Law allows the issuance of a pistol permit to a non-resident. Bartlett Declaration ¶ 28, *Id.*

29. The Court noted that when Mr. Osterweil originally submitted his application, he listed his residency as being in Schoharie County, New York. It was after the application was submitted that Mr. Osterweil changed his residence (domicile) to that of another state, and so advised the Sheriff. This change in the application led to much of the above-referenced communications and submissions. Bartlett Declaration ¶ 29, *Id.*

30. In denying Mr. Osterweil's application, the Court noted Mr. Osterweil's candid acknowledgment that he was not a resident of New York State. That being the case, the Court adhered to long-standing New York precedent that a pistol permit may be issued to residents only and that the term residence *[as used in Penal Law §400.00]* is the equivalent to domicile as outlined in Mahoney v. Lewis, 199 AD2d 734). Bartlett Declaration ¶ 30, *Id.*

31. The Court rejected Mr. Osterweil's argument that New York's pistol permit system is unconstitutional. The Court quoted extensively from Bach v. Pataki (408 F3d 75, 87) wherein the Second Circuit Court of Appeals held that "New York's interest in monitoring gun licenses is substantial and that New York's restrictions to residents and persons working primarily within the State is sufficiently related to this interest . . ." Bartlett Declaration ¶ 31, *Id.*

32. The Court followed the Second Circuit's finding that the residency requirement is an important component of New York's regulation, and concluded that that requirement appears to be reasonable and constitutionally permissible as outlined in District of

Columbia v. Heller, 128 S. Ct. 2783).  Bartlett Declaration ¶32, *Id.*

33.     The Court held that the statute in <u>Heller</u> differed significantly from the law in question

here, since an important component of the District of Columbia law consisted of a total

ban on all handgun possession within that jurisdiction.  Moreover, this Court noted that

New York law allows a nonresident, such as Mr. Osterweil, to possess long guns.  Thus,

unlike <u>Heller</u>, this Court found the New York statutory scheme does not preclude the

applicant from the possession of any firearms.  Bartlett Declaration ¶ 33, *Id.*

34.     The Court cited to the controlling decision in this jurisdiction wherein the New York

State Appellate Division, Third Department determined that ". . . New York's firearms

licensing requirement remains an acceptable means of regulating the possession of

firearms *(citations omitted)* and will not contravene <u>Heller</u> so long as it is not enforced in

an arbitrary and capricious manner as outlined in <u>District of Columbia v. Heller</u>, 128 S.

Ct. at 2819; and <u>People v. Perkins</u>, 62 AD3d 1160, leave denied 13 NY3d 748.  Bartlett

Declaration ¶ 34, *Id.*

DATED: Albany, New York
March 11, 2011

> ERIC T. SCHNEIDERMAN
> Attorney General of the State of New York
> Attorney for Defendant Bartlett
> The Capitol
> Albany, NY  12224
>
> By: *s/Roger W. Kinsey*
> Roger W. Kinsey
> Assistant Attorney General, of Counsel
> Bar Roll No. 508171
> Telephone:  (518) 473-6288
>          Fax:  (518) 473-1572
> Email: Roger.Kinsey@ag.ny.gov
> DOL #08-078786-O

TO:    Alfred G. Osterweil
310 Rossman Fly Road
Summit, New York 12175

UNITED STATES DISTRICT COURT  
NORTHERN DISTRICT OF NEW YORK

ALFRED G. OSTERWEIL,

Plaintiff,

-against-

GEORGE R. BARTLETT, III., in his official capacity as  
Licensing Officer in the County of Schoharie,

Defendant.

DEFENDANT'S RESPONSE  
TO PLAINTIFF'S  
STATEMENT PURSUANT TO  
LOCAL RULE 7.1 (a)(3)

09-CV-825

GLS/DRH

Defendant Bartlett by his attorney, Eric T. Schneiderman, Attorney General of the State of New York, responds to plaintiff's statement of material facts pursuant to Local Rule 7.1 (a)(3) states:

1.   Admit.

2.   Admit.

3.   Admit.

4.   Admit.

DATED: Albany, New York  
March 11, 2011

ERIC T. SCHNEIDERMAN  
Attorney General of the State of New York  
Attorney for Defendant Bartlett  
The Capitol  
Albany, NY  12224

By: s/Roger W. Kinsey

Roger W. Kinsey  
Assistant Attorney General, of Counsel  
Bar Roll No. 508171  
Telephone:  (518) 473-6288  
      Fax:  (518) 473-1572  
Email: Roger.Kinsey@ag.ny.gov  
DOL #08-078786-O

TO:   Alfred G. Osterweil  
       310 Rossman Fly Road  
       Summit, New York 12175

United States District Court - Northern District of New York

---

Alfred G. Osterweil,

        Plaintiff,

                               Civil Action No. 1:09-CV-825 (GLS/DRH)

vs.

George R. Bartlett III, et al.

        Defendant.

---

George R. Bartlett, III, affirms under penalty of perjury:

## **Background**

1.     I am the duly elected Schoharie County Judge. In my capacity as Schoharie County Judge, I am the licensing officer in Schoharie County for pistol (firearm) permits (Penal Law §400).

2.     On or about May 21, 2008, Alfred Osterweil submitted an application with the Schoharie County Sheriff's Department for a New York State Pistol permit. In this application, he listed his residence as being in Schoharie County, New York. (Exhibit 1A)

## **Investigation by Sheriff**

3.     Pursuant to Penal Law §400.00[4], the Schoharie County Sheriff ("Sheriff") conducts investigations regarding pistol permit applications. Part of the investigation involves verifying information set forth in the application, receiving references from the applicant's references, obtaining criminal background checks, obtaining the applicant's fingerprints and then submitting the fingerprints to the New York State Division of Criminal Justice Services and the FBI for records check.

4.  By letter dated June 24, 2008 the Sheriff advised Mr. Osterweil that he needed to come into the Sheriff's office "to correct and/or complete some information on your permit." *(Exhibit 1)*

5.  In response, Mr. Osterweil sent a letter dated June 25, 2008 to the Sheriff stating that since he applied for a permit, he had purchased a home in another state which he intended to utilize as his primary residence and to now use his Schoharie County property as a vacation home. Accordingly, he asked "Under those circumstances, am I still eligible for a permit . . . Obviously, if my move to another state rules out a pistol permit, there is no sense in correcting the application." *(Exhibit 2)*

6.  By memo dated July 8, 2008, the Sheriff forwarded Mr. Osterweil's "incomplete" application to the Court together with Mr. Osterweil's letter of June 25, 2008. *(Exhibit 3)*

7.  On July 16, 2008, the Court also received a letter from Mr. Osterweil. *(Exhibit 4)* According to my secretary, the Sheriff then requested that the application be given back to him and this was done. Apparently, the Court also sent Mr. Osterweil's letter received July 16, 2008 to the Sheriff without responding.

8.  Upon information and belief, on August 13, 2008, the New York State Division of Criminal Justice Services *("DCJS")* advised the Schoharie County Sheriff that "Due to the poor quality of the fingerprint impressions received, DCJS is unable to determine whether this individual has any other criminal record in New York State." *(Exhibit 5)*

9.  Upon information and belief, on or about July 31, 2008, Mr. Osterweil's fingerprints were rejected by the FBI as "the quality of the characteristics in too low to be used." *(Exhibit 6)*

10. By letter dated August 18, 2001, the Schoharie County Sheriff requested Mr. Osterweil to come into his office to be refingerprinted. *(Exhibit 7)*

11. Upon information and belief, on September 8, 2008, Mr. Osterweil's fingerprints were apparently again rejected by the FBI because the "quality of the characteristics is too low to be used." *(Exhibit 8)*

12.   After Mr. Osterweil's fingerprints were again rejected a series of e-mails
      ensued between the Sheriff and Mr. Osterweil. *(Exhibit 9)*

## Court Involvement

13.   By letter dated February 18, 2009, the Sheriff advised Mr. Osterweil that he
      was sending Mr. Osterweil application to me. *(Exhibit 10)*

14.   By letter to Mr. Osterweil dated February 20, 2009, I set forth what I felt
      were the issues regarding Mr. Osterweil's application *(i.e., the lack of
      quality fingerprints that could be used by the FBI and New York State
      Division of Criminal Justice Services and his residency [domicile]).*
      Accordingly, the Court scheduled an appearance on March 24, 2009 for Mr.
      Osterweil and/or his attorney. *(Exhibit 11)*

15.   Specifically, the letter scheduling the matter explained that this Court
      appearance was to allow Mr. Osterweil or his attorney the opportunity to
      "present any arguments in support of your application. In particular, I
      would be interested in your supplying any legal precedent supporting your
      position with regard to residency and in support of a fingerprint check
      waiver. Moreover, I would like the Sheriff to be present to explain the
      fingerprint situation and answer any questions you or your attorney may
      have." *(Exhibit 11)*

16.   By letter to the Court dated March 3, 2009, Mr. Osterweil, sent information
      on special steps that could be taken with respect to persons with worn
      fingerprints. Mr. Osterweil indicated that none of these "special steps" were
      utilized by the Schoharie County Sheriff in his case. *(Exhibit 12)*

17.   By letter dated March 4, 2009, Mr. Osterweil advised the Court that he
      would not be available to attend Court on March 24, 2009 as scheduled, and
      would not be available until the summer. In this letter, Mr. Osterweil sets
      forth several issues he had with New York law and the process used in
      processing pistol permits. Mr. Osterweil's submission contained several
      enclosures and an affidavit. *(Exhibit 13)*

18.   By another letter dated March 4, 2009 to the Court, Mr. Osterweil
      forwarded a supplemental affidavit. *(Exhibit 14).*

19.  By letter dated March 13, 2009, the Court responded to Mr. Osterweil's
     correspondence.  Pursuant to Mr. Osterweil's request, the Court cancelled
     the appearance scheduled for March 24, 2009 and asked Mr. Osterweil if he
     wished to reschedule the March 24, 2009 appearances or if he wished to
     waive an appearance.  *(Exhibit 15)*

20.  By letter dated March 19, 2009, Mr. Osterweil responded, explaining in
     some detail his position regarding the lack of fingerprints and a residency
     requirement.  He also stated that he would not be available to appear in the
     Court prior to April 15, 2009.  *(Exhibit 16)*

21.  As Mr. Osterweil's letter of March 19, 2009 did not indicate if he wished to
     personally appear in Court or waive a personal appearance, by letter dated
     April 10, 2009, I wrote Mr. Osterweil a letter to inquire whether he wished
     to reschedule the March 24, 2009 Court date or waive a personal appearance
     and consider his application fully submitted on papers.  *(Exhibit 17)*

22.  By letter dated April 13, 2009, Mr. Osterweil responded that " . . . I do not
     wish to leave any stone unturned in the prosecution of this matter, I will
     appear before you <u>if you request</u> me to do so . . ."  "I expect to be in
     Summit [Schoharie County] commencing on or about June 15, 2009, and
     will be available to appear at your convenience thereafter." *(Exhibit 18)*
     *(emphasis supplied)*

23.  By letter dated May 1, 2009, I acknowledged receipt of Mr. Osterweil's
     letter of April 13, 2009 and responded that: "It appears from this
     correspondence that you do not wish to submit any further information or
     personally appear in support of your application.  Accordingly, unless I hear
     from you to the contrary on or before May 15, 2009, I will consider your
     application fully submitted and will proceed to determine it." *(Exhibit 19)*

24.  By letter dated May 6, 2009, Mr. Osterweil wrote to the Court indicating he
     did not wish a personal appearance and referred the Court to a recent
     decision by the Ninth Circuit Court of Appeals in support of his argument
     concerning the constitutionality of New York's pistol permitting law.
     *(Exhibit 20)*

**Decision**

25.    On May 29, 2010, the Court issued a written decision denying Mr.
       Osterweil's pistol permit application. *(Exhibit 21)*

**Finger Print Issue**

26.    In this decision, the Court rejected Mr. Osterweil's argument that, since
       more than six (6) months elapsed since he submitted his application, the
       Court was required to grant his application.

27.    The Court found there was good cause for the time taken in rendering a
       decision.

28.    Initially, the Court noted that Mr. Osterweil's application was as yet not
       complete as, due to the poor quality of his fingerprints, the Sheriff had been
       unable to complete the investigation required by New York Law (Penal Law
       §400). The Court noted, as a courtesy to Mr. Osterweil, the Court held the
       issue of fingerprints in abeyance in order to address the threshold issue of
       whether New York Law allows the issuance of a pistol permit to a non-
       resident.

29.    Moreover, the Court noted that when Mr. Osterweil originally submitted his
       application, he listed his residency as being in Schoharie County, New
       York. It was after the application was submitted that Mr. Osterweil changed
       his residence (domicile) to that of another state, and so advised the Sheriff.
       This change in the application led to much of the above-referenced
       communications and submissions.

**Residency Issue**

30.    In denying Mr. Osterweil's application, the Court noted Mr. Osterweil's
       candid acknowledgment that he was not a resident of New York State. That
       being the case, the Court adhered to long-standing New York precedent that
       a pistol permit may be issued to residents only and that the term residence
       *[as used in Penal Law §400.00]* is the equivalent to domicile *(see, Mahoney
       v. Lewis, 199 AD2d 734).*

31.     The Court rejected Mr. Osterweil's argument that New York's pistol permit system is unconstitutional. The Court quoted extensively from _Bach v. Pataki (408 F3d 75, 87)_ wherein the Second Circuit Court of Appeals held that "New York's interest in monitoring gun licenses is substantial and that New York's restrictions to residents and persons working primarily within the State is sufficiently related to this interest . . ."

32.     This Court followed the Second Circuit's finding that the residency requirement is an important component of New York's regulation, and concluded that that requirement appears to be reasonable and constitutionally permissible _(see, District of Columbia v. Heller, 128 S. Ct. 2783)._

33.     This Court held that the statute in _Heller_ differed significantly from the law in question here, since an important component of the District of Columbia law consisted of a total ban on all handgun possession within that jurisdiction. Moreover, this Court noted that New York law allows a nonresident, such as Mr. Osterweil, to possess long guns. Thus, unlike _Heller_, this Court found the New York statutory scheme does not preclude the applicant from the possession of any firearms.

34.     Finally, this Court cited to the controlling decision in this jurisdiction wherein the New York State Appellate Division, Third Department determined that ". . . New York's firearms licensing requirement remains an acceptable means of regulating the possession of firearms _(citations omitted)_ and will not contravene _Heller_ so long as it is not enforced in an arbitrary and capricious manner _(see, District of Columbia v. Heller, 128 S. Ct. at 2819; People v. Perkins, 62 AD3d 1160, leave denied 13 NY3d 748)._


Affirmed:     October **25**, 2010
              Schoharie, New York


                                    _George R. Bartlett III._
                                    George R. Bartlett III

APPLICATION

INSTRUCTIONS: Print or type in black ink only

| NYSID NUMBER | | COUNTY OF ISSUE | |
| LICENSE NUMBER | **STATE OF NEW YORK** | | |
| DATE OF ISSUE | **PISTOL/REVOLVER LICENSE APPLICATION** | EXPIRATION DATE | |

R - 3 REV. 10/03

PRESENT OCCUPATION: _RETIRED_    CITIZEN OF U.S.A. ☒ YES ☐ NO

EMPLOYED BY _RETIRED_    NATURE OF BUSINESS _N/A_    BUSINESS ADDRESS _N/A_

I HEREBY APPLY FOR A PISTOL/REVOLVER LICENSE TO:  (Check one only)  CARRY CONCEALED ☒  * POSSESS ON PREMISES
☐ * POSSESS/CARRY DURING EMPLOYMENT (* Premise address or place of employment must be provided)

A LICENSE IS REQUIRED FOR THE FOLLOWING REASON:  STREET ADDRESS OR OTHER LOCATION _TARGET PRACTICE_   CITY,VILLAGE,TOWN   ZIP CODE
_AND HUNTING_

**GIVE FOUR CHARACTER REFERENCES WHO BY THEIR SIGNATURE ATTEST TO YOUR GOOD MORAL CHARACTER**

| LAST,FIRST,M.I. | STREET ADDRESS | CITY,VILLAGE,TOWN | SIGNATURE |
|---|---|---|---|
| FLAHERTY, MICHAEL | POB 28  2347 ROUTE 10 | SUMMIT | |
| FAUCHER, DOUGLAS | POB 309  141 ERNEST DR | SUMMIT | Douglas Faucher |
| GOLDSMITH, GARY | POB 249  226 CHARLES RD | SUMMIT | Gary Goldsmith |
| MEANEY, JOHN C | POB 159  292 BEARGULCH RD | SUMMIT | John C Meaney |

HAVE YOU EVER BEEN ARRESTED, SUMMONED, CHARGED OR INDICTED ANYWHERE FOR ANY OFFENSE, INCLUDING DWI (EXCEPT TRAFFIC INFRACTIONS)? ☐ YES ☒ NO   IF YES, FURNISH THE FOLLOWING INFORMATION:

| DATE | POLICE AGENCY | CHARGE | DISPOSITION - COURT AND DATE |
|---|---|---|---|
| | | | |
| | | | |

| | | |
|---|---|---|
| HAVE YOU EVER BEEN TERMINATED/DISCHARGED FROM ANY EMPLOYMENT OR THE ARMED FORCES FOR CAUSE? | ☐ YES | ☒ NO |
| HAVE YOU EVER UNDERGONE TREATMENT FOR ALCOHOLISM OR DRUG USE? | ☐ YES | ☒ NO |
| HAVE YOU EVER SUFFERED ANY MENTAL ILLNESS, OR BEEN CONFINED TO ANY HOSPITAL, PUBLIC OR PRIVATE INSTITUTION, FOR MENTAL ILLNESS? | ☐ YES | ☒ NO |
| HAVE YOU EVER HAD A PISTOL LICENSE, DEALER'S LICENSE, GUNSMITH LICENSE, OR ANY APPLICATION FOR SUCH A LICENSE DISAPPROVED, OR HAD SUCH A LICENSE REVOKED OR CANCELLED? | ☐ YES | ☒ NO |
| DO YOU HAVE ANY PHYSICAL CONDITION WHICH COULD INTERFERE WITH THE SAFE AND PROPER USE OF A HANDGUN? | ☐ YES | ☒ NO |
| HAVE YOU EVER BEEN CHARGED, PETITIONED AGAINST, A RESPONDENT, OR OTHERWISE BEEN A SUBJECT OF A PROCEEDING IN FAMILY COURT? | ☐ YES | ☒ NO |

IF ANSWER TO ANY QUESTION IS YES, EXPLAIN HERE:

PHOTOGRAPH OF APPLICANT
TAKEN WITHIN 30 DAYS

FULL FACE ONLY

ANY OMISSION OF FACT OR ANY FALSE STATEMENT WILL BE SUFFICIENT CAUSE TO DENY THIS APPLICATION AND CONSTITUTES A CRIME PUNISHABLE BY FINE, IMPRISONMENT, OR BOTH.
I AM AWARE THAT THE FOLLOWING CONDITIONS AFFECT ANY LICENSE WHICH MAY BE ISSUED TO ME:

1. NO LICENSE ISSUED AS A RESULT OF THIS APPLICATION IS VALID IN THE CITY OF NEW YORK.
2. ANY LICENSE ISSUED AS A RESULT OF THIS APPLICATION WILL BE VALID ONLY FOR A PISTOL OR REVOLVER SPECIFICALLY DESCRIBED IN THE LICENSE PROPERLY ISSUED BY THE LICENSING OFFICER.
3. IF I PERMANENTLY CHANGE MY ADDRESS, NOTICE OF SUCH CHANGE AND MY NEW ADDRESS MUST BE FORWARDED TO THE SUPERINTENDENT OF THE STATE POLICE AND IN NASSAU COUNTY AND SUFFOLK COUNTY, TO THE LICENSING OFFICER OF THAT COUNTY, WITHIN 10 DAYS OF SUCH CHANGE.
4. ANY LICENSE ISSUED AS A RESULT OF THIS APPLICATION IS SUBJECT TO REVOCATION AT ANY TIME BY THE LICENSING OFFICER OR ANY JUDGE OR JUSTICE OF A COURT OF RECORD.

JURAT:
SIGNED AND SWORN TO BEFORE ME
THIS _16th_ DAY OF _May_ , 20 _08_
AT _Richmondville_ , NEW YORK

SIGNATURE OF APPLICANT

SIGNATURE OF OFFICER ADMINISTERING OATH
_Notary_
TITLE OF OFFICER

**CAROL A. EAKIN**
Notary Public, State of New York
No. 01EA6017271
Qualified in Schoharie County
Commission Expires December 7, 2010

THIS FORM APPROVED BY SUPERINTENDENT OF STATE POLICE AS REQUIRED BY PENAL LAW SECTION 400.00,SUBD.3.

APPLICATION NOT VALID UNLESS SWORN

PPB3A

| 1. RIGHT THUMB | 2. RIGHT FOREFINGER | 3. RIGHT MIDDLE FINGER | 4. RIGHT RING FINGER | 5. RIGHT LITTLE FINGER |
|---|---|---|---|---|
|  |  |  |  |  |

| 6. LEFT THUMB | 7. LEFT FOREFINGER | 8. LEFT MIDDLE FINGER | 9. LEFT RING FINGER | 10. LEFT LITTLE FINGER |
|---|---|---|---|---|
|  |  |  |  |  |

PLAIN IMPRESSIONS TAKEN SIMULTANEOUSLY

| LEFT FOUR FINGERS | THUMBS TAKEN TOGETHER | RIGHT FOUR FINGERS |
|---|---|---|

IMPRESSIONS TAKEN BY:   NAME _Floyd Scales_   RANK _Deputy_   SHIELD _138_   DATE _5/21/08_

APPLICANT'S SIGNATURE AND ADDRESS: _Alfred Osterweil   310 Rossman Fly Road   Summit_

INVESTIGATION REPORT - ALL INFORMATION PROVIDED BY THIS APPLICANT HAS BEEN VERIFIED:

NAME _____   RANK _____   ORGANIZATION _____

RECOMMEND   APPROVAL - DISAPPROVAL:   (STRIKE OUT ONE)

SIGNATURE OF INVESTIGATING OFFICER _____

THIS APPLICATION IS   APPROVED - DISAPPROVED   (STRIKE OUT ONE)

THE FOLLOWING RESTRICTION(S) IS (ARE) APPLICABLE TO THIS LICENSE:

TITLE AND SIGNATURE OF LICENSING OFFICER _____

IF LICENSING OFFICER AUTHORIZES THE POSSESSION OF A PISTOL OR REVOLVER AT THE TIME OF ISSUE OF ORIGINAL LICENSE, FURNISH THE FOLLOWING INFORMATION:

| MANUFACTURER | PISTOL OR REVOLVER | CALIBER | SERIAL NUMBER | MODEL | PROPERTY OF: |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

DUPLICATE OF THIS APPLICATION MUST BE FILED WITH THE SUPERINTENDENT OF STATE POLICE WITHIN 10 DAYS OF ISSUANCE AS REQUIRED BY PENAL LAW SECTION 400.00 SUBD.5.

PPB3A(PPB3)

EXHIBIT 1



EXHIBIT 1



# Schoharie County Sheriff's Office

**JOHN BATES, JR.**
SHERIFF

(518) 295-7066

**WILLIAM A. SLATER**
UNDERSHERIFF

157 DEPOT LANE
P.O. BOX 689
SCHOHARIE, NY 12157
FAX (518) 295-7094

| CIVIL | (518) 295-7080 |
| | (518) 296-8888 |
| RECORDS | (518) 295-7072 |
| JAIL | (518) 295-7071 |
| DEPUTIES | (518) 295-7076 |
| DARE | (518) 295-7098 |
| NON-EMERGENCY | (518) 295-8114 |
| EMERGENCY | 911 |

Civil 295-7080

Mr. Osterweil:                        June 24, 2008

### REGARDING YOUR PISTOL PERMIT APPLICATION

(  )  Application not signed or notarized.

(  )  Some arrests or convictions not listed or incorrect.

(  )  Reference sheet not notarized or signed.

(  )  Some reference sheets indicate you may not be a full
time resident of Schoharie County - Explain.

(  )  In reference to your pistol permit application, the
**D.C.J.S.** has rejected the original fingerprint card.
It will be necessary for you to come in to the office
to be reprinted.  Also ask the deputy to reprint you
on an **F.B.I.** card.

(  )  In reference to your pistol permit application, the
**F.B.I.** has rejected the original fingerprint card.  It
will be necessary for you to come in to the office to
be reprinted.

(  )  There is no additional charge for reprinting and it
can be done any Wednesday evening between 6:30 PM and
8:30 PM.  Please bring this letter with you so you
get printed on the correct card.

(XX)  You may stop at the Sheriff's civil office Monday-
Friday between 9 AM and 4 PM.

(XX)  Other:  Please stop at the Sheriff's civil office to
complete and/or correct some information on your permit
application.  A "premises" permit is only valid inside
the residence for which you have applied.  The
application needs to be changed to "carry concealed".
Also "race" information is missing on one copy of the
application.

EXHIBIT 2

EXHIBIT 2

John Bates,Jr.,Sheriff
157 Depot Lane
PO Box 689
schoharie, NY 12157

Dear Sir,

With reference to your letter of June 24, 2008, a copy of which I have enclosed, I have a few questions.
Since I applied for a pistol permit, I purchased a home in another state. My intention is to to make that state my
primary residence while I still intend to have a vacation property here in Schoharie County. Under those
circumstance, am I still eligible for a permit. I note that the application itself does not appear to require that
Schoharie County be my principal residence or domicile.
Obviously, if my move to another state rules out a pistol permit, there is no sense in correcting the application.
Thank you for your attention to this matter.

Alfred G Osterweil
310 Rossman Fly Road
POB 173
Summit NY 12175

6/25/08

EXHIBIT 3

EXHIBIT 3



# Schoharie County Sheriff's Office

**JOHN BATES, JR.**
SHERIFF

(518) 295-7066

**WILLIAM A. SLATER**
UNDERSHERIFF

157 DEPOT LANE
P.O. BOX 689
SCHOHARIE, NY 12157
FAX (518) 295-7094

| CIVIL | (518) 295-7080 |
| | (518) 296-8888 |
| RECORDS | (518) 295-7072 |
| JAIL | (518) 295-7071 |
| DEPUTIES | (518) 295-7076 |
| DARE | (518) 295-7098 |
| NON-EMERGENCY | (518) 295-8114 |
| EMERGENCY | 911 |

## MEMORANDUM

TO:          The Honorable George Bartlett

FROM:     Sheriff John S. Bates

RE:           Pistol Permit Application:
                 Alfred G. Osterweil

DATE:      July 8, 2008



This incomplete application is being forwarded for your review.

Also, enclosed is a letter dated June 25, 2008 from Mr. Osterweil detailing his current residency plans.  Please advise how you wish for me to proceed with this application.

JSB/rm
Enc.

John Bates,Jr.,Sheriff
157 Depot Lane
PO Box 689
schoharie, NY 12157


Dear Sir,

With reference to your letter of June 24, 2008, a copy of which I have enclosed, I have a few questions.
Since I applied for a pistol permit, I purchased a home in another state. My intention is to to make that state my
primary residence while I still intend to have a vacation property here in Schoharie County. Under those
circumstance, am I still eligible for a permit. I note that the application itself does not appear to require that
Schoharie County be my principal residence or domicile.
Obviously, if my move to another state rules out a pistol permit, there is no sense in correcting the application.
Thank you for your attention to this matter.

Alfred G Osterweil
310 Rossman Fly Road
POB 173
Summit NY 12175

6/25/08



# Schoharie County Sheriff's Office

**JOHN BATES, JR.**
SHERIFF

(518) 295-7066

**WILLIAM A. SLATER**
UNDERSHERIFF

157 DEPOT LANE
P.O. BOX 689
SCHOHARIE, NY 12157
FAX (518) 295-7094

| CIVIL | (518) 295-7080 |
| | (518) 296-8888 |
| RECORDS | (518) 295-7072 |
| JAIL | (518) 295-7071 |
| DEPUTIES | (518) 295-7076 |
| DARE | (518) 295-7098 |
| NON-EMERGENCY | (518) 295-8114 |
| EMERGENCY | 911 |

Civil 295-7080

Mr. Osterweil:                              June 24, 2008

### REGARDING YOUR PISTOL PERMIT APPLICATION

( )   Application not signed or notarized.

( )   Some arrests or convictions not listed or incorrect.

( )   Reference sheet not notarized or signed.

( )   Some reference sheets indicate you may not be a full
      time resident of Schoharie County - Explain.

( )   In reference to your pistol permit application, the
      D.C.J.S. has rejected the original fingerprint card.
      It will be necessary for you to come in to the office
      to be reprinted.  Also ask the deputy to reprint you
      on an F.B.I. card.

( )   In reference to your pistol permit application, the
      F.B.I. has rejected the original fingerprint card.  It
      will be necessary for you to come in to the office to
      be reprinted.

( )   There is no additional charge for reprinting and it
      can be done any Wednesday evening between 6:30 PM and
      8:30 PM.  Please bring this letter with you so you
      get printed on the correct card.

(XX)  You may stop at the Sheriff's civil office Monday-
      Friday between 9 AM and 4 PM.

(XX)  Other:  Please stop at the Sheriff's civil office to
      complete and/or correct some information on your permit
      application.  A "premises" permit is only valid **inside**
      the residence for which you have applied.  The
      application needs to be changed to "carry concealed".
      Also "race" information is missing on one copy of the
      application.

EXHIBIT 4

EXHIBIT 4

Alfred G. Osterweil
P.O. Box 173
Summit, New York  12175

July 10, 2008



The Honorable George R. Bartlett, III
P.O. Box 429
Schoharie, New York   12157

Re:  **Handgun License**

Dear Sir:

Some months ago, I filed for a license to purchase and hold a handgun.  At
that time I had been a full-time resident of Summit.  Shortly thereafter, it
became expedient for me to change my primary residence and to become
domiciled in another state.  When the Sheriff wrote to me with respect to a
minor issue on my application, I took it upon myself to be entirely forthright
and to advise him of the change in my status.  Thereafter, Sheriff Bates
called me to discuss the issue.  He was most courteous and professional and
suggested that there might be a problem because the State has been taking
the position that an applicant must have his primary residence in New York.
I intend to continue to own a home in New York as I do now; however, I
intend to vote and obtain a driver's license in that other state.  I will utilize
this Summit home as a summer home, spending the great majority of the
year outside New York.

I have read the <u>Heller</u> case, which was decided shortly after I wrote to
Sheriff Bates advising him of my projected move to another state.  That case
was quite clear, it seems to me, stating that the Second Amendment was
adopted to permit all citizens to own and bear arms to protect them in their
homes.  The case never uses the term "residence", "principal residence",
"domicile", or similar designation.  Justice Scalia referred to one's "home"
throughout the majority opinion.  If the amendment was meant to permit me
to protect myself in my home, is it not logical to assume that I have the same
right in a second home?  Indeed, the founding fathers came to Philadelphia
from all the thirteen states where they had their primary residences but
stayed and lived in Philadelphia for long periods of time in a "second

home". They did not choose to limit the scope of the amendment to domicile, primary residences, and the like.

In the event the Court holds the same view as does Sheriff Bates and denies my application, I believe the issue is sufficiently significant for me to pursue the matter with vigor. While I am not admitted to practice law in New York, I am admitted to practice in New Jersey, the District of Columbia, the Third Circuit Court of Appeals and the United States Supreme Court. I am prepared to appear *pro se* to see this matter concluded as a natural extension of the <u>Heller</u> case.

Should the Court wish to establish a record, I would be very happy to appear before the Court at any time the Court feels it convenient. If the Court wishes to have me provide an affidavit to frame the issue, I would be happy to provide same. In short, I would hope that the Court will deal expeditiously with the issue before it with the knowledge that I will cooperate fully to meet any and all directives of the Court.

Respectfully yours,

Alfred G. Osterweil

Copy to Sheriff Bates

EXHIBIT 5

Fingerprint response on 08/13/2008 09:45 am for transaction 10073138   https://159.181.56.? vebqueue/get.jsp?msgID=414d512053554e5052.

## Fingerprint Response

**ORI: NY0470000**
**Schoharie County Sheriff Department**
**NYSID : 10421025N**
**Attention: A fingerprint search shows no available prior NYS information for this individual.**

New York State Division of Criminal Justice Services
4 Tower Place
Albany, NY 12203-3764
Tel: 1-800-262-DCJS
Denise E. O'Donnell Commissioner of NYS Division of Criminal Justice Services

<u>Identification</u>   <u>Summary</u>   <u>Criminal History</u>   <u>Job/License</u>   <u>Wanted</u>   <u>Missing</u>   <u>NCIC/III</u>

### ● Transaction Data

| | |
|---|---|
| Name: | ALFRED G OSTERWEIL |
| Transaction ID: | 10073138 |
| Agency ORI: | NY0470000 |
| SSN: | ████2222 |
| Type of Submission: | CIVIL |

**Civil Information**

| | |
|---|---|
| Type of Application: | Pistol |
| Comments: | CARRY |
| Name: | ALFRED G OSTERWEIL |
| Address: | 310 ROSSMAN FLY RD, SUMMIT, NY |
| Date of Birth: | ████ 1931 |
| SSN: | ████2222 |
| Date of Application: | May 21, 2008 |
| Application Agency: | <u>Schoharie County Sheriff Department</u> |
| Application Number: | |

### ● Transaction Status Information

**Caution** - Due to the **poor quality** of the fingerprint impressions received, DCJS is unable to determine whether this individual has any other criminal record in New York State.

| Activity | Date/Time | Elapsed |
|---|---|---|
| Initial Transaction Received | July 08, 2008 12:59:23 pm | |
| Latest Resubmission | August 13, 2008 08:53:52 am | |
| Transaction Completed | August 13, 2008 09:45:54 am | 0 hours 51 mins |
| Rapsheet Produced | August 13, 2008 09:45:56 am | |

| Reject Date/Time | Restart Date/Time | Reject Reason(s) |
|---|---|---|
| August 13, 2008 08:51 am | August 13, 2008 08:52 am | Restarted - Input Processing Error |
| August 13, 2008 08:53 am | August 13, 2008 08:53 am | Restarted - Input Processing Error |

### *NYS DCJS Repository Response*

Fingerprint response on 08/13/2008 09:45 am for transaction 10073138    https://159.181.56.1/webqueue/get.jsp?msgID=414d512053554e5052.

## ✪ Attention - Important Information                                          ⬆

   * See **Additional Information** at the bottom of this response for more banners pertaining to the criminal history

## ✪ Identification Information                                                   ⬆

**Name:**
ALFRED G OSTERWEIL   ALFRED G OSTERWEIL

**Date of Birth:**
▮▮▮▮ 1931      ▮▮▮▮ 1931

**Place of Birth:**
New Jersey     New Jersey

**Address:**
310 ROSSMAN FLY RD, SUMMIT, NY
310 ROSSMAN FLY RD, SUMMIT, NY

| **Sex:** | **Race:** | **Ethnicity:** | **SkinTone:** |
|---|---|---|---|
| Male | White/White | | Medium/Medium |
| **Eye Color:** | **Hair Color:** | **Height:** | **Weight:** |
| Brown | White | 5' 11" | 175 |

**SSN:**
▮▮▮▮2222   ▮▮▮▮▮2222

**NYSID#:**    **FBI#:**    **NCIC Classification:**
10421025N

**III status:**

## ✪ Summary Information                                                        ⬆
There is no Summary Information associated with this history.

## ✪ NYS Criminal History Information                                           ⬆
There is no Criminal History Information associated with this history.

## ✪ Other History Related Information                                          ⬆
There is no Other History Related Information associated with this history.

## ✪ Job/License Information                                                    ⬆

**Civil Information**
**Type of Application:** Pistol
**Comments:**            CARRY
**Name:**                ALFRED G OSTERWEIL
**Address:**             310 ROSSMAN FLY RD, SUMMIT, NY
**Date of Birth:**       ▮▮▮▮ 1931
**SSN:**                 ▮▮▮▮2222
**Date of Application:** May 21, 2008
**Application Agency:**  Schoharie County Sheriff Department

Application Number:

## ● Wanted Information                                                    ⬆

There is no NYS Wanted Information associated with this history.

## ● Missing Person Information                                           ⬆

There is no NYS Missing Person Information associated with this history.

## ● Additional Information                                               ⬆

### *Federal NCIC, III and/or FBI Response*                              ⬆

## ● NCIC Information                                                     ⬆

**The following information is provided in response to your request for a search of the NCIC Person files based on:**

- **Name: OSTERWEIL, ALFRED G**
- **Sex: M**
- **Race: W**
- **Date of Birth:** ██/1931
- **Social Security number:** ██2222

```
NY0470000

NO NCIC WANT SOC/█████2222
NO NCIC WANT NAM/OSTERWEIL, ALFRED G DOB/1931 ████ RAC/W SEX/M
***MESSAGE KEY QW SEARCHES WANTED PERSON FILE FELONY RECORDS REGARDLESS OF
EXTRADITION AND MISDEMEANOR RECORDS INDICATING POSSIBLE EXTRADITION FROM THE
INQUIRING AGENCY'S LOCATION.  ALL OTHER NCIC PERSONS FILES ARE SEARCHED
WITHOUT LIMITATIONS.
```

**WARNING:** Release of any of the information presented in this computerized Case History to unauthorized individuals or agencies is prohibited by federal law TITLE 42 USC 3771b.
This report is to be used for this one specific purpose as described in the Use and Dissemination Agreement your agency has on file with DCJS. **Destroy after use and request an updated rap sheet for subsequent needs.**
All information presented herein is as complete as the data furnished to DCJS.

EXHIBIT 6

EXHIBIT 6

# *Rejection Reason for a TCN*

 

**Requested BCN:  08668401W000**                    Created: 7/31/08    1:25:22PM

| TCN | TIME STAMP | REASON FOR REJECTION |
|-----|------------|----------------------|
| 866840003 | 7/31/08  11:04:15AM | L0008 |

---

IAFIS Detail Rejection Reason

**IAFIS ICN:**  E2008207000000079920

| TCN | IAFIS_RECV_TS | MSG_CODE | MSG_TEXT |
|-----|---------------|----------|----------|
| 866840003 | 7/30/08  9:21:04AM | L0008 | L0008 - The quality of the characteristics is too low to be used . |

1-17a(Rev.4-14-08)



**U.S. Department of Justice**
Federal Bureau of Investigation

AUG 07 2008 5 9 5 9

Clarksburg, WV 26306

The fingerprints appearing on the attached fingerprint card(s) are not adequate for accurate identification purposes.   The reason(s) for return are set forth below:

**CODE** **DESCRIPTION**
**L0008**   The quality of characteristics is too low to be used.
        (Determined by the FBI's Automated Fingerprint Identification System)
**L0116**   Fingerprint pattern(s) not discernible.
**L0117**   Insufficient pattern area(s) recorded for identification purposes.
**L0118**   Erroneous or incomplete fingerprint(s) on images; fingers or hands
        out of sequence; printed twice; missing and no reason given.

It is requested that the individual(s) be reprinted and fully rolled and clearly recorded fingerprint card(s) be resubmitted to the FBI, Criminal Justice Information Services (CJIS) Division.

**Resubmitting Criminal Fingerprint Cards:**

When submitting criminal reprints, it is not necessary to return the original fingerprint card(s).

**Resubmitting Applicant/Civil Fingerprint Cards:**

For applicant/civil fingerprint cards for which a fee is involved, one reprint will be processedd at no additional charge.   The first reprint must be returned with the original prints and all attachments, in order to receive credit.

See the opposite side of this form for suggestions for obtaining legible fingerprints.

Thank you for your cooperation in this matter.

Criminal Justice Information Services Division
FBI

**Please Note Instructions on Reverse Side**

## Please Note

It is suggested that each newly recorded fingerprint card be examined to ensure that the impressions are fully rolled and clearly recorded, bearing in mind the following:



Please, attempt to print fingers which are deformed or scarred and note fingerprints which are amputated or missing at birth.

Your earnest cooperation is solicited in obtaining the best possible impressions in each block on each fingerprint card. By doing so, you are rendering a vital service and making a major contribution to all agencies participating in the fingerprint exchange program.

Training information relative to the procedures for properly recording fingerprints can be obtained by contacting FBI, CJIS Division at (304) 625-5590 or (304) 625-2000.

EXHIBIT 7

EXHIBIT 7



# Schoharie County Sheriff's Office

♦

**JOHN BATES, JR.**
SHERIFF

(518) 295-7066

**WILLIAM A. SLATER**
UNDERSHERIFF

157 DEPOT LANE
P.O. BOX 689
SCHOHARIE, NY 12157
FAX (518) 295-7094

| CIVIL | (518) 295-7080 |
| | (518) 296-8888 |
| RECORDS | (518) 295-7072 |
| JAIL | (518) 295-7071 |
| DEPUTIES | (518) 295-7076 |
| DARE | (518) 295-7098 |
| NON-EMERGENCY | (518) 295-8114 |
| EMERGENCY | 911 |

Civil 295-7080

Mr. Osterweil:                          August 18, 2008

### REGARDING YOUR PISTOL PERMIT APPLICATION

(  )  Application not signed or notarized.

(  )  Some arrests or convictions not listed or incorrect.

(  )  Reference sheet not notarized or signed.

(  )  Some reference sheets indicate you may not be a full
      time resident of Schoharie County - Explain.

(  )  In reference to your pistol permit application, the
      D.C.J.S. has rejected the original fingerprint card.
      It will be necessary for you to come in to the office
      to be reprinted.  Also ask the deputy to reprint you
      on an F.B.I. card.

(XX)  In reference to your pistol permit application, the
      F.B.I. has rejected the original fingerprint card.  It
      will be necessary for you to come in to the office to
      be reprinted.

(XX)  There is no additional charge for reprinting and it
      can be done any Wednesday evening between 6:30 PM and
      8:30 PM.  Please bring this letter with you so you
      get printed on the correct card.

(  )  You may stop at the Sheriff's civil office Monday-
      Friday between 9 AM and 4 PM.

(  )  Other:



EXHIBIT 8

EXHIBIT 8

# *Rejection Reason for a TCN*

 

**Requested BCN:  08672511W000**                    Created: 9/8/08      8:48:27AM

| TCN | TIME STAMP | REASON FOR REJECTION |
|-----|------------|----------------------|
| 867251011 | 9/8/08  7:45:49AM | L0008 |

---

IAFIS Detail Rejection Reason

**IAFIS ICN:**  E2008249000000058561

| TCN | IAFIS_RECV_TS | MSG_CODE | MSG_TEXT |
|-----|---------------|----------|----------|
| 867251011 | 9/6/08  9:57:10AM | L0008 | L0008 - The quality of the characteristics is too low to be used . |

1-17a(Rev.4-14-08)



**U.S. Department of Justice**
Federal Bureau of Investigation

SEP 1 2 2006 9 59

Clarksburg, WV 26306

The fingerprints appearing on the attached fingerprint card(s) are not adequate for accurate identification purposes.  The reason(s) for return are set forth below:

**CODE**  **DESCRIPTION**
**L0008**  The quality of characteristics is too low to be used.
(Determined by the FBI's Automated Fingerprint Identification System)
**L0116**  Fingerprint pattern(s) not discernible.
**L0117**  Insufficient pattern area(s) recorded for identification purposes.
**L0118**  Erroneous or incomplete fingerprint(s) on images; fingers or hands
out of sequence; printed twice; missing and no reason given.

It is requested that the individual(s) be reprinted and fully rolled and clearly recorded fingerprint card(s) be resubmitted to the FBI, Criminal Justice Information Services (CJIS) Division.

**Resubmitting Criminal Fingerprint Cards:**

When submitting criminal reprints, it is not necessary to return the original fingerprint card(s).

**Resubmitting Applicant/Civil Fingerprint Cards:**

For applicant/civil fingerprint cards for which a fee is involved, one reprint will be processedd at no additional charge.  The first reprint must be returned with the original prints and all attachments, in order to receive credit.

See the opposite side of this form for suggestions for obtaining legible fingerprints.

Thank you for your cooperation in this matter.

Criminal Justice Information Services Division
FBI

**Please Note Instructions on Reverse Side**

# Please Note

It is suggested that each newly recorded fingerprint card be examined to ensure that the impressions are fully rolled and clearly recorded, bearing in mind the following:



Please, attempt to print fingers which are deformed or scarred and note fingerprints which are amputated or missing at birth.

Your earnest cooperation is solicited in obtaining the best possible impressions in each block on each fingerprint card. By doing so, you are rendering a vital service and making a major contribution to all agencies participating in the fingerprint exchange program.

Training information relative to the procedures for properly recording fingerprints can be obtained by contacting FBI, CJIS Division at (304) 625-5590 or (304) 625-2000.

SEP 1 5 2004 3 9 0 3

1-12 (Rev. 8-4-05)

**U.S. DEPARTMENT OF JUSTICE**

Federal Bureau of Investigation
Criminal Justice Information Services Division
Identification and Investigative Services Section

1000 Custer Hollow Road
Clarksburg, WV 26306

Date _____

Contributor:

The enclosed fingerprints and/or correspondence are being returned to you because of reason(s) indicated below:

☐ Second request for correction.
☐ (Contributor) (CIDN) (SOC) omitted or incorrect
☐ Name (not shown at top of card) (name and signature differ) (name illegible or unclear).
☐ Essential information (omitted) (not clear) (incomplete):   ☐ Sex      ☐ Descriptive data      ☐ Date of birth
☐ Charge and/or date of arrest (omitted) (not clear) incomplete). List charges in literal form (i.e. murder, rape, robbery, etc.)
☐ Advise reason for submission of fingerprints: (i.e. Law Enforcement, Criminal Justice, Weapon Permit, etc.)
☐ Fingerprint(s) illegible - please submit another card.  For enhanced legibility, ensure fingers are rolled nail to nail.
☐ Inked finger impressions not on card.
☐ Advise reason for submission of fingerprints; if criminal furnish charge; or if applicant furnish position for which applying.
☐ FBI number omitted.  Rolled impressions of all fingers, and plain impressions, are necessary to process.
☐ Impressions not black on standard white fingerprint card stock.
☐ Apparently mailed to us by mistake.
☐ Our records fail to reveal a statute from your state requiring fingerprinting for the position indicated.
☐ There is no indication the enclosed cards and/or correspondence have been processed through your state identification
     bureau or central agency prior to submission to the FBI.
☐ Enclosed card or correspondence may have been submitted by your office.  Please list contributor and return to FBI.  If not
     submitted by your office, please advise.
☐ We do not include information unsupported by fingerprints in our files.
☐ Fingerprint card with nonserious offense.
☐ Please enter Sex Offender Registration information into the "Convicted Sexual Offender Registry File" using NCIC 2000.
☐ A new processing fee will be charged.  Please submit a set of fingerprints without attachments.
☐ Failure to follow 3rd submission rules.
☐ REJ/50 - Transaction received for processing matches NFF record from your state.
☐ REJ/51 - SID on file different than SID on print.
☐ REJ/52 - SID previously established for another FNU.
☐ REJ/53 - SID missing for NFF participant.
☐ Live scan equipment not properly programmed.
☐ The form used for submission was (not the correct form/fingerprint card) (not a standard form/fingerprint card), please resubmit.
☐ Please submit electronically.
☐ Cannot update Subject Record because DOA _____ and corresponding DO S already exists.
☐ Fingerprint cards accepted by Immigration and Naturalization Services (INS) (excluding PORTPASS and PAL programs), must be
     forwarded to the respective service center for processing.
☐ Attached fingerprint card has been afforded an Integrated Automated Fingerprint Identification System (IAFIS) name check.
☐ The fingerprints and/or correspondence are being returned per your request.

☐ The FBI has only approved two inkless methods for obtaining fingerprints.  It is suggested that you contact the
     appropriate vendor listed below who sold you your equipment for clarification of processing procedures.

Identicator Corporation (310) 305-8181          Dactek International, Inc.   (818) 787-1901
4051 Glencoe Avenue                             8142 Orion Avenue
Marina Del Rey, CA. 90292                        Van Nuys, CA.  91406

☐ Other
███████████████████████████████████████████   Your cooperation is appreciated.

Enclosure(s)

Exhibit 9

**Subject:** Al;fred G Osterweil permit
**From:** "Al Osterweil" <twodogs@midtel.net>
**Date:** Mon, 15 Dec 2008 08:08:44 -0600
**To:** "sheriffbates" <sheriffofc@co.schoharie.ny.us>

```
Dear Sheriff Bates,

Some months have now passed since I was re-fingerprinted. I have not been scheduled
for the gun safety class your office provides, nor have I had any communication
from your office at all.
Would you please contact me and advise me of the status of my application.A
response to this e-mail woulxd be fine.
Sincerely,
Alfred G Osterweil
```

A71
Case 1:09-cv-00825-MAD-DRH   Document 33-1   Filed 03/11/11   Page 38 of 117
Re: Al;fred G Osterweil permit

**Subject:** Re: Al;fred G Osterweil permit
**From:** Schoharie County Sheriff <sheriffofc@co.schoharie.ny.us>
**Date:** Tue, 16 Dec 2008 15:02:12 -0500
**To:** Al Osterweil <twodogs@midtel.net>

Mr. Osterweil,

   The F.B.I. has rejected your fingerprints for the second time.  I am meeting with
Judge Bartlett next week and will ask him if he will consider your application
without the F.B.I. check.  If so,  you will be scheduled for the next class.

John Bates


Al Osterweil wrote:
   Dear Sheriff Bates,

   Some months have now passed since I was re-fingerprinted. I have not been
   scheduled for the gun safety class your office provides, nor have I had any
   communication from your office at all.
   Would you please contact me and advise me of the status of my application.A
   response to this e-mail woulxd be fine.
   Sincerely,
   Alfred G Osterweil

**Subject:**
**From:** "Al Osterweil" <twodogs@midtel.net>
**Date:** Mon, 2 Feb 2009 13:30:14 -0600
**To:** "sheriffbates" <sheriffofc@co.schoharie.ny.us>

Dear Sheriff Bates,I last received an E-mail from you on December 16, 2008. At that time you iondicated you were going to speak to Judge Bartlett, who would be acting not as a judge, but rather as the county's "issuing agent". I must insist on a response to my application forthwith. Dragging this out and denying me the right to gun ownership violates my rights as a US citizen under 42 USC 1983. I will not hesitate to seek damages and relief against the county and all lother persons who are in complicity in this matter.
Very truly yours,
Alfred G Osterweil

Re:

**Subject:** Re:
**From:** Schoharie County Sheriff <sheriffofc@co.schoharie.ny.us>
**Date:** Tue, 03 Feb 2009 15:00:52 -0500
**To:** Al Osterweil <twodogs@midtel.net>

Mr. Osterweil,

   I met with Judge Bartlett on Tuesday, December 23, 2008 regarding other pistol
permit matters.  He was unable to address your application at that time.  His
secretary was asked by me to schedule an appointment to specifically  discuss your
application.  I did not receive an appointment date until last week.  I will now
meet with Judge Bartlett on Friday, February 13, 2009.  For your information, your
fingerprints have been rejected for the second time by both the F.B.I. and NY State
D.C.J.S.   They will not process another set of prints without an additional fee of
$105.00.   I intend to ask the Judge if there is any way to avoid this additional
fee for you.

Sincerely,

Sheriff John S. Bates, Jr.


Al Osterweil wrote:
   Dear Sheriff Bates,I last received an E-mail from you on December 16, 2008. At
   that time you iondicated you were going to speak to Judge Bartlett, who would be
   acting not as a judge, but rather as the county's "issuing agent". I must insist
   on a response to my application forthwith. Dragging this out and denying me the
   right to gun ownership violates my rights as a US citizen under 42 USC 1983. I
   will not hesitate to seek damages and relief against the county and all lother
   persons who are in complicity in this matter. Very truly yours,
   Alfred G Osterweil

Re:

**Subject:** Re:
**From:** "Al Osterweil" <twodogs@midtel.net>
**Date:** Wed, 4 Feb 2009 06:28:07 -0600
**To:** "Schoharie County Sheriff" <sheriffofc@co.schoharie.ny.us>

Dear Sheriff Bates
Thank you for your response of 2/03/09. It may be that I am simply not able
to provide clear fingerprints. Does that mean that I am disqualified from
gun ownership in New York? Your deputies noted that several fingers printed
out clear;ly and only a few were difficult to read. If the FBI can locate
felons with only one finger's print at a crime scene, they should be able to
run my prints. Further, why should I be required to pay an additional fee
and have the process linger on for several more months.Even the flawed NY
statute indicates that the entire process must be completed within 6 months,
irrespective of whether the prints come back from the FBI within that period
of time.We are well beyond 6 months at this juncture.
The way my matter is being handled, it appears that every efort is being
made to thwart my application for gun ownership.I suppose an illegal alien
who lives in a tent in Schoharie as his only residence but whose
fingerprints are clearer than mine would have been issued a permit within
the prescribed 6 months. I pay enormous property taxes in Schoharie County
on two residences, I served in the Armed Forces of the USA, I pay my income
taxes, unlike some of our highest ranking  governmental officials, and
insteadof being treated fairly in accordance with the law as enunciated by
our own Supreme Court, my right to protect myself and my family in my two
homes in Summit NY is being stymied.This is not the kind of country I grew
up in and served.
I look forward to a speedy resolution of this matter.
Very truly yours,
Alfred G Osterweil


----- Original Message ----- From: "Schoharie County Sheriff"
<sheriffofc@co.schoharie.ny.us>
To: "Al Osterweil" <twodogs@midtel.net>
Sent: Tuesday, February 03, 2009 2:00 PM
Subject: Re:


Mr. Osterweil,

    I met with Judge Bartlett on Tuesday, December 23, 2008 regarding other
pistol permit matters.  He was unable to address your application at that
time.  His secretary was asked by me to schedule an appointment to
specifically  discuss your application.  I did not receive an appointment
date until last week.  I will now meet with Judge Bartlett on Friday,
February 13, 2009.  For your information, your fingerprints have been
rejected for the second time by both the F.B.I. and NY State D.C.J.S.
They will not process another set of prints without an additional fee of
$105.00.   I intend to ask the Judge if there is any way to avoid this
additional fee for you.

Sincerely,

Sheriff John S. Bates, Jr.


Al Osterweil wrote:
    Dear Sheriff Bates,I last received an E-mail from you on December 16,
2008. At that time you iondicated you were going to speak to Judge
Bartlett, who would be acting not as a judge, but rather as the county's
"issuing agent". I must insist on a response to my application forthwith.

Re:

Dragging this out and denying me the right to gun ownership violates my
rights as a US citizen under 42 USC 1983. I will not hesitate to seek
damages and relief against the county and all lother persons who are in
complicity in this matter. Very truly yours,
Alfred G Osterweil

Exhibit 10



# Schoharie County Sheriff's Office

**JOHN BATES, JR.**
SHERIFF

(518) 295-7066

**WILLIAM A. SLATER**
UNDERSHERIFF

157 DEPOT LANE
P.O, BOX 689
SCHOHARIE, NY 12157
FAX (518) 295-7094

| CIVIL | (518) 295-7080 |
| | (518) 296-8888 |
| RECORDS | (518) 295-7072 |
| JAIL | (518) 295-7071 |
| DEPUTIES | (518) 295-7076 |
| DARE | (518) 295-7098 |
| NON-EMERGENCY | (518) 295-8114 |
| EMERGENCY | 911 |

February 18, 2009

Alfred G. Osterweil
310 Rossman Fly Road
Summit, NY 12175

Dear Mr. Osterweil,

As I explained in my e-mail of February 3, 2009, I met with Judge Bartlett on Friday, February 13, 2009.

Judge Bartlett has requested that your permit application be turned over to him. This is being done today. Any further questions regarding this matter, should be directed to the Court at 518-295-8383.

Sincerely,

John S. Bates, Jr.
Sheriff
Schoharie County

Cc: Hon. George R. Bartlett III

JSB|mh

Exhibit 11



**COUNTY COURT OF THE STATE OF NEW YORK**
COUNTY OF SCHOHARIE
THE COURTHOUSE - 290 MAIN STREET
P.O. BOX 669
SCHOHARIE, NEW YORK 12157
TEL: (518) 295-8342
FAX: (518) 295-7226

GEORGE R. BARTLETT III
COUNTY COURT JUDGE

William J. Minkel
COURT ATTORNEY

F. CHRISTIAN SPIES
CHIEF CLERK

February 20, 2009

Mr. Alfred G. Osterweil
310 Rossman Fly Road
Summit, New York 12175

    Re:   Pistol Permit Application

Dear Mr. Osterweil:

    I met with Sheriff Bates on February 3, 2009 concerning various issues; and during that meeting, he indicated he had legal questions regarding your pistol permit application that he felt should be addressed by the Court prior to his office further processing your application. Accordingly, in order to avoid any <u>ex parte</u> discussions, I asked the Sheriff to forward your paperwork to me so that I could review your application and ascertain the issues involved with your permit application.

    I have reviewed your file and it appears to me that there are two threshold issues. One being that the FBI has rejected your fingerprints twice due to the fact that the "quality of characteristics is too low to be used." Moreover, it appears that New York State DCJS was also unable to utilize your fingerprints in their record's check. There is also a note in your file, apparently from the Deputy who took your prints, indicating concern about the FBI being able to read your prints as, in his opinion, you did not have "prints to speak of. They are very worn."

    Penal Law §400 requires an FBI fingerprint and NYS DCJS search prior to the issuance of a pistol permit, but does allow the issuing authority some discretion with respect to this requirement. As the failure to be able to read your prints is certainly not under your control, I would entertain a request to waive this requirement.

Page 2

The second issue seems to be that you are not or will not be a resident of the State of New York. In this regard, New York Law has regularly held that pistol permits should be issued to residents only[1] (see, Mahoney v. Lewis, 199 A.D. 2d 734). However, I acknowledge your correspondence which sets forth your intention to maintain a second home in Schoharie County and certainly appreciate the fact that, as such, you will pay real estate taxes upon that property.

At this juncture, I would like to schedule an appearance in Court where you or your attorney can present any arguments in support of your application. In particular, I would be interested in your supplying any legal precedent supporting your position with regard to residency and in support of a fingerprint check waiver. Moreover, I would like the Sheriff to be present to explain the fingerprint situation and answer any questions you or your attorney may have.

I have, accordingly, scheduled this matter for an appearance on **Tuesday, March 24, 2009 at 1:30 p.m.** If you or your attorney wish to submit written, legal arguments prior to this date, please feel free to submit same. Also, should you wish to review your file, please call Kathy in my office to arrange for a convenient time to do so. Finally, if the date set for an appearance is not convenient for you, please call my office to reschedule.

Very truly yours,

GEORGE R. BARTLETT, III

GRB/klp
c:     Sheriff John S. Bates, Jr.
       F. Christian Spies, Chief Clerk

---

[1] In Mahoney v. Lewis, id. at p. 735 it was held that the "term residence [as used in Penal Law §400] is equivalent to domicile and requires something more than mere ownership of land."

Exhibit 12

Alfred G. Osterweil
P. O. Box 173
Summit New York 12175
March 3, 2009



RECEIVED
MAR - 3 2009
SUPREME/COUNTY COURT
SCHOHARIE COUNTY

Re: Pistol Permit

Dear Judge Bartlett

I will be sending you a package of materials with respect to my application, but I thought you might want to visit the FBI site with respect to fingerprinting, steps to take, the issue of worn fingerprints and other matters related to the fingerprinting done by sheriff's deputies..

None of the special steps suggested in the FBI article which is attached to this FAX were utilized when I was fingerprinted.

Respectfully,

Alfred G Osterweil.

Enclosures 12

By FAX to 518 295-7226

# Taking Legible Fingerprints

## Section I. Introduction

The purpose of this program is to provide information regarding the nature of fingerprints and outline techniques for taking legible fingerprints.

Fingerprints can be recorded on a standard fingerprint card or digitally. Obtaining quality fingerprint impressions can be a matter of using proper techniques. Even though the methods of recording fingerprints may differ, the techniques for obtaining quality fingerprints are very similar.

## Section II. Fingerprint Pattern Types

Fingerprints are the result of minute ridges and valleys found on the hand of every person. In the fingers and thumbs, these ridges form patterns of loops, whorls and arches.

### Outline

I.    Introduction

II.   **Fingerprint Pattern Types**
      1. Loop, Whorl, Arch

III.  **Fingerprint Impression Types**
      1. Rolled. Plain

IV.   **Basic Fingerprinting Equipment**
      1. Ink, Paper, Live Scan

V.    **Steps for Fingerprinting**

VI.   **Special Situations**
      1. Amputations
      2. Bandaged Fingers
      3. Scars
      4. Deformities
      5. Worn Fingerprints
      6. Extra Fingers

VII.  **Quality Checklist**



**LOOP**
In a loop pattern, the ridges enter from either side, re-curve and pass out or tend to pass out the same side they entered.



**WHORL**
In a whorl pattern, the ridges are usually circular.



**ARCH**
In an arch pattern the ridges enter from one side, make a rise in the center and exit generally on the opposite side.

**Each of the three pattern types have focal points which are used for classification.**

In the **Loop** pattern there are two focal points: the **Core**, or the center of the loop, and the delta. The **Delta** is the area of the pattern where there is a triangulation or a dividing of the ridges. When recording fingerprints, the delta and the area between the delta and the core must be completely recorded.



A **Whorl** pattern will have two or more deltas. For a whorl pattern, all deltas and the areas between them must be recorded.



The **Arch** pattern has no delta or core; but, it too, must be fully recorded so that its individual characteristics can be readily distinguished.



**Section III. Fingerprint Impression Types**

There are two types of impressions involved in taking fingerprints. The upper ten impressions are taken individually, thumb, index, middle, ring, and little fingers of each hand. These are referred to as the "rolled" impressions because the fingers are rolled from one side of the fingernail to the other, in order to obtain all

available ridge detail.

The impressions at the bottom of the card are taken simutaneously without rolling, printing all of the fingers of each hand at a forty-five degree angle and then the thumbs. These are referred to as "plain," "slapped," or "flat" impressions. The plain impressions are used to verify the sequence and accuracy of the rolled impressions.

**Rolled Impressions**



**Plain Impressions**

## Section IV. Basic Fingerprint Equipment

Fingerprints can be recorded with any of the following materials:

- Ink (Black Printers Ink or Porelon Pad) and Paper (Standard Fingerprint Card, FD-249 Criminal Card or FD-258 Applicant Card). A Porelon Pad contains a built-in ink supply.

- Chemicals and Paper (Standard Fingerprint Card)

- Livescan. For a list of FBI certified Live Scan and Card Scan devices see the FBI Certified Equipment List at www.fbi.gov.

## Section V. Steps for Fingerprinting

The recommended height for the fingerprinting device (Card or Live-Scan) is approximately thirty-nine inches from the floor. This will allow the forearm of an average adult being fingerprinted to be parallel to the floor, at which position it is best to roll and record fingerprints. If the fingerprinting device is not at this height, care must be taken or the finger tends to rise off the device. If this happens, the technician will fail to capture the lower portion of the first joint and necessary ridge detail will be missing.

1. Fingers to be printed must be clean and dry. Wiping the individual's fingers with an alcohol swab and then drying them should prevent perspiration from being a problem. If the individual's occupation has caused a wearing down or
   rough surface on the fingers, use lotion to soften the fingers (be sure to wipe the lotion off before printing).

2. The individual being fingerprinted should be asked to stand in front of and at a forearm's length from the fingerprinting device. The individual should stand to the right and rear of the person taking the fingerprints.

3. Encourage the individual being fingerprinted to relax. Ask them to look at some distant object to distract them from what you are doing.

4. Grasp the individual's right hand at the base of the thumb with your right hand. Cup your hand over the individual's fingers, tucking under those fingers
   not being printed. Guide the finger being printed with your left hand.

5. If using the ink and paper method, roll the finger on the inking plate or Porelon Pad so that the entire fingerprint pattern area is evenly covered with ink. The ink should cover from one edge of the nail to the other and from the crease of the first joint to the tip of the finger. Using the right amount of ink is of vital importance. Too little ink and the impression will be too light. Too much ink and the fine details will run together.



**Bulb
of the
Finger**

**First
Joint**

6. In taking the rolled impression, the side of the bulb (see illustration above) of the finger is placed upon the paper fingerprint card or the fingerprinting device, and the finger is rolled to the other side until it faces the opposite direction. Care should be exercised so the bulb of each finger is rolled evenly from tip to below the first joint. Generally, the weight of the finger is all the pressure needed to clearly record the fingerprint.

 **Click here for video clip showing rolling technique**

7. In order to take advantage of the natural movement of the forearm, the hand should be rotated from the more difficult position to the easiest position. This requires that the thumbs be rolled toward and the fingers away from the center of the individual's body. This process relieves strain and leaves the fingers relaxed when rolling so that they may be lifted easily without danger of slipping which smudges and blurs the fingerprints.

8. Roll each finger from nail to nail in the appropriate space taking care to lift each finger up and away after rolling, to avoid smudging.

9. If using the ink and paper method and a rolled impression is not acceptable, you may use an adhesive re-tab to cover the fingerprint in its space. (No more than one re-tab per finger block is permitted.) For live scan, the image can be deleted and retaken.

10. Plain impressions are printed last, at the bottom of the card. The technician simultaneously presses the individual's four fingers (on the right hand), keeping the fingers together, on the surface of the fingerprint card or the fingerprinting device at a forty-five degree angle in order to capture all four fingers in the allotted space (see illustration). Repeat this process for the left hand. Print both thumbs simutaneously in the plain impression thumb blocks (to ensure that they are in the proper spaces).



 **Please Note:** *Never place a fingerprint impression on the back of a fingerprint card.*

11. If using the ink and paper method, complete the information at the top of the
fingerprint card (masthead). If using live scan, complete the required
information.

## Section VI. Special Situations

Special attention must be given when fingerprinting an individual with abnormalities
of the fingers, thumbs or hands. Special situations include:

- Amputations
- Bandaged Fingers or Hands
- Scars
- Deformities
- Worn Fingerprints
- Extra Fingers
- Webbed Fingers

**Amputations**
An amputation exists when an individual has one or more fingers, thumbs or hands
missing. This condition should be noted in the appropriate block of the fingerprint
submission. Total amputation should be designated using the following notations:

- Amputation (AMP)
- XX
- Missing at Birth (MAB)

 **Please Note:** *The term "Missing," is **not** interpreted as amputation by the FBI.*

**Bandaged Fingers or Hands**
If the individual has a bandage or cast on a finger, thumb or hand, place the
notation, "Unable to Print" or "UP" in the appropriate finger block.

**Scars**
A scar exists when an individual has permanent tissue damage to finger, thumb
or hand and when only pattern areas that have been totally destroyed or the ridge
detail appears distorted. These fingerprints should be taken as they exist. The
scars can be noted as "Scarred," but it is not required.

**Deformities**
A deformity may exist as a result of an injury, birth defect or disease. An attempt
should be made to fingerprint the individual with the techniques outlined

previously; although special equipment (e.g., a fingerprint spoon) may be needed when fingerprinting individuals with deformities. The equipment can be found in the "Postmortem Kit" and consists of:

- Black Printers Ink
- Spatula
- Fingerprint Card Strip Holder (Spoon)
- Fingerprint Card Strips



**Fingerprint Card Strip Holder (Spoon)**

**Spatula**

**Fingerprint Card Strips**

### How to Use the Fingerprint Spoon

1. Place a fingerprint card strip in the fingerprint card strip holder (spoon).

2. Using the spatula, ink the finger (starting with the right hand) and be sure to apply ink from nail to nail.

3. Place the inked finger on the fingerprint card strip holder (curved area) and press down. **Do not** roll the finger. The curved shape of the holder will serve the same purpose as rolling the finger.

4. Cut out the finger block from the card strip and paste in the corresponding block on the standard fingerprint card.

5. Repeat these steps for each of the remaining fingers. Be sure to record the correct finger in the correct finger block.

 **Please Note:** *A strip of fingerprint re-tabs can be substituted for the fingerprint card strip*

If utilizing Live-Scan equipment, the use of a Fingerprint Spoon is not an option. You may want to fingerprint the individual on a standard fingerprint card using either Black Printers Ink, Porelon Pad or the Chemical method so that a Fingerprint Spoon may be used. Then either scan the fingerprint card and submit electronically, or mail the card.

If Live-Scan is the only option, then the finger block(s) should be left empty with a notation of "Unable to Print" or "UP." However, the number of finger blocks without fingerprint images should be kept at a minimum (no more than five).

**Worn Fingerprints**
An individual may, by the nature of their work or age, have very thin or worn ridges in the pattern area. Light pressure and very little ink are used to record these types of fingerprint impressions. A technique known as "milking the fingers" can be used to raise the fingerprints prior to fingerprinting. The technique involves applying pressure or rubbing the fingers in a downward motion from palm to fingertip.
In a situation of dry, flaky fingers, simply add a small amount of hand lotion or ridge builder prior to fingerprinting.

**Extra Fingers**
If an individual has more than ten fingers, the thumbs and the next four fingers should be printed. When a subject with more than ten fingers has an intentional amputation performed, it is invariably the extra finger on the little finger side that is amputated.



*Don't print the extra finger*



**Webbed Fingers or Split Thumbs**
An individual may have two or more fingers webbed or grown together, making it impossible
to roll such fingers. Such fingers should be rolled as completely as possible, and a notation made to the effect that they are joined or "webbed."

*Print if possible ...*                    *...Or make a notation*

   

**Section VII. Quality Checklist**

To verify that the fingerprint impressions meet the FBI's requirements, please use the following checklist:

1. Is there a fingerprint impression in each finger block? If there is a missing fingerprint impression, is there a reason noted in the finger block (e.g., AMP, missing at birth, unable to print, etc.)?

*Make sure to note when images are amputated or unable to print...*



2. Are the fingerprints rolled fully, from nail to nail?

*Same finger . . .*

**Not rolled fully**  **Acceptable**

Mar 03 09 08:38a

p.11

Taking Legible Fingerprints

3. If the fingerprint impression is a loop, are the delta and core present?
   If the fingerprint impression is a whorl, are all deltas present?

4. Are the fingerprint impressions clear and distinct?

5. Are the fingerprint impressions uniform in tone and not too dark or light?

**Too Dark**                **Too Light**                **Ink Unevenly Distributed**
(too much ink or pressure)  (too little ink or pressure)  (causing light and dark areas)

        

6. Are the four finger impressions and a thumb impression in the plain
   impression block for each hand?

7. Are the rolled fingerprint impressions in the correct finger blocks when
   compared to the plain impressions?

*Verify images are in correct order ...*



 **Please Note:** *If using live scan equipment to capture fingerprint
impressions, it is important to clean the equipment regularly and
calibrate routinely per the manufacturers guidelines, to ensure the
quality and integrity of the fingerprint images.*

**Back to the beginning**

Exhibit 13



Alfred G. Osterweil
P.O.Box 173
Summit, New York,12175
March 4, 2009

The Honorable George R. Bartlett,III
Schoharie County Courthouse
Schoharie, New York  12157

Re: Pistol Permit Application

Dear Judge Bartlett,

I received your letter dated February 20, 2009, and wish to take this opportunity to reply to same.
At the outset, I cannot be present in Schoharie County on March 24, 2009. At this time I am  unable to
provide a date certain.

While I am aware of the adage that a lawyer who represents himself has a fool for a client, I will appear
*pro se* in this matter. I believe also that this case is important to many home owners in Schoharie
County who may vote in other states but return annually to Schoharie as their vacation residence.

I would like to take issue with several of the views set forth in your correspondence, and, in addition,
advance several facts and legal positions not touched upon by you.

Prior to analyzing the meaning and rationale of a  residency requirement, which you described as a
threshold issue, I should like to review some preliminary matters. It is my understanding that Schoharie
County, like many but not all counties,  falls into  that category where the statute requires that  a judge
be the "licensing officer". Because many categories of personnel, nonjudicial in nature, are designated
as licensing officers, and because this activity is administrative rather than judicial, I do not see any
basis to have a plenary hearing in this matter.  Indeed , I would strenuously object to such a hearing as I
believe it is unwarranted and might be construed to insulate any governmental entity and its agents,
servants and employees from the reach of  42 USC Sec.1983. Further it could  preclude me  from
proceeding directly to the  US District Court from any adverse decision. While I am not admitted to
practice in New York,  it is my understanding that if I were to proceed in a plenary hearing and be
denied a license, my remedy would be to appeal to a state court rather than a direct appeal to the federal
system. Beyond that, there is that old rule of law that I vaguely remember from law school that a
litigant must exhaust his administrative remedies prior to resorting to the courts.

A point which was omitted in your letter is the failure of the licensing officer to render a decision or
otherwise comply with the provisions of the statute within the prescribed time limits and its effect in
this case. My records reflect that I filed for the license on May 21, 2008, by handing a copy to a
sheriff's deputy who reviewed it and found it to comply with the statute. I thereafter received a letter

from the sheriff dated June 24, 2008 (Attachment A), requesting me to stop down at his office to correct a minor matter on the application. I then wrote to Sheriff Bates, advising him that while I was still a full time resident of Summit New York, I intended to set up my primary residence in another state, retaining my Summit home as a vacation home (Attachment B). Sheriff Bates called me after receiving my letter and generally indicated that the issue of my future move would impact negatively on my application. At the time of his call, the U.S. Supreme court had just decided the case of District of Columbia vs. Heller and I had obtained a copy of the slip opinion. I mentioned the case to Sheriff Bates but he had not yet read it. Based upon the holding in that case, I took it upon myself to write directly to you (Attachment C) to offer to provide you with additional information you might require to comfortably render a decision wherein you could adopt a new view of the residency requirements of the New York statute as now impacted by the Heller case.

I then met with Sheriff Bates on August 14, 2008, at which time he advised me that I would have to be re-fingerprinted. In fact I was re-fingerprinted on August 20, 2008. The only occasion I received any word from you was your recent letter dated February 20, 2009(Attachment D). I previously recognized that the residency requirement originally appearing in the statute probably dealt with the issue of monitoring and therefore, a detailed look into my background could convince the licensing official that perhaps I required less monitoring than other applicants.

I have provided, as Attachment E, some of the background facts I was prepared to provide by affidavit or otherwise had you responded to my letter.

But getting to the issue of the time lapse here and its effect, the statute provides that ..."Except upon written notice to the applicant specifically stating the reasons for any delay, in each case the licensing officer shall act upon any application for a license pursuant to this section within six months of the date of presentment of such an application to the appropriate party. Such delay may only be for good cause and with respect to the applicant. In acting upon an application, the licensing officer shall either deny the application for reasons specifically and concisely stated in writing or grant the application..." It is my contention based on the facts in this matter that my application must be considered as granted since I received no denial and no reasons for any such denial. Surely, every citizen is entitled to rely upon time limitations imposed upon public officials to the same extent that time limits are imposed upon him. For example, if I fail to file a civil complaint within the prescribed time, I am foreclosed from proceeding. There is a reason for the six month provision, and a general rule of statutory construction compels the courts to acknowledge this language and to give it meaning. If we do nothing with respect to a failure to act within six months, we will have written that provision out of the statute. Additionally, the statute provides that "The failure or refusal of the Federal Bureau of Investigation to make the fingerprint check...shall not constitute the sole basis for refusal to issue a permit..." I have never been given any reason for not receiving a permit.

Having dealt with the issue of timeliness required by the government, I should like to address the issue of residency and the Supreme Court decision in Heller. I have only the slip opinion and thus, cannot provide the official citation. The opinion of the court is clear and unequivocal. The language of the court is compelling. On page 64, :"In sum, we hold that the District's ban on handguns in the home violates the Second Amendment... the District must permit him to register his handgun and must issue him a license to carry it in the home." The term "home" is used repeatedly throughout the decision. There is no reference to residence, domicile, principal residence or any other term which could limit the scope of this protection in one's home. The entire purpose of the Second Amendment, to insure the safety of each individual in his home, compels us to insist that a so-called second home is entitled to no less protection than a single residence. What logic could possibly compel the Supreme Court to adopt a

rule which leaves a citizen protected in only one of his homes. We contend that this ruling impliedly strikes down any state requirement that limits possession of a gun to a principal residence, domicile or other class of dwelling.

Admittedly, the court did refer to certain limitations that states could impose upon potential gun owners, but those limitations which appear on pages 54-56 deal with such issues as felons, persons with mental disorders and the like. There are no references to limitations on the type of dwellings in the recitation of the measures and areas of regulation and restriction a state might take. We submit that by enumerating areas of permissible regulation, and by omitting any reference to the type of home in that list, the court intended to strike down any such limitation. The axiom *expressio unius est exclusio alterius* seems applicable here. I hope I am forgiven if I have faltered in my Latin.

Further, we point to Article 2, Section 4 of the New York Civil Rights Law which provides: "A well regulated militia being necessary to the security of a free state, the right of the people to bear arms shall not be infringed," Thus, it is our contention that even absent the decision in Heller, any attempt by New York to limit gun ownership to certain classes of residents and deny such rights to other residents violate its own civil rights provision.

There is another rule of statutory construction which appears applicable, and that arises because New York copied, identically, the language for its Civil Rights Law as it appears in the United States Second Amendment. The rule of construction is that when a governmental entity enacts a statute, regulation or other legislation which contains the same language as appears in another entity's laws, the law presumes it had the same intent as the framers of the original document. Thus, in this situation, New York intended its act to have the same meaning and scope as the Federal provision. Since the Heller Court has interpreted the meaning of the Second Amendment, New York courts must adopt that same meaning. In this case, it means that the New York Civil Rights Act authorizes me to possess a gun in my home in Summit, irrespective of where I vote, so long as I continue to maintain a home there, as I do presently. This is not a rental property. It is my home

I will now deal with the issue of residency as though the Heller case did not exist and as though the New York Civil Rights Act was not a copy of the Second Amendment.. Your letter of February 20, 2009, cites Mahoney v. Lewis where it was held that the "term residence ...is equivalent to domicile and requires something more than mere ownership of land." Well, I have a rather large residence at 310 Rossman Fly Road and I have lived there for some years. I continue to live there and call it my home although I now vote in another state. In addition, we own another home in Summit, New York on Eagle Mountain Road in which we also live and which we also call home. Certain family situations compelled us to have these living arrangements but that is a personal matter and I need not burden anyone with those details. I have a great deal more here in Summit than mere ownership of land. But beyond that I am aware of the case of Bach vs. Pataki, decided by the 2ⁿᵈ CCA. I do not have the official case before me and thus, cannot provide the official citation. That case was brought by a person who had no home in New York but regularly visited his parents who did have a home somewhere upstate. That case was decided on the question of whether the Second Amendment was an individual right. The court ruled it was not an individual right, a position which is now in conflict with the Supreme Court..However, the Court of Appeals did provide its rationale for the residency requirement in *dicta* by Judge Wesley. The thrust of this *dicta* is that the state has an interest in monitoring citizens who have been licensed to have handguns to determine their continuing behavior and to be able to revoke licenses for poor judgment in the community. While *dicta* is not binding I believe I should deal with it in the event it were to become a factor here. Permit me to provide several alternative situations as follows: I continue to be domiciled in New York but I purchase a home in another state and spend

most of the year there while still retaining my Summit home. The only difference between that situation and mine is the change of the place I vote. Had I done that, there would be no residency issue here. Another situation which demonstrates the fallacy of the so-called monitoring issue would arise where I continue to be domiciled in Summit but I travel through Europe for a year or more, or if I purchase a motor home and spend most if not all of the year out of state. I submit that this monitoring issue might have had some efficacy when Summit, New York was inhabited solely by dairy farmers who took their product to market by horse and wagon. It has no validity in a modern society which is mobile and where citizens are more likely to vacation elsewhere for long periods and have second homes. Laws have to make sense. In some situations the passage of time or events not previously conceived cast a different light on a law.

With respect to my fingerprints, I do not wish to belabor the issue. The statute is clear that a license may be issued without them coming back from the FBI, and you indicated that it was not determinative to you. Obviously, it is beyond my control to provide fingerprints acceptable to the FBI. This is not an uncommon situation according to my research. Indeed, the sheriff's own printed form has a box to be checked for the failure to obtain acceptable prints. The purpose of the prints is to assist in determining whether an applicant has a criminal record or other disqualifying aspect to his life, but there are other methods of investigation available to make these determinations.

Under all the circumstances set forth in this letter, I ask that you forthwith issue me a license for a handgun in my home.

As I indicated at the start of this letter I will not be available to speak to you personally in March, 2009, if you refuse to issue me a license at this time. I will be in Summit this summer, and if you order me to appear before you I will, as an officer of the court, comply. If I am so ordered, I would like to know whether this will be an administrative discussion or a court hearing, Further, because my case has generated so much interest from various not for profit organizations and so many gun owners in New York, I would like to bring along at least one interested New York journalist who is, himself, a gun enthusiast. Obviously, if you order a court hearing, such a hearing will automatically be open to the public.

Respectfully,

Alfred G. Osterweil



### Schoharie County Sheriff's Office

JOHN BATES, JR.
SHERIFF
(518) 295-7066

WILLIAM A. SLATER
UNDERSHERIFF

157 DEPOT LANE
P.O. BOX 689
SCHOHARIE, NY 12157
FAX (518) 295-7094

| CIVIL | (518) 295-7080 |
| | (518) 296-8888 |
| RECORDS | (518) 295-7072 |
| JAIL | (518) 295-7071 |
| DEPUTIES | (518) 295-7076 |
| DARE | (518) 295-7098 |
| NON-EMERGENCY | (518) 295-8114 |
| EMERGENCY | 911 |

Civil 295-7080

Mr. Osterweil:                          June 24, 2008

#### REGARDING YOUR PISTOL PERMIT APPLICATION

(  )  Application not signed or notarized.

(  )  Some arrests or convictions not listed or incorrect.

(  )  Reference sheet not notarized or signed.

(  )  Some reference sheets indicate you may not be a full
       time resident of Schoharie County - Explain.

(  )  In reference to your pistol permit application, the
       D.C.J.S. has rejected the original fingerprint card.
       It will be necessary for you to come in to the office
       to be reprinted.  Also ask the deputy to reprint you
       on an F.B.I. card.

(  )  In reference to your pistol permit application, the
       F.B.I. has rejected the original fingerprint card.  It
       will be necessary for you to come in to the office to
       be reprinted.

(  )  There is no additional charge for reprinting and it
       can be done any Wednesday evening between 6:30 PM and
       8:30 PM.  Please bring this letter with you so you
       get printed on the correct card.

(XX)  You may stop at the Sheriff's civil office Monday-
       Friday between 9 AM and 4 PM.

(XX)  Other:  Please stop at the Sheriff's civil office to
       complete and/or correct some information on your permit
       application.  A "premises" permit is only valid inside
       the residence for which you have applied.  The
       application needs to be changed to "carry concealed".
       Also "race" information is missing on one copy of the
       application.



John Bates, Jr., Sheriff
157 Depot Lane
PO Box 689
schoharie, NY 12157

Dear Sir,

With reference to your letter of June 24, 2008, a copy of which I have enclosed, I have a few questions.
Since I applied for a pistol permit, I purchased a home in another state. My intention is to to make that state my
primary residence while I still intend to have a vacation property here in Schoharie County. Under those
circumstance, am I still eligible for a permit. I note that the application itself does not appear to require that
Schoharie County be my principal residence or domicile.
Obviously, if my move to another state rules out a pistol permit, there is no sense in correcting the application.
Thank you for your attention to this matter.

Alfred G Osterweil
310 Rossman Fly Road
POB 173
Summit NY 12175



Alfred G. Osterweil
P.O. Box 173
Summit, New York  12175

July 10, 2008

The Honorable George R. Bartlett, III
P.O. Box 429
Schoharie, New York  12157

Re: **Handgun License**

Dear Sir:

Some months ago, I filed for a license to purchase and hold a handgun.  At
that time I had been a full-time resident of Summit.  Shortly thereafter, it
became expedient for me to change my primary residence and to become
domiciled in another state.  When the Sheriff wrote to me with respect to a
minor issue on my application, I took it upon myself to be entirely forthright
and to advise him of the change in my status.  Thereafter, Sheriff Bates
called me to discuss the issue.  He was most courteous and professional and
suggested that there might be a problem because the State has been taking
the position that an applicant must have his primary residence in New York.
I intend to continue to own a home in New York as I do now; however, I
intend to vote and obtain a driver's license in that other state.  I will utilize
this Summit home as a summer home, spending the great majority of the
year outside New York.

I have read the Heller case, which was decided shortly after I wrote to
Sheriff Bates advising him of my projected move to another state.  That case
was quite clear, it seems to me, stating that the Second Amendment was
adopted to permit all citizens to own and bear arms to protect them in their
homes.  The case never uses the term "residence", "principal residence",
"domicile", or similar designation.  Justice Scalia referred to one's "home"
throughout the majority opinion.  If the amendment was meant to permit me
to protect myself in my home, is it not logical to assume that I have the same
right in a second home?  Indeed, the founding fathers came to Philadelphia
from all the thirteen states where they had their primary residences but
stayed and lived in Philadelphia for long periods of time in a "second

home". They did not choose to limit the scope of the amendment to domicile, primary residences, and the like.

In the event the Court holds the same view as does Sheriff Bates and denies my application, I believe the issue is sufficiently significant for me to pursue the matter with vigor. While I am not admitted to practice law in New York, I am admitted to practice in New Jersey, the District of Columbia, the Third Circuit Court of Appeals and the United States Supreme Court. I am prepared to appear *pro se* to see this matter concluded as a natural extension of the <u>Heller</u> case.

Should the Court wish to establish a record, I would be very happy to appear before the Court at any time the Court feels it convenient. If the Court wishes to have me provide an affidavit to frame the issue, I would be happy to provide same. In short, I would hope that the Court will deal expeditiously with the issue before it with the knowledge that I will cooperate fully to meet any and all directives of the Court.

Respectfully yours,


Alfred G. Osterweil

Copy to Sheriff Bates



**COUNTY COURT OF THE STATE OF NEW YORK**
COUNTY OF SCHOHARIE
THE COURTHOUSE - 290 MAIN STREET
P.O. BOX 669
SCHOHARIE, NEW YORK 12157
TEL: (518) 295-8342
FAX: (518) 295-7226



GEORGE R. BARTLETT III
COUNTY COURT JUDGE

WILLIAM J. MINKEL
COURT ATTORNEY

F. CHRISTIAN SPIES
CHIEF CLERK

February 20, 2009

Mr. Alfred G. Osterweil
310 Rossman Fly Road
Summit, New York  12175

     Re:    Pistol Permit Application

Dear Mr. Osterweil:

    I met with Sheriff Bates on February 3, 2009 concerning various issues; and during that meeting, he indicated he had legal questions regarding your pistol permit application that he felt should be addressed by the Court prior to his office further processing your application. Accordingly, in order to avoid any <u>ex parte</u> discussions, I asked the Sheriff to forward your paperwork to me so that I could review your application and ascertain the issues involved with your permit application.

    I have reviewed your file and it appears to me that there are two threshold issues. One being that the FBI has rejected your fingerprints twice due to the fact that the "quality of characteristics is too low to be used." Moreover, it appears that New York State DCJS was also unable to utilize your fingerprints in their record's check. There is also a note in your file, apparently from the Deputy who took your prints, indicating concern about the FBI being able to read your prints as, in his opinion, you did not have "prints to speak of. They are very worn."

    Penal Law §400 requires an FBI fingerprint and NYS DCJS search prior to the issuance of a pistol permit, but does allow the issuing authority some discretion with respect to this requirement. As the failure to be able to read your prints is certainly not under your control, I would entertain a request to waive this requirement.

The second issue seems to be that you are not or will not be a resident of the State of New York. In this regard, New York Law has regularly held that pistol permits should be issued to residents only[1] (see, Mahoney v. Lewis, 199 A.D. 2d 734). However, I acknowledge your correspondence which sets forth your intention to maintain a second home in Schoharie County and certainly appreciate the fact that, as such, you will pay real estate taxes upon that property.

At this juncture, I would like to schedule an appearance in Court where you or your attorney can present any arguments in support of your application. In particular, I would be interested in your supplying any legal precedent supporting your position with regard to residency and in support of a fingerprint check waiver. Moreover, I would like the Sheriff to be present to explain the fingerprint situation and answer any questions you or your attorney may have.

I have, accordingly, scheduled this matter for an appearance on **Tuesday, March 24, 2009 at 1:30 p.m.** If you or your attorney wish to submit written, legal arguments prior to this date, please feel free to submit same. Also, should you wish to review your file, please call Kathy in my office to arrange for a convenient time to do so. Finally, if the date set for an appearance is not convenient for you, please call my office to reschedule.

Very truly yours,

GEORGE R. BARTLETT, III

GRB/klp
c:     Sheriff John S. Bates, Jr.
       F. Christian Spies, Chief Clerk

---

[1] In Mahoney v. Lewis, id. at p. 735 it was held that the "term residence [as used in Penal Law §400] is equivalent to domicile and requires something more than mere ownership of land."



# AFFIDAVIT

I, Alfred G. Osterweil, of 310 Rossman Fly Road, Summit, New York do hereby swear to the following statements as true to the best of my knowledge and belief and I acknowledge that I may be punished for contempt and convicted of other offenses if any of said statements are false:

1. I was born in Newark New Jersey,
2. I received a Bachelor of Arts degree from Rutgers University.
3. I received a Juris Doctor degree from Rutgers University School of Law
4. I was inducted into the Army of the United States and trained at Fort Dix, New Jersey
5. As part of that training I was qualified with trhe M1 Garand and won medals as a marksman and sharpshooter with it
6. I was also qualified with the 30 caliber air cooled machine gun, the 30 caliber water cooled machine gun, the Browning Automatic Rifle and the standard army 45 caliber sidearm.
7. I thereafter was shipped to Germany where I served in an elite group of 136 men scattered throughout Germany
8. That unit, The 66th Counter Intelligence Group required a security clearance several levels above top secret.
9. As a result I was fingerprinted and underwent a background check by the FBI which included interviews with my instructors from law school back to elementary school, a check with friends and associates, a review of all books in my home and even an interview with my dentist and family physician.
10. While in Germany I was in civilian clothes rather than uniform, I did not sleep nor eat in a military facility nor did I report to a military supervisor. I was authorized and did carry a 45 caliber sidearm.
11. Upon discharge, I commenced the practice of law which I followed until my retirement in 1998 in Edgewater New Jersey'.
12. I was admitted to practice and did appear in all courts in New Jersey, the District Court for the District of New Jersey and the 3rd Circuit Court of Appeals In Philadelphia. On motion, I argued before the New York Supreme Court at 10 Center Street, Manhattan. I never appeared before the courts in the District of Columbia nor the U.S.Supreme Court although I am admitted to practice in each of them.
13. For the last thirty or so years of practice I represented police organizations almost solely, Included in the one hundred or so organizations I represented were the police employed by the Port Authority of New York and New Jersey. As such I was privy to various anti-terror plans established at Kennedy International Airport, La Guardia Airport and Newark International Airport
14. I received an honorable discharge from the US Army and I was never the subject of discipline as an attorney.
15. I was never convicted of any crime, be it felony or misdemeanor nor have I ever been arrested
16. I have never been treated for any type of mental illness
17. I am not addicted nor have I ever been addicted to any drug or substance including alcohol
18. I am married with an adult daughter and two grandsons.

19. I have two homes in Summit, New York and two homes in Many, Louisiana, I consider all of them my home and I rent out none of them

20. I have purchased guns in the past and have always been cleared to do so without any delay by the ATF. My most recent purchase which was within the past 30 days was a 22 caliber rifle

_____   3/4/09

Alfred G. Osterweil

This is to certify that the Affiant, Alfred G. Osterweil,
did appear before me and swear to the truthfulness of the statements made therein.

_____   3/4/09

Cynthia A. Rollenhagen
Attorney-at-Law
State of New Jersey

**AFFIDAVIT**

I, Alfred G. Osterweil, of 310 Rossman Fly Road, Summit, New York do hereby swear to the following statements as true to the best of my knowledge and belief and I acknowledge that I may be punished for contempt and convicted of other offenses if any of said statements are false:

1. I was born in Newark New Jersey,
2. I received a Bachelor of Arts degree from Rutgers University.
3. I received a Juris Doctor degree from Rutgers University School of Law
4. I was inducted into the Army of the United States and trained at Fort Dix, New Jersey
5. As part of that training I was qualified with trhe M1 Garand and won medals as a marksman and sharpshooter with it
6. I was also qualified with the 30 caliber air cooled machine gun, the 30 caliber water cooled machine gun, the Browning Automatic Rifle and the standard army 45 caliber sidearm.
7. I thereafter was shipped to Germany where I served in an elite group of 136 men scattered throughout Germany
8. That unit, The 66th Counter Intelligence Group required a security clearance several levels above top secret.
9. As a result I was fingerprinted and underwent a background check by the FBI which included interviews with my instructors from law school back to elementary school, a check with friends and associates, a review of all books in my home and even an interview with my dentist and family physician.
10. While in Germany I was in civilian clothes rather than uniform, I did not sleep nor eat in a military facility nor did I report to a military supervisor. I was authorized and did carry a 45 caliber sidearm.
11. Upon discharge, I commenced the practice of law which I followed until my retirement in 1998 in Edgewater New Jersey'.
12. I was admitted to practice and did appear in all courts in New Jersey, the District Court for the District of New Jersey and the 3rd Circuit Court of Appeals In Philadelphia. On motion, I argued before the New York Supreme Court at 10 Center Street, Manhattan. I never appeared before the courts in the District of Columbia nor the U.S.Supreme Court although I am admitted to practice in each of them.
13. For the last thirty or so years of practice I represented police organizations almost solely, Included in the one hundred or so organizations I represented were the police employed by the Port Authority of New York and New Jersey. As such I was privy to various anti-terror plans established at Kennedy International Airport, La Guardia Airport and Newark International Airport
14. I received an honorable discharge from the US Army and I was never the subject of discipline as an attorney.
15. I was never convicted of any crime, be it felony or misdemeanor nor have I ever been arrested
16. I have never been treated for any type of mental illness
17. I am not addicted nor have I ever been addicted to any drug or substance including alcohol
18. I am married with an adult daughter and two grandsons.

19. I have two homes in Summit, New York and two homes in Many, Louisiana, I consider all of them my home and I rent out none of them
20. I have purchased guns in the past and have always been cleared to do so without any delay by the ATF. My most recent purchase which was within the past 30 days was a 22 caliber rifle

_____  3/4/09
Alfred G. Osterweil

This is to certify that the Affiant, Alfred G. Osterweil,
did appear before me and swear to the truthfulness of the statements made therein.

_____  3/4/09
Cynthia A. Rollenhagen
Attorney-at-Law
State of New Jersey

# Supplemental Affidavit

I, Alfred G. Osterweil, of 310 Rossman Fly Road, Summit, New York, do hereby swear to the following statements as true to the best of my knowledge and belief and I acknowledge that I may be punished for contempt and convicted of other offenses if any of said statements are false:

1. I recently had the opportunity to review the dealer's copy of the federal Firearms Transaction Record associated with a transaction in which I purchased a Heritage Arms, 22 caliber Rough Rider model revolver, serial number F54528.

2. This is the official form all licensed gun dealers must complete for any such transaction, and it was created to comply with the Brady Handgun Violence Protection Act of 1993 (Brady Act),

3. I was required to provide certain personal information and answer all questions which appeared on this Form 4473 which is issued pursuant to 18 USC Sec 921 *et.seq.*

4. The dealer must then communicate with the FBI for a so-called NICS background check.

5. The FBI was contacted and a background check was performed. The document reveals that the NICS transaction number is IBCZ-WG5, the name and Brady identification number are Christi and 4371, respectively.

6. I paid for and received the revolver. Thus, it is incontrovertible that I received a favorable background check from the FBI on February 13, 2009, the date of the transaction.

_____ S/ Alfred _____ 3/4/09
Alfred G. Osterweil

This to certify that the Affiant, Alfred G. Osterweil,
did appear before me and swear to the truthfulness of the statements made therein.

_____ S/ Cynthia A. Rollenhagen _____ 3/4/09
Cynthia A. Rollenhagen
Attorney-at-Law
State of New Jersey

Exhibit 14



**Alfred G Osterweil**
P. O. Box  173
Summit, New York 12173
March 4, 2009

The Honorable George R. Bartlett,III
Schoharie County Courthouse
Schoharie, New York, 12157

Re: Pistol Permit Application

Dear Judge Bartlett,

Having already mailed a letter to you with enclosures, including an affidavit, kindly add to that
submission this letter and the enclosed Supplemental  Affidavit which certainly bears rather strongly on
the issue you raised with respect to an FBI check.

I submit that the fact that I successfully underwent a background check by the FBI on February 13,
2009, makes moot any possible issue about poor quality fingerprints prior thereto.

Respectfully,

Alfred G.terweil

# Supplemental Affidavit

I, Alfred G. Osterweil, of 310 Rossman Fly Road, Summit, New York, do hereby swear to the following statements as true to the best of my knowledge and belief and I acknowledge that I may be punished for contempt and convicted of other offenses if any of said statements are false:

1. I recently had the opportunity to review the dealer's copy of the federal Firearms Transaction Record associated with a transaction in which I purchased a Heritage Arms, 22 caliber Rough Rider model revolver, serial number F54528.

2. This is the official form all licensed gun dealers must complete for any such transaction, and it was created to comply with the Brady Handgun Violence Protection Act of 1993 (Brady Act),

3. I was required to provide certain personal information and answer all questions which appeared on this Form 4473 which is issued pursuant to 18 USC Sec 921 *et.seq.*

4. The dealer must then communicate with the FBI for a so-called NICS background check.

5. The FBI was contacted and a background check was performed. The document reveals that the NICS transaction number is 1BCZ-WG5, the name and Brady identification number are Christi and 4371, respectively.

6. I paid for and received the revolver. Thus, it is incontrovertible that I received a favorable background check from the FBI on February 13, 2009, the date of the transaction.

_____  3/4/09

Alfred G. Osterweil

This to certify that the Affiant, Alfred G. Osterweil,
did appear before me and swear to the truthfulness of the statements made therein.

_____  3/4/09

Cynthia A. Rollenhagen
Attorney-at-Law
State of New Jersey

Exhibit 15



STATE OF NEW YORK
UNIFIED COURT SYSTEM
**SCHOHARIE COUNTY COURT**
THE COURTHOUSE PO BOX 669
SCHOHARIE, NEW YORK  12157
(518) 295-8342
FAX 295-7226

GEORGE R. BARTLETT, III
COUNTY JUDGE

March 13, 2009

Mr. Alfred G. Osterweil
P.O. Box 173
Summit, New York  12175

    Re:   Pistol Permit Application

Dear Mr. Osterweil:

    This will acknowledge receipt of your letter dated March 3, 2009 and two letters dated March 4, 2009.  I will attempt to answer your letters as best I can at this preliminary juncture.

    Pursuant to your request, the Court date scheduled for March 24, 2009 is cancelled.

    It was not my intention in my letter of February 20, 2009 to order you to attend a "plenary hearing" nor to preclude you from challenging any decision that you may disagree with as you seem to suggest in one of your letters of March 4, 2009.  Pursuant to common practice, and in fulfillment of my duties as licensing officer, I was merely trying to afford you an opportunity to, personally or through an attorney, present any facts and/or arguments you wished directly to the Court. Moreover, such an appearance would give you a full opportunity to set forth any facts you wished to present regarding your nexus to Schoharie County, New York, or to present other potentially pertinent facts concerning your application.

    In any event, if you do not wish to appear before the Court, I will certainly not require your attendance at this time.

Page 2

Accordingly, please advise the Court as to whether you would like me to reschedule the March 24, 2009 appearance, which you previously advised that you cannot attend, or whether you do not wish appear at all.

In answer to your concern about a hearing precluding your right to seek review of the Court's decision should it deny your application, I would suggest you consult with an attorney familiar with Article 78 proceedings[1] or any analogous federal challenges.

Next, I will attempt to address your concern about the fact that although your application was filed on May 21, 2008, you do not have a decision as yet. In this regard, I direct your attention to Article 400 of the New York State Penal Law. Penal Law §400.00 requires that prior to the issuance of a license, "the duly constituted police authorities of the locality where such application is made" (here the Schoharie County Sheriff) conduct an investigation. There are certain statutory requirements entailed in this investigation, including a fingerprint check by FBI and search by DCJS. It is my understanding that the Sheriff has not been able to complete his investigation, as he has been unable to obtain proper searches as your fingerprints have, to date, not been of sufficient quality to allow for completion of these checks.

I realize your frustrations and that this is not your fault. However, it is not the Sheriff's fault either. It simply remains an issue that prevents the completion of the necessary investigation.

For your information, at the time the NYS Legislature inserted the requirement of an FBI fingerprint check, the FBI did not honor requests for fingerprint search checks for pistol permit applications. Accordingly, in 1971, the Legislature amended Penal Law §400.00(4) to provide that the FBI's failure to run a fingerprint check shall not constitute the sole basis of a refusal to issue a permit (see, 39 _McKinney's Consolidated Laws of New York, Practice Commentary by William C. Donnino_, Penal Law §400.00 at pp. 68-69.) Subsequently, the FBI started honoring requests for fingerprint checks.[2]

---

[1]. See, NY Civil Practice Law and Rules (CPLR) §§ 7801 et. seq.

[2]Please note that, although the statute provides no exceptions to fingerprint search requirements in order to accommodate the fact the FBI may not perform a search, the Court may not deny an application solely because the FBI did not provide a check. In order to allow you to provide fingerprints, I will request the Sheriff to see if he can utilize any different methods; and, in this regard, will forward him the literature you sent to me. Also, it is my understanding that

Page 3

## **Conclusion**

Rather than trouble you with the time and expense having your fingerprints retaken and resubmitted, without knowing an answer to your eligibility issue as a nonresident property owner, you may wish the eligibility issue be decided first. That way, if it is determined that you are not eligible, you need not to go to the additional trouble and expense of being re-fingerprinted. If, however, the Court determines that you are eligible for a permit, even though you are not a resident, you would need to resubmit your fingerprints to allow the Sheriff to complete his investigation. If you disagree with this process and wish to have the fingerprint process finished first, please advise on or before April 15, 2009.

Please advise on or before **April 15, 2009** whether you wish to appear before the Court. If you wish to appear, please plan to submit any supporting documentation or written arguments at or prior to that time. If you wish to waive an appearance, please advise the Court as soon as possible and submit any further written arguments on or before April 15, 2009, including, at a minimum, an affidavit or affirmation setting forth the facts as to your residence and your nexus with Schoharie County, New York. I note that you have submitted an affidavit dated March 4, 2009 and appreciate receiving the information contained therein. However if you do decide to appear, I would still request you to submit an affidavit or affirmation prior to your appearance detailing your residence status.

Thank you very much for your attention to this matter, and your efforts to properly frame the issue.

Date: March 13, 2009
      Schoharie, New York

Very truly yours,

GEORGE R. BARTLETT, III

GRB/klp

c:    Sheriff John S. Bates, Jr. (w/literature)

---

there has been some success in restoring fingerprints through treatment by a dermatologist or by the use of protective gloves until ridges grow back.

Exhibit 16

Exhibit 16

**ALFRED G. OSTERWEIL**
P.O. Box 173
Summit, New York, 12175



RECEIVED
MAR 2 6 2009
SCHOHARIE COUNTY
FAMILY COURT

Dear Judge Bartlett,

I received your your letter dated March 13, 2009, and wish to respond to several of the positions you have set forth..

You now state that the reason for not complying with the requirement that a decision on the application must be reached within six months or the applicant be given reasons for non-compliance was the fact that "the Sheriff has not been able to obtain proper searches as your fingerprints have, to date, bot been of sufficient quality to allow for completion of these checks."

First, the statute requires the licensing officer to specifically state in writing the reasons for any delay and such delay may only be for good cause. I am sure you will acknowledge that I received no such notice from the licensing officer.

Additionally, you yourself, in your letter to me dated February 20, said that section 400 of the Penal Law " requires an FBI fingerprint and NYS DCJS search prior to the issuance of a pistol permit, but does allow the issuing authority some discretion with respect to this requirement. As the failure to be able to read your prints is certainly not under your control, I would entertain a request to waive this requirement."

I find it somewhat disquieting that you are now stating that the fingerprinting is a necessity and cannot or will not be waived.

Further you provide a bit of legislative history, presumably to bolster this new position you have enunciated where fingerprinting is apparently now essential. More specifically, "...at the time the NYS Legislature inserted the requirement of an FBI fingerprint check, the FBI did not honor requests for fingerprint search checks for pistol permit applications. Accordingly, in 1971 the Legislature amended Penal Law...400.00(4) to provide that the FBI's failure to run a fingerprint check shall not constitute the sole basis of a refusal to issue a permit.....Subsequently, the FBI started honoring requests for fingerprint checks." May I respectfully point out that once the FBI started honoring these requests for fingerprint checks, the Legislature could have easily removed the language which to this day says that a failure by the FBI to return the check was not by itself grounds for refusal to grant a permit. Indeed, by keeping the language after the FBI commenced honoring requests, we should interpret that refusal by the legislature to modify the language as its strong intent to require more than a lack of an FBI check to deny an application.

You refer obliquely to the fact that I forwarded to you an article dealing with difficult fingerprinting situations and methods commonly used to create workable prints This was from an FBI site, and I stated that none of the techniques suggested by the FBI were utilized with me. How ironic it is that you

are now suggesting that the Sheriff utilize those methods when I am once more fingerprinted.

I now refer to a sentence in your "Conclusion" which appears quite ominous and, I respectfully submit, inappropriate.. That sentence reads as follows: "If however, the Court determines that you are eligible for a permit even though you are not a resident,you would need to resubmit your fingerprints to allow the Sheriff to complete his investigation."

In this sentence, you once more elevate an FBI fingerprint report as being essential before any permit can be issued, contrary to my view of the statute and your own analysis. To me this represents a complete about face from your earlier position and I am having great difficulty in understanding how or why such diametrically opposing positions can exist or be compatible.

My position is that the Sheriff has done his investigation by contacting the references I named, all of whom have responded and by fingerprinting me on two separate occasions. That the fingerprints were not adequate has been dealt with by me, and until this recent letter of yours, appeared inconsequential. Beyond that the Sheriff is not the licensing official, and he is not charged with deciding what investigation is sufficient. That you may utilize his services does not make his judgment critical in this matter. I presume that he does those ministerial acts which you request of him. I do not believe that he is vested with any statutory decision making powers, and I do not believe that your powers are delegable to him or any other person.

Additionally, you state that I am "not a resident," I believe I am a resident of Schoharie County although I am domiciled elsewhere. Beyond that you seem to be prejudging this matter on the basis of residence, not withstanding the Supreme Court's reference to one's home as being the determinative factor for gun ownership.

With respect to testimony or affidavits, you will recall that I offered to appear before you to provide you with all the information you might need by letter of July 10, 2008, to which you never responded. That was long before six months elapsed. Thereafter, I provided you with two affidavits although your letter refers to a single affidavit. Perhaps that second affidavit was misplaced. In any event I will provide you with additional copies of both prior affidavits as well as a third affidavit with this letter. Frankly, I do not see the necessity of any proofs demonstrating my "nexus to Schoharie County." I recall that you relied on a state court decision, Mahoney v. Lewis, which in your view defined the term residence as more than mere ownership of land for the purpose of the penal code. While I believe I meet the definition as enunciated by that case, even if I do not, I submit that the Heller case trumps any existing law in conflict with it. As I have repeatedly maintained, I believe you should focus on whether I reside in a place that meets the definition of home, the word used repeatedly by the Supreme Court

I make no requests. If you ask something of me, I shall comply. In any event, I cannot be available and present in Schoharie County prior to April 15, 2009. Based upon the indications in your letter, you will bifurcate my application and first determine if I am otherwise entitled to a pistol permit, and if you so find, you will thereafter require another attempt to fingerprint me. While I do not believe such fingerprinting is necessary, in order to speed this process up, I will consent to be re-fingerprinted if you decide the eligibility issue favorably to me.

You suggested that I familiarize myself with Article 78 Proceedings. I have participated in such a hearing in New York, and in other jurisdictions where it is referred to as an Action In Lieu Of

Prerogative Writ. In such actions a Pettitioner seeks relief from an administrative ruling on the grounds that it is arbitrary and capricious. There is a heavy burden on the Petitioner and deference is given to the agency. Rather than take that route and stay within the state Ccourt system in Schoharie County, I believe a more direct method of challenging your ruling would be to go directly to the U.S. District Court by filing an action pursuant to 42 USC: Section 1983. In order to save your law clerk a few steps, I am enclosing a copy of the referenced statute.

What is interesting in this matter is that I, as an officer of the court and an honest citizen, chose to voluntarily advise the sheriff that I was changing my domicile, without which information my application would probably have sped through. I do not regret my forthrightness nor do I expect any accolades for doing what is right.

On the other hand, I am deeply disappointed in a system where honest citizens are put through a painstaking process in which government officials are virtually dedicated to denying them rights guaranteed them by the Constitution. We seem to have lost sight of the fact that the Second Amendment was enacted to protect these citizens from those very same government officials who have erected the barriers to the exercise of their constitutional rights.

Respectfully,

Alfred G. Osterweil

3/19/09

**Sec. 1983. – Civil action for deprivation of rights**

**Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia**

# AFFIDAVIT

I, Alfred G. Osterweil, of 310 Rossman Fly Road, Summit, New York do hereby swear to the following statements as true to the best of my knowledge and belief and I acknowledge that I may be punished for contempt and convicted of other offenses if any of said statements are false.

1. This third affidavit is provided to Judge Bartlett consistent with his letter dated March 13, 2009.
2. I incorporate by reference herein, any statement of fact I made in any correspondence to Judge Bartlett, and swear to those statements as being true.
3. Title to my home located at 310 Rossman Fly Road was closed on April 1, 2003.
4. From that time to today, my wife and I have played and continue to play a role in town affairs and we continue to participate in all social, political and community affairs.
5. We continue to be members in and pay dues to the Summit Snowriders, a social group dedicated to the outdoors and snowmobiling.
6. We continue to be members in and pay dues to the Summit Conservation Club, a group dedicated to the preservation of the environment.
7. I was a commissioner on the Summit Fire District Board of Commissioners but chose not to run for reelection after receiving a legal opinion that I had to be a registered voter to hold this office.
8. I was an unpaid member of the Board of Directors of Western Catskills Revitalization Corporation, a not for profit entity that distributes grants and services to needy applicants in Delaware and Schoharie Counties principally. I was compelled to leave because of a by-law which had certain attendance requirements I could not achieve.
9. My wife was a member of the Study Committee to create a new town master plan, and she participated for approximately three years up to its completion. While I was not named to that committee, I would attend many of its meetings to add such comments and give as much input as I could based on my experiences with other master plan committees.
10. My wife was also appointed to the Summit Town Planning board, and she attended regularly until she received a legal opinion that she had to be a registered voter to continue to serve.
11. Even after we had purchased a home in another state, we continued to be involved in local matters, attending town board and other town meetings.
12. With respect to the Summit Fire Department, I have a close relationship with the former and present Chiefs, and I continue to monitor current fire department matters even when I am not in town, by phone and e-mail.
13. On or about June, 2007, we purchased a home located at 159 Eagle Mountain Road, Summit, New York. Even after we had decided to purchase a home in another state, we had a garage/barn built on the Eagle Mountain property at a cost in excess of 30,000 dollars. That work was completed on or about June, 2008.
14. We continue to rent a mail box in Summit, New York,
15. We do not rent out either property nor have we put either of them up for sale.
16. We have many friends in Summit and we continuer to be in contact with them, This includes all

the references I supplied to the Sheriff on my application.

17. I am on a first name basis with the Town Supervisor, the members of the Town Board and the members of the Planning Board.

18. My wife continues to be a member of a church in Jefferson, Schoharie County,thus tithing and otherwise contributing to the church and the Schoharie County community.

19. I am on a first name basis with her Pastor and have contributed funds to many local charitable causes administered by the Pastor.

20. I remain a taxpayer of not inconsiderable sums, and I will continue to oversee my local and county governments to ensure a reasonable basis for any increases.

21. I purchased a home in another state for health reasons, an attempt to avoid the severe winters we have and other reasons personal to us.

22. I have attached to this affidavit a copy of the letter I faxed to Judge Bartlett with respect to the FBI site dealing with fingerprinting

23. During this past winter, while we were in warmer climes, my daughter had occasion to live in our home at 310 Rossman Fly Road.

24. My brother-in-law and my sister-in- law reside in their home on Lang Road, Summit, New York.

25. My mother-in-law resides in Summit, New York, and due to her age and infirmities, requires assistence provided regularly by Summit home care personnel.

26. With respect to the issue of "monitoring" I can be monitored quite adequately as compared to a gun owner in a county of a million or more people as is the case in other counties even assuming monitoring is a valid consideration in view of the Supreme Court ruling in the Heller case...

_3/19/09_

Alfred G. Osterweil

This to certify that the Affiant, Alfred G. Osterweil,
did appear before me and swear to the truthfulness of the statements made therein.

_3/19/09_

Cynthia A. Rollenhagen
An Attorney-at-Law
State of New Jersey

**Alfred G. Osterweil**
P. O. Box 173
Summit New York 12175
March 3, 2009


Re: Pistol Permit


Dear Judge Bartlett

I will be sending you a package of materials with respect to my application, but I thought you might want to visit the FBI site with respect to fingerprinting, steps to take, the issue of worn fingerprints and other matters related to the fingerprinting done by sheriff's deputies..

None of the special steps suggested in the FBI article which is attached to this FAX were utilized when I was fingerprinted.

Respectfully,


Alfred G Osterweil.

Enclosures 12

By FAX to 518 295-7226

Exhibit 17



**COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF SCHOHARIE**
PO BOX 669
SCHOHARIE, NEW YORK 12157
(518) 295-8383 : FAX 295-8451

GEORGE R. BARTLETT III
JUDGE

April 10, 2009

Mr. Alfred G. Osterweil
192 Lawson Lane
Many, Louisiana 71449

     -and-                          Re: Pistol Permit Application

Mr. Alfred G. Osterweil
P.O. Box 173
Summit, NY 12175

Dear Mr. Osterweil:

     This will acknowledge you letter and affidavit dated March 19, 2009.

     To avoid any potential confusion or misunderstanding, you are not required to personally appear in Court on April 15, 2009, or at any other time. If you would like to appear in the future to be heard on your application, please advise the Court at your earliest convenience and I will schedule your appearance for a mutually convenient date.

     If I do not hear from you by April 24, 2009, I will assume that you have waived your right to a personal appearance, deem your application to be fully submitted and then proceed to determine it.

     Thank you.

Date: April _10_, 2009
      Schoharie, New York

                                 Very truly yours,

                                 George R. Bartlett III, J.C.C.

Papers considered:

Exhibit 18

Alfred G. Osterweil
310 Rossman Fly Road, Summit, NY 12175
195 Lawson Lane, Many, La. 71449
April 13, 2009



RECEIVE
APR 20 2009
SCHOHARIE COUNTY
FAMILY COURT

Judge George R. Bartlett lll
Schoharie County Courthouse
Schoharie, N.Y. 12157

Dear Judge Bartlett:

I received your letter dated April 10, 2009, on this date.

I previously indicated that I could not be present on April 15 to appear in your court. I also indicated that it was not my original intent to request such an appearance as the statute does not appear to have any procedure for the presentation of witnesses, cross examination of witnesses or the right to subpoena witnesses or physical evidence.

Quite frankly, it seems to me to be a simple question of whether you will follow the mandate of the U. S. Supreme Court and rule that I have an absolute right to possess a gun in each of my homes, barring any personal disqualification such as a criminal record, mental instability or the like.

When I first wrote to you shortly after the Heller case was decided, and offered to appear personally, I did so to provide you with any background information you might need to feel comfortable, knowing that this application might represent a departure from the traditional view I understand you have held. Since then, I have provided you with a plethora of information, all under oath, some of which you requested.

I believe that I have set forth all the information that might be relevant to my application, thus negating any need for me to appear personally, assuming, *arguendo,* that such personal appearances are contemplated by the statute.

However, because I believe so strongly in this cause, and I do not wish to leave any stone unturned in the prosecution of this matter, I will appear before you if you request me to do so for any reason you may have.

I expect to be in Summit commencing on or about June 15, 2009, and will be available to appear at your convenience thereafter.

Respectfully,

Alfred G. Osterweil

Exhibit 19



GEORGE R. BARTLETT III
COUNTY COURT JUDGE

WILLIAM J. MINKEL
COURT ATTORNEY

COUNTY COURT OF THE STATE OF NEW YORK
COUNTY OF SCHOHARIE
THE COURTHOUSE - 290 MAIN STREET
P.O. BOX 669
SCHOHARIE, NEW YORK 12157
TEL: (518) 295-8342
FAX: (518) 295-7226

F. CHRISTIAN SPIES
CHIEF CLERK

May 1, 2009

Mr. Alfred G. Osterweil
195 Lawson Lane
Many, Louisiana  71449
      - and -
P.O. Box 173
Summit, New York 12175

    Re:   Pistol Permit Application

Dear Mr. Osterweil:

    This will acknowledge receipt of your letter dated April 13, 2009 in response to the Court's letter of April 10, 2009.

    It appears from this correspondence that you do not wish to submit any further information or personally appear in support of your application.

    Accordingly, unless I hear from you to the contrary on or before **May 15, 2009**, I will consider your application fully submitted and will proceed to determine it.

        Very truly yours,

        GEORGE R. BARTLETT, III

GRB/klp

Exhibit 20



RECEIVED
MAY 1 1 2009
SCHOHARIE COUNTY
FAMILY COURT

**Alfred G. Osterweil**
310 Rossman Fly Road, Summit N.Y. 12175
197 Lawson Lane, Many La. 71449,
May 6, 2009

Hon. George R. Bartlett lll

Dear Sir,

I have your most recent lettter dated May 1, 2009, and I wish to place a different interpretation on my prior correspndence from what you apparently gleaned.

I hoped to convey to you the thought that if you wanted any information which you believe is necessary for you to finally make a decision in this long standing application, I would cooperate fully. Thus, if you wished  to meet with me personally, or have me submit additional information, I would comply, irrespective of my own view that you probably have more information about me than you  have on any 100 or more applicants, cumulatively.To phrase it differently, while I am not requesting an opprtunity to appear or provide additional information or legal argument, I will not raise any legal or other issue if you, as the issuing official, feel you need anything, even after close to a year of the pendency of this application.I will comply fully.

While the doctrine of "justice delayed is justice denied" is a favorite axiom of mine, perhaps in this case, the delay may have proved to be helpful.

On April 20, 2009, the Ninth Circuit Court of Appeals decided the case of Allen v King. If there is any doubt in your  mind about the impact of the Heller case on New York  state law, I suggest that you focus on the powerful language and logic of this case.

Respectfully,

Alfred G. Osterweil

Exhibit 21

At a term of County Court of the State of
New York, held in and for the County of
Schoharie, New York.

PRESENT:   HON. GEORGE R. BARTLETT, III
                              Judge
------------------------------------------------------------------

In the Matter of

**Alfred G. Osterweil,**
                         Applicant

Pistol Permit Application

------------------------------------------------------------------

**DECISION/ORDER**

## **Background**

By application dated May 16, 2008, Alfred G. Osterweil (applicant) applied for a

New York State Pistol Permit.  In due course, the applicant submitted four references

dated June 30, 2008, July 1, 2008, July 14, 2008, respectively.  After his initial review of

the application,  by letter dated June 24, 2008, the Schoharie County Sheriff (Sheriff)

requested the  applicant to come into the Sheriff's Office to "complete or correct" certain

information on the application.

By letter dated June 25, 2008, the applicant advised the Sheriff that "[s]ince I

applied for a pistol permit, I purchased a home in another state.  My intention is to make

that state my primary residence while I still intend to have vacation property here in

Schoharie County.  Under those circumstance [sic], am I still eligible for a permit.  I note

1

that the application itself does not appear to require that the Schoharie County be my

principal residence or domicile . . ."

By memorandum dated July 8, 2008, the Sheriff forwarded the subject application

to this Court, advising that "[t]his incomplete application is being forwarded for review.

Also, enclosed is a letter dated June 25, 2008 from Mr. Osterweil detailing his current

residence plans.  Please advise how you wish me to proceed with this application.

However, by note dated July 17, 2008, the Court's secretary returned the file to the

Sheriff at his request.

By letter to the Court dated July 10, 2008 *(received on July 16, 2008)*, the

applicant advised that his reading of the recent United States Supreme Court's *Heller*

decision rendered New York's pistol permit residency requirement unconstitutional and,

thus, a nullity.   As the Sheriff had previously requested the applicant's  file be returned to

his office, the applicant's letter and file were so returned.

Thereafter, the FBI rejected applicant's fingerprint card. Accordingly, by letter

dated August 18, 2008, the Sheriff requested the applicant to be re-fingerprinted.  This

was apparently completed; however, on September 6, 2008, the FBI rejected the prints a

second time, indicating that "the quality of the characteristics is too low to be used."  In

addition, the fingerprint response from the New York State Division of Criminal Justice

Services (DCJS)  advised the Sheriff that "Caution -Due to the Poor quality of the

fingerprint impressions received, DCJS is unable to determine whether the individual has

any other criminal record in New York State" *(see, rap sheet, produced July 13, 2008).*

By e-mail dated December 15, 2008, the applicant wrote the Sheriff inquiring as to the status of his application. The Sheriff e-mailed applicant that his fingerprints were rejected a second time and that "I am meeting with Judge Bartlett next week and will ask him if he will consider your application without the FBI check."

Thereafter, in early February 2009, applicant e-mailed the Sheriff, the Sheriff replied, and the applicant responded on February 2, 2009 as follows:

Applicant's e-mail of February 2, 2009:

> "Dear Sheriff Bates, I last received an E-mail from you on December 16, 2008. At that time you iondicated [sic] you were going to speak to Judge Bartlett, who would be acting not as a judge, but rather as a county's "issuing agent." I must insist on a response to my application forthwith. Dragging this out and denying me the right to gun ownership violates my rights as a US citizen under 42 USC 1983. I will not hesitate to seek damages and relief against the county and all lother [sic] persons who are in complicity in this matter.
> Very truly yours,
> Alfred G. Osterweil"


Sheriff's e-mail of February 3, 2009:

> "Mr. Osterweil,
>
> I met with Judge Bartlett on Tuesday, December 23, 2008 regarding other pistol permit matters. He was unable to address your application at that time. His secretary was asked by me to schedule an appointment to specifically discuss your application. I did not receive an appointment date until last week. I will now meet with Judge Bartlett on Friday, February 13, 2009. For your information, your fingerprints have been rejected for the second time by both the F.B.I. and NY State D.C.J.S. They will not process

3

another set of prints without an additional fee of $105.00.  I intend to ask the Judge if there is any way to avoid this additional fee for you.

Sincerely,

Sheriff John S. Bates, Jr."

Applicant's e-mail of February 4, 2009:

"Dear Sheriff Bates
Thank you for your response of 2/03/09.  It may be that I am simply not able to provide clear fingerprints.  Does that mean that I am disqualified from gun ownership in New York?  Your deputies noted that several fingers printed out clear;ly [sic] and only a few were difficult to read.  If the FBI can locate felons with only one finger's print at a crime scene, they should be able to run my prints.  Further, why should I be required to pay an additional fee and have the process linger on for several more months.  Even the flawed NY statute indicates that the entire process must be completed within 6 months, irrespective of whether the prints come back from the FBI within that period of time.  We are well beyond 6 months at this juncture.

The way my matter is being handled, it appears that every efort[sic] is being made to thwart my application for gun ownership.  I suppose an illegal alien who lives in a tent in Schoharie as his only residence but whose fingerprints are clearer than mine would have been issued a permit within the prescribed 6 months.  I pay enormous property taxes in Schoharie County on two residences, I served in the Armed Forces of the USA, I pay my income taxes, unlike some of our highest ranking governmental officials, and our own Supreme Court, my right to protect myself and my family in my two homes in Summit NY is being stymied.  This is not the kind of country I grew up in and served.

I look forward to a speedy resolution of this matter.

Very truly yours,

Alfred G. Osterweil"

4

The Court met with the Sheriff on February 13, 2009.  Thereafter, by letter dated

February 18, 2009 the Sheriff advised applicant that his permit application was being

forwarded to the Court.  The Court wrote to the applicant on February 20, 2009 advising

that:

> "I met with Sheriff Bates on February 3, 2009 concerning various
> issues; and during that meeting, he indicated he had legal questions
> regarding your pistol permit application that he felt should be addressed by
> the Court prior to his office further processing your application.
> Accordingly, in order to avoid any ex parte discussions, I asked the Sheriff
> to forward your paperwork to me so that I could review your application
> and ascertain the issues involved with your permit application.
>
> I have reviewed your file and it appears to me that there are two
> threshold issues.  One being that the FBI has rejected your fingerprints
> twice due to the fact that the "quality of characteristics is too low to be used."
> Moreover, it appears that New York State DCJS was also unable to utilize
> your fingerprints in their record's check.  There is also a note in your file,
> apparently from the Deputy who took your prints, indicating concern about
> the FBI being able to read your prints as, in his opinion, you did not have
> "prints to speak of.  They are very worn."
>
> Penal Law §400.00 requires an FBI fingerprint and NYS DCJS
> search prior to the issuance of a pistol permit, but does allow the issuing
> authority some discretion with respect to this requirement.  As the failure to
> be able to read your prints is certainly not under your control, I would
> entertain a request to waive this requirement.
>
> The second issue seems to be that you are not or will not be a
> resident of the State of New York.  In this regard, New York Law has
> regularly held that pistol permits should be issued to residents only[1] (see,
> Mahoney v. Lewis, 199 AD 2d 734).  However, I acknowledge your
> correspondence which sets forth your intention to maintain a second home
> in Schoharie County and certainly appreciate the fact that, as such, you will
> pay real estate taxes upon that property.

---

[1]In Mahoney v. Lewis, id. at p. 735 it was held that the "term residence [as used in Penal Law §400.00] is equivalent to domicile and requires something more than mere ownership of land."

At this juncture, I would like to schedule an appearance in Court where you or your attorney can present any arguments in support of your application. In particular, I would be interested in your supplying any legal precedent supporting your position with regard to residency and in support of a fingerprint check waiver. Moreover, I would like the Sheriff to be present to explain the fingerprint situation and answer any questions you or your attorney may have.

I have, accordingly, scheduled this matter for an appearance on **Tuesday, March 24, 2009 at 1:30 p.m.** If you or your attorney wish to submit written, legal arguments prior to this date, please feel free to submit same. Also, should you wish to review your file, please call Kathy in my office to arrange for a convenient time to do so. Finally, if the date set for an appearance is not convenient for you, please call my office to reschedule."

Penal Law §400.00 sets forth the criteria and procedure for obtaining a "pistol permit" in New York State. In particular, Penal Law § 400.00 [4] and [4-a] provide, inter alia, that:

4. Investigation. Before a license is issued or renewed, there shall be an investigation of all statements required in the application by the duly constituted police authorities of the locality where such application is made. For that purpose, the records of the appropriate office of the department of mental hygiene concerning previous or present mental illness of the applicant shall be available for inspection by the investigating officer of the police authority. In order to ascertain any previous criminal record, the investigating officer shall take the fingerprints and physical descriptive data in quadruplicate of each individual by whom the application is signed and verified. Two copies of such fingerprints shall be taken on standard fingerprint cards eight inches square, and one copy may be taken on a card supplied for that purpose by the federal bureau of investigation . . . When completed, one standard card shall be forwarded to and retained by the division of criminal justice services in the executive department, at Albany. A search of the files of such division and written notification of the results

6

of the search to the investigating officer shall be made without unnecessary delay. Thereafter, such division shall notify the licensing officer and the executive department, division of sate police, Albany, of any criminal record of the applicant filed therein subsequent to the search of its files. A second standard card, or the one supplied by the federal bureau of investigation, as the case may be, shall be forwarded to the bureau at Washington with a request that the files of the bureau be searched and notification of the results of the search be made to the investigating police authority. The failure or refusal of the federal bureau of investigation to make the fingerprint check provided for in this section shall not constitute the sole basis for refusal to issue a permit pursuant to the provisions of this section. Of the remaining two fingerprint cards, one shall be filed with the executive department, division of state police, Albany, within ten days after issuance of the license, and the other remain on file with the investigating police authority. . . Upon completion of the investigation, the police authority shall report the results to the licensing officer without unnecessary delay.

4-a.   Processing of license applications. Applications for licenses shall be accepted for processing by the licensing officer at the time of presentment. Except upon written notice to the applicant specifically stating the reasons for any delay, in each case the licensing officer shall act upon any application for license pursuant to this section within six months of the date of presentment of such an application to the appropriate authority. Such delay may only be for good cause with respect to the applicant. In acting upon an application, the licensing officer shall either deny the application for reasons specifically and concisely stated in writing or grant the application and issue the license applied for.

## QUESTIONS PRESENTED

I.   <u>Does the passage of time mandate that applicant's application be granted</u>.

Noting that it has been more than six months since he submitted his application for

a pistol permit, applicant asserts that his permit application must be granted.

Penal Law §400.00(4-a) provides in pertinent part that "applications for licenses shall be accepted for processing by the licensing officer at the time of presentment. Except upon written notice to the applicant specifically stating the reasons for any delay, in each case the licensing officer shall act upon any application for a license pursuant to this section within six months of the date of presentment . . .   Such delay may only be for good cause and with respect to the applicant . . ."

The Court did not render a decision denying or granting the application within six months.  However, there appears to be good cause for any delay,  which reasons were communicated to applicant by the Sheriff, who was conducting an investigation mandated by Penal Law §400.00 and then, after the application was forwarded to the Court, by the Court.

The application indicated that the applicant's residence was in Schoharie County. Following submission of the application, the applicant then advised of a change in his residence to another state.  Communications made clear this was an issue that needed development-especially in light of the _Heller_ decision.

It should also be noted that applicant did not complete submission of his required character references until July 14, 2008.

Moreover, to date the Sheriff has still been unable to complete his investigation as applicant's fingerprints have been rejected by the FBI and DCJS, having been deemed to not be of sufficient quality to be used for comparison.  Apparently, this is nobody's fault;

8

but rather, the result of applicant having worn fingerprints. Although the Court has the discretion to issue a pistol permit without the completion of an FBI check, it lacks the authority to waive a DCJS search. The applicant has been made aware of this issue through communications from the Sheriff and the Court. Indeed, the applicant was even re-fingerprinted in an effort by the Sheriff to obtain fingerprints that could be used.

Accordingly, as the application remains incomplete and as applicant has been made aware of the issue with his fingerprints, it appears the statute has been complied with. Moreover, given the issue regarding the constitutionality of New York's residency requirement and the importance of this issue, good cause exists for any delay. In any event, contrary to applicant's assertion, the fact that an application is not decided within six (6) months does not mandate that the application be granted.

Finally, this Court notes that the issue with respect to fingerprints has been held in abeyance to save the applicant the expense, time and trouble of being fingerprinted again until he receives a decision with respect to the threshold issue of whether a pistol permit may be issued to a nonresident of New York State.

## II.   Is New York State's Residency Requirement for Issuance of a Pistol Permit Unconstitutional?

Insofar as pertinent to this application ,it is well-established that New York pistol

permits may be issued to residents only [2] *(see, Mahoney v. Lewis, 199 AD2d 734,*

*supra.);* and in this regard, it has been held that the "term residence [as used in Penal Law

§400.00] is equivalent to domicile and requires something more than mere ownership of

land" *(id. at p. 735).*

The applicant has candidly advised the Court that New York State is not his

primary residence and, thus not his domicile.  However, citing the 2008 decision by the

United States Supreme Court in *District of Columbia v. Heller (128 S Ct. 2783),* applicant

contends that the residency requirement in New York's licensing law is unconstitutional.

**A.   Does the Second Amendment impose a limitation on State legislation?**

Initially, in upholding New York's residency requirement, the Second Circuit

Court of Appeals determined that, even if the Second Amendment conferred individual

rights *(as Heller subsequently held)*, it would not affect New York State's gun laws as

"we hold that the Second Amendment's right to keep and bear arms' imposes a limitation

on only federal, not state, legislative efforts *(see, Bach v. Pataki, 408 F 3d 75,84 .* The

*Heller* decision did not address the issue of whether the Second Amendment applies to

state legislation and therefore *Bach* remains the law in New York.  However,  it should be

noted that the Ninth Circuit Court of Appeals has reached a contrary conclusion *(see,*

*Nordyk v. King, ____ F 3d ___, 2009 WL 1036086).*

---

[2]Under New York's licensing statutes, non-residents may only apply for a license if they work principally
within the State.

10

**B.**   **Assuming the Second Amendment applies to State legislation, is New York's pistol permit system constitutional?**

In concluding that "the Second Amendment conferred an underline's right to keep and bear arms" *(emphasis supplied)*, the Supreme Court directly found, for the first time, that the right to keep and bear arms extends to individuals, not merely state-regulated militias.   Nevertheless, the Supreme Court in *Heller* specifically permitted reasonable regulation; and in this vain, since *Heller*, several courts have upheld New York's gun laws *(see, e.g., People v. Abdullah*, 23 Misc. 3rd 232; *Chwick v. Mulvey*, 13564/08 [ Nassau County Supreme Court]; *People v. Ferguson*, 21 Misc. 3d 1120).

In *Bach v. Pataki (408 F3d 75,87)*, the Second Circuit Court of Appeals held that "New York's interest in monitoring gun licensees is substantial and that New York's restriction of licenses to residents and persons working primarily within the State is sufficiently related to this interest . . ."   The Second Circuit concluded that:

> There is no question that New York discriminates against non-residents in providing handgun licenses under Article 400.   Defendants do not contest this fact.   Instead, they argue that the discrimination is sufficiently justified by New York's public safety interest in monitoring handgun licenses.   We do not doubt, and *Bach* does not dispute, that '[t]he State has a substantial and legitimate interest . . . in insuring the safety of the general public from individuals who, by their conduct, have shown themselves to be lacking the essential temperament or character which should be present in one intrusted with a dangerous instrument.'

> New York's monitoring interest is, in essence, an interest in continually obtaining relevant behavioral information.   The State's licensing scheme vests broad revocation discretion in a licensing officer, permitting that officer to revoke a license on the basis of a wide variety of behavioral data; including information reported from local incidents . . .   (citation omitted)

11

The operative information available to licensing officers is not restricted to the legal formalities of an arrest warrant, an accusatory instrument, or a judgment of conviction. Licensing officers have the discretion to revoke licenses upon display of 'poor judgment'. (citations omitted) . . .

The ongoing flow of information to a licensing officer as a result of the licensee's tie to a particular residence or community, is an important element of the State's regulatory scheme. It substantially increases the likelihood that a licensing officer will be alerted to facts that cast doubt on a licensee's fitness to possess a firearm. *(citation omitted)* Bach challenges the substantiality of this relationship. He contends: (1) nonresidents within the State are no more difficult to monitor than residents, and (2) New York has now shown that it could not obtain the same quality of information from other States. Thus, Bach concludes defendants have not shown any "palpable and unique risks" posed by out-of-state residents. We disagree.

First, although it may be true that New York can monitor nonresidents as easily as residents while either are in the State, New York has an interest in the entirety of a licensee's relevant behavior. Information regarding a licensee's adherence to license conditions is information that may only exist when the gun owner is in-state, but information regarding the licensee's character and fitness for a continued license is not so limited. New York has just as much of an interest, for example, in discovering signs of mental instability demonstrated in New Jersey as in discovering that instability in New York. The State can only monitor those activities that actually take place in New York. Thus, New York can best monitor the behavior of those licensees who spend significant amounts of time in the State. By limiting applications to residents and in-state workers, New York captures this pool of persons. It would be much more difficult for New York to monitor the behavior of mere visitors like Bach whose lives are spent elsewhere.   . . .

Second, we think it self-evident that, at least in Bach's case, other States, like Virginia, cannot adequately play the part of monitor for the State of New York or provide it with a stream of behavioral information approximating what New York gather. They do not have the incentives to do so. First, other States are not bound to impose a discretionary revocation system like New York's. Therefore, they need not engage in monitoring of licensees similar to New York's monitoring. Second, because a New York license operates only in New York, other States, like Virginia, have very

little to gain from a revocation of a New York license - - a revocation would affect the safety of New Yorkers, not Virginians. Obviously, New Yorkers have a much greater interest in reporting misbehavior to New York local licensing officers than do out-of-state persons and their government officers. Monitoring is incentive-driven; without these incentives, there is little reason to expect effective monitoring, if any *(citation omitted)*.

Moreover, Bach does not point to any adequate alternative method for New York to collect this information. Bach argues that New York can and does rely on out-of-state reporting and cites Penal Law §400.00(11), which provides for revocation or suspension of a license upon the conviction of a felony or serious offense "anywhere." But New York's system permits license revocations for a range of misbehavior of which serious offenses and felonies form only a small part and Bach does not point to any reason to expect Virginia or any other State to report such behavior to New York. Bach also suggests that New York could require nonresidents to submit to more frequent renewals or periodic interviews with local officials. However, New York's proffered interest is in monitoring the relevant day-to-day behavior of license-holders; it is unclear how an accelerated renewal schedule or a round of interviews with local officials would supply this information.

Bach also suggests that reference letters or certifications from a nonresident's local authorities could fill New York's informational gap. Perhaps in other contexts references or similar informational requests might provide an adequate substitute source of information. For instance, when a State has an interest in monitoring the fitness of a licensed professional, references from persons involved in professional relationship with the licensee might be an adequate source of information. Or, where a State has an interest in monitoring the fitness of a licensed user of some universally-insured activity--driving an automobile, for instance--submission of updated insurance reports might prove adequate. In both examples, there may be strong arguments that another party has an equally strong incentive to monitor the licensee's relevant behavior–the professional's clients will often have a personal stake in the professional's work; the insurer will have a financial stake in the insured's risk profile. Here, however, Bach has not pointed to any monitor with a similar interest in assessing a nonresident's fitness to carry a handgun. Other States are not bound by New York's monitoring system. Thus, Bach has not shown how New York could "protect its interests through less restrictive means." (citation omitted).

13

New York's monitoring rationale is distinct from rationales rejected in other Privileges and Immunities Clause cases. Most importantly, the monitoring rationale is not an interest of merely "general concern," to which a resident/nonresident distinction would not be tailored, but, rather, actually turns on where a person spends his or her time. The exception for nonresidents working in-state is consistent with this criterion. The exception also further distinguishes New York's license requirements from those invalidated in *Piper* and *Friedman*. There, nonresident lawyers were denied admittance to the bar even through their primary places of business were within the licensing State *(citation omitted)*. Here, by contrast, nonresidents with their primary place of business in New York are eligible for an Article 400 license (citation omitted). New York's exception is relevant because the location of a licensee's principal employment correlates with the State's monitoring interest in a manner similar to the place of the licensee's residence–both present opportunities for the State to monitor the licensee. New York's nonresident distinction, with the in-state worker exception, is thus tailored to the State's monitoring interest.

As detailed above by the Second Circuit Court of Appeals, the residency requirement is an important component of New York's regulation which allows the State to restrict handgun possession to persons of acceptable temperament, fitness and character. Such a restriction appears to be reasonable and, thus, is constitutionally permissible *(see, District of Columbia v. Heller, supra.)*. The statute in *Heller* differs significantly from the law in question here, since an important component of the District of Columbia law, which clearly influenced the Supreme Court was that the law, among other things, totally banned all handgun possession in the District of *Columbia (see, Heller, supra.* at 2817; see also, *People v. Ferguson, supra; Chwick v Mulvey, supra)*. Moreover, New York law allows a non-resident, such as the applicant, to possess long guns in New York. Thus, unlike the situation in *Heller*, the New York statutory scheme

14

does not essentially preclude the applicant from the possession of <u>any</u> firearms.

As to constitutionality of New York's pistol permit laws, additional support can be found in New York Practice Series, New York Criminal Law *(Richard A. Greenberg and Steven Y. Yurowitz, §33.1),* which concludes that:

> ... Even if the Supreme Court ultimately holds that the Second Amendment applies to the states, as *Heller* appears to presage, the Second Amendment right vindicated by *Heller* appears to be quite limited and consistent with reasonable regulation of firearms, including possession of firearms by felons or the mentally ill, carrying firearms in "sensitive" places like schools and government building, law regulating the commercial sale of weapons, and prohibiting the carrying of "dangerous or unusual weapons like M-16 rifles. The Supreme Court expressly declined to address licensing requirements, but intimated that licensing schemes like New York's would not run afoul of *Heller* so long as they are not enforced in an arbitrary or capricious manner ... Thus, the only real or substantial effect that *Heller* will likely have on New York Law is to increase the number of CPLR Article 78 petitions challenging the denial of licenses to carry or possess firearms on grounds that the denial was arbitrary and capricious.

In any event, in *People v. Perkins,( ___ AD3d___ [2009 N.Y. Slip Op. 03962]),* a controlling decision in this jurisdiction handed down on May 21, 2009, the Appellate Division, Third Department has reached the same conclusion regarding *Heller's* effect on New York State gun laws, determining as follows:

> "While the United States Supreme Court concluded in that case that the Second Amendment confers a constitutionally protected individual right to keep and bear arms as a means of self-defense within the home, it also held that the right conferred by the Second Amendment-and by extension, Civil Rights Law §4 *(see, Chwick v. Mulvey, 2008 N.Y. Slip Op 22486[U]),*is not absolute and may be limited by reasonable governmental restrictions *(see, District of Columbia v. Heller, 128 S Ct at 2816).*

15

Unlike the statute at issue in *Heller*, Penal Law article 265 does not effect a complete ban on handguns and is, therefore, not a "severe restriction" improperly infringing upon defendant's Second Amendment rights. Moreover, in our view, New York's licensing requirement remains an acceptable means of regulating the possession of firearms *(see People v. Morrill*, 101 AD2d 927; *People v. Ferguson*, 21 Misc.3d 1120[A], 2008 Slip Op 52112[U][NY City Crim Ct 2008])*, and will not contravene *Heller* so long as it is not enforced in an arbitrary and capricious manner *(see, District of Columbia v. Heller*, 128 S Ct at 2819)*" (see, *People v. Perkins*, __ AD3d ____, [2009 N.Y. Slip Opinion 03962, 2009 WL 1405913], supra).

### Conclusion

Since applicant admittedly is not a resident of the State of New York, his application for a pistol permit is <u>denied</u>.[3]

SO ORDERED.

Dated:        May 29, 2009
             Schoharie, New York

                                   GEORGE R. BARTLETT III, J.C.C.

                           - 5/29/09  LY

TO:   Alfred G. Osterweil
      Sheriff John S. Bates, Jr.
      NYS Pistol Permit Bureau
      NYS Division of Criminal Justice Services

6/1/19
KIP

---

[3] In denying the application solely on the basis of the applicant's residency status, this Court has not considered any other aspects of the application.

16

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

ALFRED G. OSTERWEIL,

                                        Plaintiff,

          vs.                                             1:09-cv-825
                                                          (MAD/DRH)

GEORGE R. BARTLETT, III, in his official
capacity as Licensing Officer in the County of
Schoharie,

                                        Defendant.

---

APPEARANCES:                              OF COUNSEL:

ALFRED G. OSTERWEIL
Many, Louisiana 71449
Plaintiff *pro se*

OFFICE OF THE NEW YORK                    ROGER W. KINSEY, AAG
STATE ATTORNEY GENERAL
The Capitol
Albany, New York 12224
Attorneys for defendant

NEW YORK STATE DEPARTMENT OF LAW          JAMES B. MCGOWAN, ESQ
The Capitol
Albany, New York 12224
Attorneys for defendant

Mae A. D'Agostino, U.S. District Judge:

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff *pro se* commenced this action challenging New York's statutory mechanism by

which individuals apply for permits to carry or possess firearms.  Plaintiff urges that the denial of

his handgun permit application violated his rights under the United States Constitution, the New York State Constitution, and the New York State Civil Rights Law.

In a Memorandum-Decision and Order dated February 24, 2010, United States District Court Judge Gary L. Sharpe granted in part and denied in part defendant's motion to dismiss. *See* Dkt. No. 15. Specifically, Judge Sharpe dismissed Governor Paterson and Attorney General Cuomo as improper parties, and further dismissed plaintiff's "first three causes of action [which] seek to mount a Second Amendment attack against only state legislation," but permitted plaintiff's claims brought pursuant to the Fourteenth Amendment to proceed. *See id.* at 6-7. In light of the Supreme Court's subsequent decision in *McDonald v. City of Chicago* ___ U.S. ___, 130 S. Ct. 3020 (2010), which held that the Second Amendment applies to the states, Judge Sharpe granted plaintiff's unopposed motion for reconsideration and reinstated his Second Amendment claims. *See* Dkt. No. 26.

Currently before the Court are the parties' cross-motions for summary judgment.


## II. BACKGROUND

Defendant, as a Schoharie County Judge, is the licensing officer in Schoharie County for pistol (firearm) permits. *See* Dkt. No. 33-2 at ¶ 1. On or about May 21, 2008, plaintiff submitted an application with the Schoharie County Sheriff's Department for a New York State pistol permit. *See id.* at ¶ 2. In this application, he listed his residence as Schoharie County, New York. *See id.*

Pursuant to New York Penal Law § 400.00, the Schoharie County Sheriff ("Sheriff") conducts investigations regarding pistol permit applications. *See id.* at ¶ 3. Part of the investigation involves verifying information set forth in the application, receiving information

from the applicant's references, performing criminal background checks, and obtaining the applicant's fingerprints, which are submitted to the New York State Division of Criminal Justice Services ("DCJS") and the Federal Bureau of Investigation for further investigation into the applicant's background. *See id.*

By letter dated June 24, 2008, the Sheriff advised plaintiff that he needed to come into the Sheriff's office "to correct and/or complete some information" on his application. *See id.* at ¶ 4. In response, plaintiff sent a letter dated June 25, 2008, stating that since he applied for a permit, he had purchased a home in another state which he intended to use as his primary residence and to now use his Schoharie County property as a vacation home. *See id.* at ¶ 5. In the letter, plaintiff asked whether, under the circumstances he set forth, he was still eligible for a pistol permit. *See id.*

On or about August 13, 2008, the DCJS advised the Sheriff that, "[d]ue to the poor quality of the fingerprint impressions received, DCJS is unable to determine whether this individual has any other criminal record in New York State." *See id.* at ¶ 8. On or about July 31, 2008, plaintiff's fingerprints were rejected by the FBI because "the quality of the characteristics i[s] too low to be used." *See id.* at ¶ 9. On August 18, 2010, the Sheriff requested plaintiff to come into his office to be re-fingerprinted. *See id.* at ¶ 10. Thereafter, on September 8, 2008, plaintiff's fingerprints were again rejected by the FBI because of their poor quality. *See id.* at ¶ 11.

In a letter dated February 18, 2009, the Sheriff advised plaintiff that he was sending his application to defendant. *See id.* at ¶ 13. In a February 20, 2009 letter, defendant set forth what he felt were the issues regarding plaintiff's application, *i.e.*, the lack of quality fingerprints that could be used by the FBI and the DCJS, as well as his residency. *See id.* at ¶ 14. Accordingly, defendant scheduled an appearance on March 24, 2009 to provide plaintiff and/or his attorney an

3

opportunity to "present any arguments in support of [his] application." *See id.* at ¶¶ 14-15.

Specifically, defendant advised plaintiff that he "would be interested in . . . any legal precedent in

support of your position with regard to residency and in support of a fingerprint check waiver."

*See id.* at ¶ 15.  Moreover, defendant informed plaintiff that he would like the Sheriff to be present

to explain the fingerprint situation and to answer any questions that plaintiff or his attorney may

have.  *See id.*

In a March 3, 2009 letter, plaintiff informed defendant of special steps that could be taken

with respect to persons with "worn" fingerprints and further indicated that none of these "special

steps" were used by the Sheriff in his case. *See id.* at ¶ 16.  Following a series of letters between

the parties, plaintiff indicated that he did not want to make a personal appearance and provided

additional arguments regarding his concerns over New York's residency and fingerprint

requirements.  *See id.* at ¶¶ 17-24.

On May 29, 2009, defendant issued a written decision denying plaintiff's pistol permit

application. *See* Dkt. No. 33-1 at Exhibit "21."  In the decision, defendant rejected plaintiff's

argument that, since more than six months had elapsed since he submitted his application,

defendant was required to grant his application, finding "good cause" for the delay. *See id.* at 7-9.

Although defendant found that the application was incomplete because the Sheriff was unable to

perform the requisite investigation due to the poor quality of plaintiff's fingerprints, defendant

held that issue in abeyance in order to address the threshold issue of whether New York law

allows the issuance of a pistol permit to a nonresident in plaintiff's situation. *See id.* at 9-16.  In

denying plaintiff's application, defendant adhered to the long-standing New York precedent that a

pistol permit may not be issued to nonresidents in plaintiff's situation; and, relying on both federal

and New York State case law, rejected plaintiff's argument that New York's firearm licensing law

is unconstitutional. *See id.* at 11-16.  Defendant held that "'New York's licensing requirement remains an acceptable means of regulating the possession of firearms . . . and will not contravene *Heller* so long as it is not enforced in an arbitrary and capricious manner *(see, District of Columbia v. Heller*, 128 S. Ct. at 2819).'"  *See id.* at 16 (internal citations and quotation omitted).

On July 21, 2009, pursuant to 42 U.S.C. § 1983, plaintiff filed the present action alleging violations of his constitutional rights stemming from the denial of his New York State pistol permit application. *See* Dkt. No. 1.  Presently before the Court are the parties' cross-motions for summary judgment.

### III. DISCUSSION

**A.      Summary judgment standard**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted).  Where the

5

non-movant either does not respond to the motion or fails to dispute the movant's statement of

material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the

court must be satisfied that the citations to evidence in the record support the movant's assertions.

*See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in

the record the assertions in the motion for summary judgment "would derogate the truth-finding

functions of the judicial process by substituting convenience for facts").

    "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than

that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289,

295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d

652 (1972)) (other citations omitted). "However, a *pro se* party's 'bald assertion,' completely

unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v.

Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d

Cir. 1991)).

**B.      Statutory framework**

    New York regulates handguns primarily through Articles 265 and 400 of the New York

State Penal Law ("Penal Law").  Article 265 creates a general ban on handgun possession, *see,

e.g.,* N.Y. Penal Law §§ 265.01(1), 265.02(4), with specific exemptions thereto, *see* N.Y. Penal

Law § 265.20.  At issue here is the residency requirement set forth in Penal Law § 400.00(3)(a),

which only allows New York residents and a narrow class of nonresidents to qualify for a

handgun permit.  *See* N.Y. Penal Law § 400.00(3)(a).

    Article 400 of the Penal Law "is the exclusive statutory mechanism for the licensing of

firearms in New York State." *O'Connor v. Scarpino*, 83 N.Y.2d 919, 920 (1994).  Licenses are

6

limited to persons over twenty-one years of age, of good moral character, without a history of crime or mental illness, and "concerning whom no good cause exists for the denial of the license." N.Y. Penal Law § 400.00(1). There are several types of pistol and revolver licenses, including licenses for household possession, *see* N.Y. Penal Law § 400.00(2)(a), for workplace possession, *see* N.Y. Penal Law § 400.00(2)(b), and to "have and carry concealed," *see* N.Y. Penal Law § 400.00(2)(f).

Licensing is a rigorous and principally local process that begins with the submission of a signed and verified application to a local licensing officer. *See* N.Y. Penal Law § 400.00(3). Applicants must demonstrate compliance with certain statutory eligibility requirements and provide any facts "as may be required to show the good character, competency and integrity of each person or individual signing the application." *Id.* Every application triggers a local investigation. *See* N.Y. Penal Law § 400.00(4). This investigation entails local police investigating the applicant's mental health history, criminal history, moral character, and, in the case of a carry license, representations of proper cause. *See* N.Y. Penal Law § 400.00(1)-(4). The investigating authority will also take the applicant's fingerprints and check them against the records of the New York State Division of Criminal Justice Services and the Federal Bureau of Investigation. *See* N.Y. Penal Law § 400.00(4). Upon completion of the investigation, the investigating authority reports its results to the licensing officer. *See id.*

Local licensing officers, often local judges,[1] have considerable discretion in deciding

whether to grant a license application. *See, e.g., Vale v. Eidens*, 290 A.D.2d 612, 613 (3d Dep't

2002) (citation omitted); *Kaplan v. Bratton*, 249 A.D.2d 199, 201 (1st Dep't 1998) (citation

omitted); *Fromson v. Nelson*, 178 A.D.2d 479, 479 (2d Dep't 1991) (citation omitted); *Marlow v.*

*Buckley*, 105 A.D.2d 1160 (4th Dep't 1984) (citations omitted).  The officer may deny an

application for any "good cause," *see* N.Y. Penal Law § 400.00(1)(g); *Brando v. Sullivan*, 290

A.D.2d 691, 691-92 (3d Dep't 2002) (citation omitted); may deny a carry license for what the

officer deems a lack of "proper cause," *see* N.Y. Penal Law § 400.00(2)(f); and may restrict a

carry license "to the purposes that justified the issuance," *O'Connor*, 83 N.Y.2d at 921.  Moreover,

a licensing officer can deny applications where he finds the applicant's personal background to be

"troubling." *Vale*, 290 A.D.2d at 613.  A licensing officer's decision will not be disturbed unless it

is arbitrary and capricious.  *See O'Brien v. Keegan*, 87 N.Y.2d 436, 439-40 (1996) (citing N.Y.

Penal Law § 400.00).

As such, licensing is a locally controlled process.  The only nonresidents eligible for a

firearm license are nonresidents who are employed in New York, and they may apply to the

licensing officer in the city or county of their principal employment or principal place of business.

*See* N.Y. Penal Law § 400.00(3)(a).  Section 400.00(3)(a) provides that

> [a]pplications shall be made and renewed, in the case of a license to
> carry or possess a pistol or revolver, to the licensing officer in the
> city or county, as the case may be, where the applicant resides, is
> principally employed or has his principal place of business as

---

[1] "'Licensing officer' means in the city of New York the police commissioner of that city; in the county of Nassau the commissioner of police of that county; in the county of Suffolk the sheriff of that county except in the towns of Babylon, Brookhaven, Huntington, Islip and Smithtown, the commissioner of police of that county; for the purposes of section 400.01 of this chapter the superintendent of state police; and elsewhere in the state a judge or justice of a court of record having his office in the county of issuance."  N.Y. Penal Law § 265.00(10).

8

> merchant or storekeeper; and, in the case of a license as gunsmith or
> dealer in firearms, to the licensing officer where such place of
> business is located.

N.Y. Penal Law § 400.00(3)(a).  The statute does not provide a mechanism for any other

nonresident applications.  One New York appellate court has explained that nonresident

applications would be inconsistent with "the purposes underlying the pistol permit procedures,

namely, to insure that only persons of acceptable background and character are permitted to carry

handguns and to provide a method for reporting information on the identity of persons possessing

weapons and the weapons themselves. . . ."  *Mahoney v. Lewis*, 199 A.D.2d 734, 735 (3d Dep't

1993).  Nonresidents without in-state employment are completely excluded from the

license-application procedure.[2]

Some classes of nonresidents may nonetheless possess or carry handguns in New York

despite the fact that they are not eligible for a New York state firearm license.  Although New

York generally "does not recognize or give effect to licenses to carry firearms issued by . . . other

state[s]," 1997 N.Y. Op. Atty. Gen. 14, federal law grants a limited right to transport unloaded

firearms through the states.  *See* 18 U.S.C. § 926A.  Additionally, Article 265 of the Penal Law

sets forth a number of provisions permitting nonresidents to possess or carry firearms.  For

example, police officers of other states may possess pistols while conducting official business in

New York, *see* N.Y. Penal Law § 265.20(a)(11), and nonresidents licensed within their own states

may use pistols in competitive shooting matches in New York, *see* N.Y. Penal Law §

265.20(a)(13).

---

[2] New York courts have limited resident applications to persons who are New York
domiciliaries.  *See Mahoney*, 199 A.D.2d at 735 (rejecting application of a New York property
owner with his principal residence in Toms River, New Jersey).

As a nonresident, without New York State employment, plaintiff is not eligible for a New York State firearms license under the current state of the law.

## C.     Plaintiff's Second Amendment claims

Plaintiff's first three causes of action allege violations of his Second Amendment right to bear arms. *See* Dkt. No. 1 at 3. The First Cause of Action alleges that defendant denied plaintiff the right to bear arms "in violation of the Second Amendment to the . . . United States Constitution, as made applicable to the states through 'selective incorporation' by the Fourteenth Amendment to the United States Constitution." *See id.* The Second Cause of Action appears to assert a New York Civil Rights law cause of action, "which tracks the language of the Second Amendment to the United States Constitution." *See id.* The Third Cause of Action asserts that defendant "denied plaintiff his right to bear arms within his home in Summit, New York, by using and applying a definition of residence akin to domicile, and determining that such residence is a prerequisite to a license, contrary to the *Heller* Court's use of the term 'home' as the situs within which a citizen has the right to bear arms." *See id.* at 3.

Regarding these claims, plaintiff claims that strict scrutiny applies to any restrictions on a person's ability to possess handguns in the home because, as the Supreme Court made clear in *Heller* and *McDonald*, the right to bear arms in one's home is a "fundamental right." *See* Dkt. No. 30 at 5-6. Defendant claims that the *Heller* court rejected the rational basis test, but "'declin[ed] to establish a level of scrutiny for evaluating Second Amendment restrictions.'" *See* Dkt. No. 33-4 at 7 (quotation omitted). Although defendant does not contend that strict scrutiny will never apply in a Second Amendment challenge, defendant argues that the proper level of scrutiny in this particular case is intermediate scrutiny. *See id.* at 7-8.

10

The Second Amendment provides that, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court recognized that the Second Amendment protects the individual right to keep and bear arms for self-defense. *See id.* at 595. Two years later in *McDonald v. City of Chicago*, ___ U.S. ___, 130 S. Ct. 3020 (2010) (plurality), the Court evaluated restrictions "similar to the District of Columbia's" in *Heller* and held that the Due Process Clause of the Fourteenth Amendment "incorporates the Second Amendment right recognized in *Heller*." *Id.* at 3026.[3]

In *Heller*, the Supreme Court examined the history of the Second Amendment and contemporaneous jurisprudence to determine whether several District of Columbia statutes, which generally prohibited the possession of handguns and required any other lawful firearms in the home to be kept inoperable (unloaded and disassembled or bound by a trigger lock), violated the Second Amendment. The Court concluded that the Second Amendment confers an individual right to "possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. It found that the District of Columbia's prohibition on operable handguns in the home was unconstitutional because the inherent right to self-defense is central to the Second Amendment and the regulation extends to the home, "where the need for defense of self, family, and property is most acute." *Id.* at 628. The Court held, however, that the right is not unlimited, noting that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons

---

[3] While a majority of the Court held that, as a fundamental right, the Second Amendment is applicable to the states, the Court was unable to agree on how or by what mechanism it applied. *See McDonald*, 130 S. Ct. at 3030-31, 3044-50 (Alito, J., writing for the plurality) (holding that the Second Amendment is incorporated to the states through the Due Process Clause of the Fourteenth Amendment); *id.* at 3059 (Thomas, J., concurring in part and concurring in judgment) (arguing that the Second Amendment right "is a privilege of American citizenship that applies to the States through the Fourteenth Amendment's Privileges or Immunities Clause").

were lawful under the Second Amendment or state analogues." *Id.* at 626 (citations omitted).  The

Court went on to state that its opinion should not cast doubt on "longstanding prohibitions on the

possession of firearms" by certain classes of persons, such as the mentally ill and convicted felons,

and in certain places constituting security concerns.  *Id.* at 626-27 & n.26 (noting that "[w]e

identify these presumptively lawful regulatory measures only as examples; our list does not

purport to be exhaustive").[4]  In essence, the Court appears to suggest that the core purpose of the

right conferred by the Second Amendment was to allow "law-abiding, responsible citizens to use

arms in defense of hearth and home." *Id.* at 635.

Notably, despite its lengthy analysis of the Second Amendment's history and text, the

*Heller* Court declined to announce the appropriate level of constitutional scrutiny for the review

of restrictions that touch upon a person's right to bear arms.  *See id.* at 634 (acknowledging the

dissent's criticism of the majority for failing to announce a level of scrutiny).  Instead, the Court

found that, "[u]nder any of the standards of scrutiny that we have applied to enumerated

_____

[4] In *McDonald*, the Court reiterated the point that the right to bear arms is not without
restrictions.  *See McDonald*, 130 S. Ct. at 3047.  Specifically, the Court held that,

> It is important to keep in mind that *Heller*, while striking down a
> law that prohibited the possession of handguns in the home,
> recognized that the right to keep and bear arms is not "a right to
> keep and carry any weapon whatsoever in any manner whatsoever
> and for whatever purpose." 554 U.S., at ___, 128 S. Ct., at 2816.
> We made it clear in *Heller* that our holding did not cast doubt on
> such longstanding regulatory measures as "prohibitions on the
> possession of firearms by felons and the mentally ill," "laws
> forbidding the carrying of firearms in sensitive places such as
> schools and government buildings, or laws imposing conditions and
> qualifications on the commercial sale of arms." . . . 128 S. Ct., at
> 2816-2817.  We repeat those assurances here.  Despite municipal
> respondents' doomsday proclamations, incorporation does not
> imperil every law regulating firearms.

*Id.*

constitutional rights," the ban at issue "would fail constitutional muster." *Id.* at 628-29 (internal

footnote and citation omitted).  The Supreme Court did, however, rule out two levels of scrutiny

as inappropriate for Second Amendment analysis.  First, it held that rational basis review was

improper because the extent to which the legislature may regulate specific, enumerated rights in

the Bill of Rights requires more exacting scrutiny.  *Id.* at 628 n.27 (holding that "[i]f all that was

required to overcome the right to keep and bear arms was a rational basis, the Second Amendment

would be redundant with the separate constitutional prohibitions on irrational laws, and would

have no effect").  Second, the majority rejected the novel "interest-balancing approach" devised by

Justice Breyer in dissent.[5]  *See id.* at 634-35 (noting that "[w]e know of no other enumerated

constitutional right whose core protection has been subjected to a freestanding 'interest balancing'

approach").  Beyond eliminating rational basis and Justice Breyer's "interest-balancing approach,"

however, the Court gave no clear guidance to the lower courts regarding the appropriate level of

scrutiny applicable to firearms restrictions.

Perhaps the most important strand of the *Heller* opinion for purposes of the present

litigation was the Supreme Court's caution to the lower courts that its decision not be interpreted

so broadly as to invalidate all existing firearms regulation.  *See id.* at 626-27.  Instead, recognizing

that "the right secured by the Second Amendment is not unlimited," *id.* at 626, the Court, as

discussed above, identified a number of "longstanding prohibitions on the possession of firearms,"

derived from various historical provisions, as "presumptively lawful regulatory measures," *id.* at

626-27 & n.26 .  Among the longstanding prohibitions that the Court found presumptively lawful

---

[5] Justice Breyer's proposed "interest balancing inquiry" asks "whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests."  *Heller*, 554 U.S. at 689-90 (citation omitted) (Breyer, J., dissenting).

were those on the possession of firearms by felons, mentally ill individuals, and minors, as well as "laws forbidding the carrying of firearms in sensitive places . . . or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* 626-27. Expanding on this principle, the Court noted that "[w]e identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 626 n.26.

The Supreme Court, thus, identified a non-exclusive, illustrative list of constitutionally permissible restrictions on the Second Amendment, but declined to clarify the class of appropriate restrictions other than "longstanding prohibitions" on the right to keep and bear arms. This uncertainty has led to a deluge of litigation concerning the intersection of the individual right to keep and bear arms as defined by *Heller* and various firearms restrictions.

The Court is unpersuaded that strict scrutiny is warranted here. Contrary to plaintiff's suggestion, fundamental constitutional rights are not invariably subject to strict scrutiny. In the First Amendment context, for example, content-neutral restrictions on the time, place and manner of speech are subject to a form of intermediate scrutiny. *See United States v. O'Brien*, 391 U.S. 367, 377 (1968). Other restrictions on speech may be held to an even lower standard of review. *See Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678–79 (1992) (noting that limitations on expressive activity conducted in a nonpublic forum need only be reasonable, as long as they are viewpoint neutral); *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 806 (1985) (same). Drawing on First Amendment jurisprudence, several courts have applied intermediate scrutiny in the Second Amendment context. *See, e.g., United States v. Smith*, 742 F. Supp. 2d 855, 861-62 (S.D.W. Va. 2010); *United States v. Walker*, 709 F. Supp. 2d 460, 466 (E.D. Va. 2010); *United States v. Marzzarella*, 595 F. Supp. 2d 596, 604-05 (W.D. Pa. 2009),

14

*aff'd* 614 F.3d 85 (3d Cir. 2010). Accordingly, plaintiff is wrong in suggesting that the Court must apply strict scrutiny.

Since the *Heller* and *McDonald* decisions are fairly recent, only several Circuit Courts of Appeals have had the opportunity to opine on how to implement their principles. The Tenth Circuit is one of them, and it adopted an approach outlined by the Third Circuit in *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010). *See United States v. Reese*, 627 F.3d 792, 800 (10th Cir. 2010). This is a two-pronged approach, whereby the reviewing court examines: (1) "'whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee'"; and, if it does, (2), whether the law passes muster under "'some form of means-end scrutiny.'" *Reese*, 627 F.3d at 800–01 (quoting *Marzzarella*, 614 F.3d at 89).

The *Marzzarella* court examined a Second Amendment challenge to a federal law prohibiting the possession of firearms with obliterated serial numbers. Analogizing to the First Amendment, the Third Circuit concluded that the Second Amendment can trigger more than one type of scrutiny, depending on the type of restriction. *See Marzzarella*, 614 F.3d at 96–97. The court decided intermediate scrutiny was appropriate in the case before the court because the law did not "severely limit the possession of firearms." *Id.* at 97.[6] In *United States v. Skoien*, 614 F.3d

---

[6] In *Marzzarella*, the court discussed the different ways in which courts have applied "intermediate scrutiny" in the First Amendment context. Specifically, the court noted that

> [i]n the First Amendment speech context, intermediate scrutiny is articulated in several different forms. *See Turner Broad. Sys.*, 512 U.S. at 662, 114 S. Ct. 2445 (requiring the regulation serve "an important or substantial" interest and not "burden substantially more speech than is necessary" to further that interest (internal quotation marks omitted)); *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, 109 S. Ct. 3028, 106 L. Ed. 2d 388 (1989) (requiring a "substantial" governmental goal and a "reasonable fit" between the regulation and that objective); *Ward*, 491 U.S. at 791, 109 S. Ct.

(continued...)

638 (7th Cir. 2010) (en banc), the Seventh Circuit similarly applied intermediate scrutiny to a

federal statute prohibiting the possession of firearms by any person convicted of a misdemeanor

crime of domestic violence. *See id.* at 641. The intermediate scrutiny test applied by both courts

generally requires an analysis of whether the challenged law serves a substantial state interest and

whether there is a reasonable fit between the objective and the law. *See Marzzarella*, 614 F.3d at

98.

---

[6](...continued)
>2746 (applying the time, place, and manner standard which asks
whether the regulation is narrowly tailored to serve a significant
governmental interest and leaves open ample alternative channels of
communication); *Cent. Hudson*, 447 U.S. at 566, 100 S. Ct. 2343
(requiring the regulation directly advance a substantial interest and
be no more extensive than necessary to serve the interest).

*Marzzarella*, 614 F.3d at 97.

The court went on to observe that,

>[a]lthough these standards differ in precise terminology, they
essentially share the same substantive requirements. They all
require the asserted governmental end to be more than just
legitimate, either "significant," "substantial," or "important." *See,
e.g., Turner Broad. Sys.*, 512 U.S. at 662, 114 S. Ct. 2445; *Ward*,
491 U.S. at 791, 109 S. Ct. 2746. They generally require the fit
between the challenged regulation and the asserted objective be
reasonable, not perfect. *See, e.g., Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525, 556, 121 S. Ct. 2404, 150 L. Ed. 2d 532 (2001); *Fox*,
492 U.S. at 480, 109 S. Ct. 3028. The regulation need not be the
least restrictive means of serving the interest, *see, e.g., Turner
Broad. Sys.*, 512 U.S. at 662, 114 S. Ct. 2445; *Ward*, 491 U.S. at
798, 109 S. Ct. 2746, but may not burden more speech than is
reasonably necessary, *see, e.g., Turner Broad. Sys.*, 512 U.S. at 662,
114 S. Ct. 2445; *Ward*, 491 U.S. at 800, 109 S. Ct. 2746.

*Id.* at 97-98.

16

In *Reese*, the Tenth Circuit used a similar approach in examining a federal law which

prohibits possession of a firearm by a person subject to a domestic protection order. *See Reese*,

627 F.3d at 802. Although the regulation at issue addressed a right protected by the Second

Amendment, in that it created a complete prohibition on possession of a firearm, the Tenth Circuit

concluded that the statute applies to a narrow class of persons "who, based on their past behavior,

are more likely to engage in domestic violence" and was therefore subject to intermediate

scrutiny. *Id.* Applying intermediate scrutiny, the court found that the government had a

substantial interest in keeping firearms out of the hands of people who have been found to pose a

credible threat to the physical safety of a family member and that the statute was substantially

related to that objective. *See id.* at 803–04.

More recently, in *Nordyke v. King*, ___ F.3d ___, 2011 WL 1632063 (9th Cir. May 2,

2011), the Ninth Circuit provided the following discussion in deciding to apply "a substantial

burden framework" in upholding a county ordinance that prohibited the possession of firearms on

county property:

> Applying strict scrutiny to every gun regulation would
> require courts to assess the effectiveness of a myriad of gun-control
> laws. Whenever a law is challenged under the Second Amendment,
> the government is likely to claim that the law serves its interest in
> reducing crime. . . . Because the Supreme Court has already held
> that "the Government's general interest in preventing crime" is
> "compelling," *United States v. Salerno*, 481 U.S. 739, 754, 107 S.
> Ct. 2095, 95 L. Ed. 2d 697 (1987), the question, under strict
> scrutiny, would be whether the regulation is narrowly tailored to
> that interest. But courts cannot determine whether a gun-control
> regulation is narrowly tailored to the prevention of crime without
> deciding whether the regulation is likely to be effective (or, at least,
> whether less burdensome regulations would be as effective).
> Sorting gun-control regulations based on their likely effectiveness is
> a task better fit for the legislature. *Cf.* Richard H. Fallon, Jr.,
> *Judicially Manageable Standards and Constitutional Meaning*, 119
> Harv. L. Rev. 1274, 1291 (2006) ("A test may be deemed judicially

17

unmanageable if it would require courts to make empirical findings or predictive judgments for which they lack competence.").

By contrast, the substantial burden test, though hardly mechanical, will not produce nearly as many difficult empirical questions as strict scrutiny. *See Volokh, supra,* at 1459–60 (arguing that it is easier to determine whether a law substantially burdens the right to bear arms than to figure out whether a law "will reduce the danger of gun crime"). Indeed, courts make similar determinations in other constitutional contexts. *See, e.g., Planned Parenthood of Se. Pa. v. Casey,* 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992) (holding that pre-viability abortion regulations are unconstitutional if they impose an "undue burden" on a women's right to terminate her pregnancy); *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984) (stating that content-neutral speech regulations are unconstitutional if they do not "leave open ample alternative channels for communication").

*Id.* at *5. With these considerations in mind, the court held that "only regulations which substantially burden the right to keep and to bear arms trigger heightened scrutiny under the Second Amendment." *Id.* at *7.[7]

This Court joins the majority of other courts to have addressed the issue and concludes that intermediate scrutiny is the appropriate level of scrutiny for this case. Two considerations

---

[7] This "substantial burden" test asks whether the regulation at issue "substantially burdens the right to keep and to bear arms." *Nordyke,* 2011 WL 1632063, at *7 (citation omitted). The court held that, "[w]here, as here, the government restricts the distribution of a constitutionally protected good or service, courts typically ask whether the restriction leaves open sufficient alternative avenues for obtaining the good or service." *Id.* As the Ninth Circuit pointed out, this test has been applied in the abortion and content-neutral speech contexts. *See id.* at *5 (citations omitted).

Although this "substantial burden" test may be appropriate in the context of a regulation that restricts the "distribution of a constitutionally protected good or service," *see id.* at *7, the Court finds that the intermediate scrutiny application which asks whether the law is "substantially related to an important government objective," *Clark,* 486 U.S. at 461, provides the appropriate analysis when a law limits "'the right of law-abiding, responsible citizens to use arms in defense of hearth and home,'" *Heller v. District of Columbia,* 698 F. Supp. 2d 179, 188 (D.D.C. 2010) (quoting *Heller,* 128 S. Ct. at 2821).

18

support this result. First, as others—including the *Heller* dissent—have suggested, the Supreme

Court's description of a list of presumptively lawful regulatory measures is at least implicitly

inconsistent with strict scrutiny. *See, e.g., Heller*, 554 U.S. at 688 (Breyer, J., dissenting) (noting

that "the majority implicitly, and appropriately, reject[ed]" a strict scrutiny standard through its list

of presumptively lawful regulatory measures); *Heller*, 698 F. Supp. 2d at 187 (noting that "the

*Heller* dissent and numerous other courts and legal scholars" have concluded that "a strict scrutiny

standard of review would not square with the majority's references to 'presumptively lawful

regulatory measures'"). Second, the burden imposed by this law falls at least one level outside the

core right recognized in *Heller, i.e.*, the right of a law abiding individual to keep and carry a

firearm for the purpose of self defense in the home. Although plaintiff still owns a house in New

York, which he uses for vacation purposes, that house is no longer his "home."

Having surveyed the approaches followed by other courts, the Court turns now to the law

at issue in this case. Defendant contends that New York State's firearm licensing scheme

promotes a "substantial and legitimate interest in insuring the safety of the general public," and

"that it is much more difficult to monitor the behavior of mere visitors who live elsewhere." *See*

Dkt. No. 33-4 at 10-11 (citing *Bach*, 408 F.3d at 91-92).[8] Moreover, defendant asserts that, "[i]n

essence, by the State limiting its residency-based permits to domiciliaries, the State best

guarantees it is able to monitor those permit-holders." *See id.* at 11.

The Court agrees. By limiting handgun licenses to those people who have the greatest

contacts with New York, the law allows the government to monitor its licensees more closely and

better ensure the public safety. Under intermediate scrutiny, the state's policy need not be perfect,

---

[8] It is clear that, in light of *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), *Bach* is
no longer binding on this Court insofar as *Bach* held that the Second Amendment does not apply
to the States.

only substantially related to a "significant," "substantial," or "important" governmental interest. *Marzzarella*, 614 F.3d at 98 (citation omitted); *see also Clark v. Jeter*, 486 U.S. 456, 461 (1988). New York State's residency requirement satisfies that standard.

Specifically, the harm caused by gun violence in this country has been well-documented, and government efforts to curtail this threat have a direct impact on domestic security. *See, e.g., BJS's Federal Justice Statistics Program, Department of Justice, Firearm Injury and Death from Crime, 1993-97*, available at http://bjs.ojp.usdoj.gov/content/pub/pdf/fidc9397.pdf (stating that of the 19.2 million incidents of nonfatal violent crime from 1993 through 1997, 28% were committed with a firearm); *BJS's Special Report, Weapon Use and Violent Crime* (September 2003), available at http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=570 (finding that, between 1993 and 2001, firearms were used in 27% of robberies, 8% of assaults, and 3% of rapes and sexual assaults, and also that "U.S. residents were victims of crimes committed with firearms at a[n] annual average rate of 4 crimes per 1,000 persons age 12 or older"); *see also Heller*, 554 U.S. at 694-96 (Breyer, J., dissenting) (discussing statistics related to gun violence). As such, the government objective promoted by these laws is not only "legitimate," *see Lewis v. United States*, 445 U.S. 55, 66 (1980), but also "important," *Clark*, 486 U.S. at 461.

Moreover, the Court finds that there is a substantial relationship between New York's residency requirement and the government's significant interest. The statute burdens only a narrow class of persons, *i.e.*, otherwise qualified out-of-state residents who wish to obtain a license to carry a firearm in New York. The State is in a considerably better position to monitor its residents' eligibility for firearms licenses as compared to nonresidents. This is even more true if a nonresident licensee is convicted of a crime in another state after his license was already

issued. New York may never become aware of the fact that this nonresident is no longer eligible for a firearms license.[9]

The Court finds that New York's residency requirement is substantially related to serve the important governmental interests set forth above. Although prohibiting gun possession by nearly all nonresidents might not be the most precisely focused means to achieve this end, intermediate scrutiny, by definition, permits the government to paint with a broader brush.[10] Morever, because the government objective is exceptionally compelling in this area, the State must be afforded wider latitude to combat the great social harm inflicted by gun violence.

Based on the foregoing, the Court denies plaintiff's motion for summary judgment and grants defendant's cross-motion for summary judgment on plaintiff's Second Amendment right to bear arms claim.

---

[9] In *Peterson v. Lacabe*, ___ F. Supp. 2d ___, 2011 WL 843909 (D. Colo. Mar. 8, 2011), the plaintiff alleged that Colorado's state statute which only permitted residents to carry concealed handguns violated his rights under, among other things, the Second Amendment. *See id.* at *1. In finding the statute constitutional, the court applied intermediate scrutiny and held that "the state's interest in monitoring a potential licensee's eligibility for a concealed handgun permit, and the increased difficulty of doing so for out-of-state residents, . . . overcomes Plaintiff's Second Amendment challenge." *Id.* at *8.

[10] One commentator has observed that "most legislation will assert broad safety concerns and broad gun control measures to match, covering both 'good' and 'bad' gun possessors and 'good' and 'bad' guns. Such legislation cannot be narrowly tailored to reach only the bad people who kill with their innocent guns." Donald Dowd, *The Relevance of the Second Amendment to Gun Control Legislation*, 58 Mont. L. Rev. 79, 111 (1997). Additionally, Professor Winkler has noted that, "due to the intensity of public opinion on guns, legislation is inevitably the result of hard-fought compromise in the political branches. To expect such legislation to reflect a tight fit between ends and means is unrealistic." Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 731 (2007).

**D.      Plaintiff's remaining claims[11]**

*1. Equal protection*

As the Supreme Court has observed, "[t]he Fourteenth Amendment's promise that no

person shall be denied the equal protection of the laws must coexist with the practical necessity

that most legislation classifies for one purpose or another, with resulting disadvantage to various

groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996) (citations omitted).  Accordingly,

the Supreme Court has "attempted to reconcile the principle with the reality by stating that, if a

law neither burdens a fundamental right nor targets a suspect class, [the court] will uphold the

legislative classification so long as it bears a rational relation to some legitimate end." *Id.*

(citation omitted); *see also Vacco v. Quill*, 521 U.S. 793, 799 (1997) (holding that the Equal

Protection Clause "embodies a general rule that States must treat like cases alike but may treat

unlike cases accordingly" (quotation omitted)).  Where a state statute burdens a fundamental right

or targets a suspect class, however, it is subject to heightened scrutiny under the Fourteenth

Amendment's Equal Protection Clause. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S.

432, 440 (1985).

In the present matter, it is clear that New York state residents and nonresidents are not

similarly situated in terms of the state's ability to obtain information about and monitor the

potential licensee's eligibility or continued eligibility for a firearms license.  As such, New York's

different treatment of nonresidents does not violate the Equal Protection Clause. *See Peruta v.*

*County of San Diego*, ___ F. Supp. 2d ___, 2010 WL 5137137, *10 (S.D. Cal. Dec. 10, 2010)

---

[11] Although plaintiff couches his Fourth, Fifth and Sixth causes of action in "equal
protection" terms, considering his *pro se* status, the Court has construed these claims as also
alleging due process violations and violations of the Privileges and Immunities Clause of Article
IV.  Defendant addressed these potential arguments in his memorandum of law in support of his
motion for summary judgment.

(finding residents and nonresidents to be situated differently for the purposes of concealed weapons permit in light of the state's substantial interest in monitoring gun licensees).

Based on the foregoing, the Court denies plaintiff's motion for summary judgment and grants defendant's cross-motion for summary judgment with respect to plaintiff's Equal Protection claims.

### 2. Privileges and immunities

"The constitutional right to travel from one State to another . . . occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized." *United States v. Guest*, 383 U.S. 745, 757 (1966). One component of the right to travel is the right of a nonresident of a state "to be treated as a welcome visitor rather than an unfriendly alien when temporarily present" in that state. *Saenz v. Roe*, 526 U.S. 489, 500 (1999). The right is protected by the Privileges and Immunities Clause of Article IV of the United States Constitution,[12] which guarantees that a citizen of one state who travels temporarily in another state is entitled to enjoy the privileges and immunities of the citizens of the state that he visits. *See id.*

The right to travel embraces at least three different components: (1) the right of a citizen of one State to enter and to leave another State; (2) the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State; and (3) for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State. *See id.* at 500-01 (citations omitted). However, not all regulations that merely have an effect on

---

[12] The Privileges and Immunities Clause provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens of the several States." U.S. Const. art. IV, § 2.

travel raise an issue of constitutional dimension.  Rather, "[a] state law implicates the right to travel when it actually deters such travel, . . . when impeding travel is its primary objective, . . . or when it uses '"any classification which serves to penalize the exercise of that right."'"  *Attorney General of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986) (plurality) (internal citations and quotation omitted).  A law embracing means that are "substantially" related to a "substantial" government interest will survive a right to travel analysis.  *See Bach v. Pataki*, 408 F.3d 75, 88 n.27 (2d Cir. 2005).

Liberally construed, plaintiff's complaint argues that the residency requirement in section 400.00 of the New York Penal Law penalizes him for traveling and spending time outside of New York.  In *Bach*, the Second Circuit concluded that New York has a substantial interest in monitoring gun licenses and that limiting licenses to residents and those working primarily within the state was sufficiently related to that interest.  *See Bach*, 408 F.3d at 88-89.  Although *McDonald* clearly overrules *Bach* insofar as *Bach* held that "the Second Amendment's 'right to keep and bear arms' imposes a limitation on only federal, not state, legislative efforts," *id.* at 84 (footnote omitted); the remaining discussion in *Bach* still remains the law of the Second Circuit and precludes plaintiff's Privileges and Immunities challenge to New York's residency requirement in New York Penal Law § 400.00.  Even if *Bach* did not preclude this claim, the above discussion relating to plaintiff's Second Amendment claims makes clear that New York has a substantial interest in limiting firearm possession to those with the most significant contacts with the State and that section 400.00 of New York's Penal Law is substantially related to that purpose.

24

Based on the foregoing, the Court denies plaintiff's motion for summary judgment and grants defendant's cross-motion for summary judgment on plaintiff's Privileges and Immunities claim.

### 3. Substantive due process[13]

Substantive due process prohibits the government from taking actions that are "arbitrary," "conscience-shocking," or "oppressive in a constitutional sense." *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (citations omitted). "'[I]ncorrect or ill-advised'" government action is insufficient to give rise to a substantive due process violation. *Id.* (quoting *Bishop v. Wood*, 426 U.S. 341, 350, 96 S. Ct. 2074, 48 L. Ed. 2d 684 (1976)) (other citation omitted). Rather, to state a cognizable claim for a violation of substantive due process, a plaintiff must show that the government exercised power "'without any reasonable justification in the service of a legitimate governmental objective[.]'" *SeaAir N.Y., Inc. v. City of N.Y.*, 250 F.3d 183, 187 (2d Cir. 2001) (quoting *County of Sacramento v. Lewis*, 532 U .S. 833, 846, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)). Indeed, the Second Circuit has noted that "[s]ubstantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority[.]" *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999) (citation omitted).

As defendant correctly notes, none of the alleged governmental conduct gives rise to a substantive due process claim. Clearly, defendant's conduct in denying plaintiff's license application cannot be said to have been "'without any reasonable justification,'" as he was merely

---

[13] Although the complaint does not appear to allege a substantive due process claim, defendant addressed the issue in its memorandum of law.

implementing the law as defined by the courts. Moreover, New York's regulatory scheme, which

requires a thorough background check and sufficient ties to New York before a license will issue,

cannot be said to violate substantive due process. As discussed, the regulatory scheme serves a

significant governmental interest and is not unlike the statutory scheme enacted by more than half

of the states which likewise restrict the ability of nonresidents to apply for firearms licenses.[14]

Based on the foregoing, the Court denies plaintiff's motion for summary judgment and

grants defendant's cross-motion for summary judgment on plaintiff's substantive due process

claim.


### 4. *Procedural due process*

In his Fifth Cause of Action, plaintiff alleges that his Fourteenth Amendment rights were

violated when defendant "failed to comply with their own statutory requirements that a decision

be reached by the licensing officer within six months or, in the alternative, a reason be provided,

in writing to the applicant, setting forth the reason for the failure to approve or deny the

application." *See* Dkt. No. 1 at 4. In his Sixth Cause of Action, plaintiff alleges that his

Fourteenth Amendment rights were violated when defendant determined "that plaintiff was not a

resident of the State of New York within the meaning of New York Statutes, and thus ineligible to

---

[14] Ala. Code § 13A-11-75 (2002); Alaska Stat. § 18.65.700 (2002); Ark. Code § 5-73-301 (1999); Calif. Penal Code § 12050(a)(1)(D) (2002); Conn. Gen. Stat. § 29-28 (2002); 11 Del. Code § 1441; Ga. Code § 16-11-129 (2002); Ind. Code § 35-47-2-3 (2002); Ky. Rev. Stat. § 237.110 (2002); La. Rev. Stat. Ann. § 1379.3 (2003); Mich. Comp. Laws § 28.425b (2002); Minn. Stat. § 624.714 (2000); Miss. Code Ann. § 45-9-101 (2002); Mo. Rev. Stat. § 571.090 (2002); Mont. Code Ann. § 45-8-321 (2002); Nev. Rev. Stat. Ann. 202.350 (2002); N.C. Gen. Stat. § 14-415.12 (2002); N.D. Cent. Code § 62.1-04-03 (2001); Okla. Stat. tit. 21, § 1290.9 (2002); Or. Rev. Stat. § 166.291 (2001); S.C. Code. Ann. 23-31-215 (2002); S.D. Codified Laws § 23-7-7 (2002); Tenn. Code Ann. § 39-17-1351 (2002); Tex. Gov't Code Ann. § 411.172 (2002); Va. Code Ann. § 18.2-308 (2002); W. Va. Code § 61-7-4 (2002); Wyo. Stat. § 6-8-104 (2002).

obtain a license, notwithstanding the clear and convincing proof that he was a resident, albeit not domiciled in the State of New York." *See id.* Defendant asserts that plaintiff's claim does not give rise to a procedural due process claim because it merely alleges a violation of state law, which is not cognizable in an action brought pursuant to 42 U.S.C. § 1983.

In order to prevail on a Fourteenth Amendment procedural due process claim pursuant to 42 U.S.C. § 1983, "the plaintiff must show (1) that he possessed a protected liberty or property interest; and (2) that he was deprived of that interest without due process." *Rehman v. State Univ. of N.Y. at Stony Brook*, 596 F. Supp. 2d 643, 656 (E.D.N.Y. 2009) (citing *McMenemy v. City of Rochester*, 241 F.3d 279, 285-86 (2d Cir. 2001)). "Property rights arise from '"an independent source such as state law," [with] federal constitutional law determin[ing] whether that interest rises to the level of a "legitimate claim of entitlement" protected by the Due Process Clause.'" *Pichen v. City of Auburn, N.Y.*, 728 F. Supp. 2d 192, 198 (N.D.N.Y. 2010) (quotation and other citation omitted). However, "[w]here there is a meaningful postdeprivation remedy, there is no due process violation." *Gudema v. Nassau County*, 163 F.3d 717, 724 (2d Cir. 1998) (citation omitted).

Insofar as plaintiff alleges that the delay in processing his application violated his due process rights, the claim fails to state a procedural due process claim. *See Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir. 1987) (holding that, "[a]t most, any violation of state procedural requirements would create liability under state law . . ."). As to the Sixth Cause of Action, because plaintiff was entitled to challenge the denial of his firearms license application in an Article 78 proceeding, plaintiff had available to him a meaningful post-deprivation remedy under state law. *See O'Brien*, 87 N.Y.2d at 439; *see also Gudema*, 163 F.3d at 726 (noting that an

Article 78 proceeding is an adequate state-law remedy).  As such, plaintiff has failed to state a procedural due process claim.

Based on the foregoing, the Court denies plaintiff's motion for summary judgment and grants defendant's cross-motion for summary judgment on plaintiff's procedural due process claims.

### 5. *State-law claims*

In his complaint, plaintiff references both the New York State Constitution and the New York State Civil Rights Law and, therefore, appears to be asserting state-law causes of action.  *See* Dkt. No. 1 at 3-4.

Application of supplemental jurisdiction is discretionary, and "it requires a balancing of the considerations of comity, fairness to the litigants, judicial economy, and the avoidance of needless decisions of state law." *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 809 (2d Cir. 1979) (citation omitted).  Since the Court has dismissed all of plaintiff's federal claims, it declines to exercise supplemental jurisdiction over his state-law claims and dismisses them without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that plaintiff's motion for summary judgment is **DENIED** in its entirety; and the Court further

**ORDERS** that defendant's cross-motion for summary judgment is **GRANTED** in its entirety; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in defendant's favor and close this case.

**IT IS SO ORDERED.**

Dated: May 20, 2011
      Albany, New York

Mae A. D'Agostino
U.S. District Judge

**\* \* \* \* \* UNITED STATES DISTRICT COURT \* \* \* \* \***

_____NORTHERN_____   **DISTRICT OF** _____NEW YORK_____

**JUDGMENT IN A CIVIL CASE**

**DOCKET NO.    1:09-CV-825 MAD/DRH**

ALFRED G. OSTERWEIL,
                    **Plaintiff(s),**

            v.

GEORGE R. BARTLETT, III,
                    **Defendant(s).**

_____  **JURY VERDICT.  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.**

____XX_____  **DECISION by COURT.  This action came to trial or hearing before the Court.  The issues have been tried and a decision has been rendered.**

        **IT IS ORDERED AND ADJUDGED** that plaintiff's motion for summary judgment is DENIED in its entirety; ORDERED that defendant's cross motion for summary judgment is GRANTED in its entirety, all in accordance with the Memorandum-Decision and Order of the Honorable Mae A. D'Agostino, U.S. District Judge, signed May 20, 2011.

**DATE:** __May 20, 2011_____

                                    _____
                                    Clerk of Court

                                    S/Britney Norton
                            By: _____
                                    Deputy Clerk

United States District Court for the
Northern district of New York

Case No. 09-CV-0825

U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

JUN 1 3 2011

LAWRENCE K. BAERMAN, CLERK
ALBANY

Alfred G. Osterweil

*Plaintiff*

*v*

George Bartlett III

*Defendant*

Notice of Appeal


Notice is hereby given that Alfred G. Osterweil, Plaintiff in the above-named case, does hereby appeal

to the United States Court of Appeals for the Second Circuit, from an order dated May 20, 2011,

entered by District Court Judge Mae A. D'Agostino, dismissing the complaint.

Alfred G. Osterweil, Plaintiff *pro se*

310 Rossman Fly Road

P. O. Box 173

Summit, New York 12175

Phone:  (518) 287-1646     E-Mail: twodogs@midtel.net